## HELM FINANCIAL CORPORATION, Plaintiff,

v.

## IOWA NORTHERN RAILWAY COMPANY, Defendant.

### No. C01–3006–MWB.

United States District Court,
N.D. Iowa,
Central Division.

May 31, 2002.

Opinion on Plaintiff's Motion to Correct Decision June 10, 2002.

Opinion on Defendant's Motion to Alter Decision June 17, 2002.

MEMORANDUM OPINION AND OR-
DER REGARDING THE PARTIES'
CROSS–MOTIONS FOR SUM-
MARY JUDGMENT

BENNETT, Chief Judge.

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................. 940
 A. Factual Background ...................................... 940
 1. The IANR locomotives .............................. 941
 2. The MKCX locomotives ............................. 943
 3. The payment dispute .............................. 945
 B. Procedural Background ................................... 950
 1. Helm's Complaint and IANR's original Answer ...... 950
 2. Helm's first summary judgment motion ............. 950
 3. IANR's First Amended Answer, Affirmative Defenses, and Coun-
 terclaim ......................................... 950
 4. IANR's motions for summary judgment an d motions to strike ... 951
 5. Helm's second motion for summary judgment and motions to
 strike ........................................... 951
 6. Oral arguments ................................... 952

II. WHAT RECORD CAN BE CONSIDERED? ............................. 952
 A. IANR's Motions To Strike ............................... 952
 1. Applicable standards ............................. 952
 a. Lack of personal knowledge .................. 952
 b. Contradiction of prior testimony ............ 954
 2. Application of the standards ..................... 955
 a. Mr. Bernard's affidavit ..................... 955
 b. Mr. Warner's affidavit ...................... 957
 B. Helm's Motions to Strike ............................... 959
 1. Deficiencies of IANR's resistance to Helm's second summary judg-
 ment motion ...................................... 959
 2. Improper amendment of prior statement of facts ... 961

III. STANDARDS FOR SUMMARY JUDGMENT ............................. 963
 A. Requirements Of Rule 56 ................................ 963
 B. The Parties' Burdens ................................... 964

IV. MERITS OF THE SUMMARY JUDGMENT MOTIONS .................... 965
 A. Who Breached The IANR Lease? ........................... 965
 1. The claim and counterclaim ....................... 965
 a. Arguments of the parties .................... 966
 b. What constitutes the IANR Lease? ............ 968
 i. Oral promises and amendments ........... 968
 ii. Written amendment ...................... 969
 c. Breach by IANR .............................. 970
 d. Breach by Helm .............................. 974

940

　　2.　IANR's unconscionability defense ................................. 976
　　　　a.　Arguments of the parties ...................................... 976
　　　　b.　Applicable law .............................................. 977
　　　　c.　Unconscionability of the challenged terms ...................... 979
　　　　　　i.　Procedural unconscionability ........................... 979
　　　　　　ii.　Substantive unconscionability .......................... 981
　　3.　Failure to mitigate damages defense ........................... 981
　B.　IANR's Breach Of Warranty Counterclaims ........................ 983
　C.　Breach Of Covenant Of Good Faith And Fair Dealing ............... 983
　　1.　Arguments of the parties ...................................... 984
　　2.　Governing law ................................................ 984
　　3.　The record in light of governing law ........................... 985
　D.　Counterclaim For Quantum Meruit ............................... 987
　　1.　Arguments of the parties ...................................... 987
　　2.　The governing law ............................................ 988
　　3.　The record in light of governing law ........................... 988
　E.　Who Pays For Rent And Repairs To The MKCX Locomotives? ........... 989
　　1.　Helm's claim and IANR's defenses ............................. 989
　　2.　Arguments of the parties ...................................... 990
　　3.　The governing law ............................................ 990
　　4.　The record in light of governing law ........................... 992
　F.　IANR's Counterclaim For Tortious Interference With Business ........... 995
　　1.　Arguments of the parties ...................................... 995
　　2.　The governing law ............................................ 996
　　3.　The record in light of governing law ........................... 996

V.　CONCLUSION ....................................................... 997

This lawsuit, which is set for trial to begin on July 15, 2002, involves claims by plaintiff Helm Financial Corporation (Helm) that defendant Iowa Northern Railway Company (IANR) failed to pay for rent and repairs on four locomotives leased from Helm and used by IANR in its shortline railroad business in north central Iowa. IANR has also brought various counterclaims, including claims for breach of lease, tortious interference with business, and punitive damages. This matter comes before the court pursuant to various cross-motions for summary judgment or partial summary judgment, as well as motions by the parties to strike portions of each other's responses to the dispositive motions. These motions have now been fully briefed and the court heard oral arguments on them on May 17, 2002. Therefore, these motions are now ripe for disposition by the court.

## I.　INTRODUCTION

### A.　Factual Background

Although this matter is before the court on cross-motions for summary judgment or partial summary judgment, the court will not attempt here an exhaustive dissertation of the undisputed and disputed facts in the record. Rather, the court will present sufficient of the facts, both disputed and undisputed, to put in context the parties' arguments for and against summary judgment on the various claims, counterclaims, and defenses in this litigation. This task is not an easy one in this case, however, because the parties hotly contest not only individual facts, but the completeness or context of those facts and the inferences or legal conclusions to be drawn from them.

Despite the intensity of the parties' disputes, what is clear is that, at the center of this litigation is Helm's allegation that IANR has failed to pay for use of and repairs to four locomotives, which IANR

used in its shortline railroad business in north central Iowa. IANR leased two of the locomotives at issue, designated IANR 3607 and IANR 3609, respectively, directly from Helm in 1995 and returned them to Helm in January 2001 pursuant to an agreed court order issued by this court in prior litigation. *See* Helm's Appendix to First Motion for Summary Judgment at 50 (Exhibit 14, Order of December 20, 2000, in Case No. C 00–3095–MWB). The other two locomotives at issue, designated MKCX 4302 and MKCX 4303, respectively, on which Helm also held the lease, were provided to IANR in May 2000 by another railroad, the Canada American Railroad Company (CDAC). IANR returned those two locomotives to Helm in December 2000. Although there is some temporal overlap in IANR's use of the four locomotives, the court believes that a more coherent picture of the facts in this case can be developed by discussing separately the facts pertaining to each pair of locomotives, at least up until the point at which their stories become inextricably intertwined.

### 1. The IANR locomotives

IANR and Helm entered into a Lease of Railroad Equipment (the IANR Lease) dated March 28, 1995, for four locomotives. *See* Helm's Appendix to First Motion for Summary Judgment (Exhibit 1, Lease of Railroad Equipment) at 2. IANR's President executed the lease on March 30, 1995, and Helm's President executed the lease on September 29, 1995. *Id.* at 19. However, IANR contends that the story begins well before March 28, 1995, with IANR's determination that 2,000 horsepower, GP–38 locomotives, would meet its requirements followed by "detailed" discussions between IANR and Helm regarding IANR's power needs. It is undisputed that Helm represented that it had several GP–38 locomotives that were then or

would soon be available to lease to IANR and that IANR's then Chief Mechanical Officer, Richard Adreon, inspected several locomotives at Helm's facility in Oregon in February 1995 before hand-picking four locomotives that he considered best suited to IANR's needs.

The four locomotives selected by IANR became the subject of the IANR Lease, and were described in Annex A of that Lease as "Four (4), two-thousand (2,000) horsepower, GP38 locomotives," with the following "New Unit Numbers": IANR 3606 ("Old Unit Number" HLCX 2034); IANR 3607 ("Old Unit Number" HLCX 3607); IANR 3609 ("Old Unit Number" HLCX 3609); and IANR 3611 ("Old Unit Number" HLCX 3611). *See id.* at 22. IANR now contends that the "essence" of the lease, as far as IANR was concerned— and that Helm knew it—was that the locomotives would provide 2,000 horsepower of traction. However, apart from the reference to the horsepower of the locomotives in the "Equipment Description" in Annex A of the IANR Lease noted above, and two other Annexes repeating that description for purposes of a Certificate of Acceptance (Annex B) and a Memorandum of Lease (Annex E, Exhibit A), the IANR Lease makes no reference to the horsepower or traction capacity of the locomotives as a specific term of the parties' agreement, nor does it contain any express representation by Helm as to the traction capacity or other performance specifications of the locomotives. Instead, the body of the IANR Lease simply refers to the items subject to the lease as "Units."

The parties dispute whether the IANR Lease was exclusively "drawn" by Helm, as IANR contends, or was extensively negotiated between the parties, involving some fifteen exchanges before the final terms were agreed upon, as Helm contends. Whatever the negotiation process,

or lack thereof, the IANR Lease for the four locomotives was for a fixed term of sixty months, but that fixed term did not commence until the first day of the month following the delivery of the last unit under the lease. *Id.* at 2 (§ 3, ¶ A). The Lease provided for a rental of $145 per unit per day, *id.* at 3 (§ 4, ¶ A), and was, by its terms, a "net lease" providing, *inter alia,* that "Lessee shall not be entitled to any abatement of Rent, reduction thereof or set-off against Rent. . . ." *Id.* (§ 4, ¶ C). The Lease also placed on IANR, among other things, the risk of any loss, damage, or destruction, *see id.* at 5(§ 7), the responsibility, "at its own cost and expense," of maintaining, servicing, and repairing the locomotives, *id.* at 7 (§ 9, ¶ C(i)), and the costs of insurance. *Id.* at 8 (§ 9, ¶ D). The IANR Lease also states that the locomotives were leased "AS–IS," and purports to disclaim any warranties or representations of any kind by Helm regarding the locomotives, although it does assign to IANR all warranties and indemnities of the manufacturer, reconditioner, repairer, or maintainer of the locomotives. *Id.* at 7 (§ 9, ¶ A), and does grant IANR "the right to inspect and reject the Units subject to this Lease at the Delivery Point." *Id.* at 2 (§ 2, ¶ A). If IANR accepted the units, as evidenced by a "Certificate of Acceptance" that was "in the form set forth in Annex B attached [to the Lease]," the Lease provided that "the execution of [the 'Certificate of Acceptance'] shall constitute conclusive evidence of acceptance of the Units herein identified." *Id.*

IANR contends that it anticipated delivery of the locomotives soon after the lease was executed, but Helm contends that it proposed, and the parties agreed, that delivery of the locomotives would begin in May 1995. In any event, Helm began delivering the locomotives to the agreed "Delivery Point" in Cedar Rapids, Iowa, in June of 1995.

However, after inspecting the units, as permitted by the IANR Lease, IANR requested that various repairs be made at Helm's expense. Indeed, IANR now maintains that the locomotives had suffered so badly from lack of maintenance or misuse between February 1995 and delivery in the summer of 1995 that they were "not the same" locomotives that IANR's Chief Mechanical Officer had inspected and selected in February. It is undisputed that Helm made the repairs that IANR requested after inspection at the time of delivery. IANR eventually executed a "Certificate of Acceptance," which indicates that IANR 3606 was accepted on July 1, 1995; IANR 3607 was accepted on August 7, 1995; IANR 3609 was also accepted on August 7, 1995; and IANR 3611 was accepted on July 6, 1995. *See* Helm's Appendix to First Motion for Summary Judgment (Exhibit 4, Certificate of Acceptance) at 36.

IANR contends that it is significant that the "Certificate of Acceptance" eventually presented by Helm in September 1995 did not include in the "Equipment Description" the reference to "Four (4), two-thousand (2,000) horsepower, GP38 locomotives," which had appeared in the form "Certificate of Acceptance" in Annex B to the IANR Lease, although it otherwise contained essentially the same language of acceptance and essentially the same identification of the locomotives by unit number (albeit, identifying the locomotives only by their IANR numbers instead of by both their HLCX and IANR numbers). *See* Helm's Appendix to First Motion for Summary Judgment (Exhibit 2, IANR Lease, Annex B) at 26. IANR also contends that it is significant that the "Certificate of Acceptance" was not presented by Helm at the time of delivery or even immediately after repairs were completed and IANR took delivery of the locomotives, but was instead presented only in September 1995

and executed by IANR only on February 27, 1996. IANR also asserts that IANR's President, Daniel Sabin, had refused to sign the "Certificate of Acceptance," although IANR's Vice President, ·B.F. "Pete" Collins eventually signed it, upon Helm's insistence that Helm needed the document in· order to make its "filings."

It is undisputed, or cannot reasonably be disputed, that IANR experienced mechanical problems, of varying frequency and severity, with each of the four locomotives that was subject to the IANR Lease, and incurred repair expenses and downtime for each of the locomotives as a result. However, Helm disputes the frequency and severity of these problems, pointing to the lack of any documentary evidence of significant or frequent complaints by IANR to Helm about the performance of the locomotives. Eventually, in an Amendment No. 1 to the IANR Lease, dated December 11, 1997, and executed as of that date, the parties agreed to terminate the IANR Lease early as to two of the locomotives, the one intended to have the "New Unit Number" IANR 3606, but never actually renumbered, and the one numbered IANR 3611. IANR contends that Helm waited until IANR had made significant repairs to those two locomotives before demanding their return and selling or leasing them to another railroad at·a profit for Helm, at the same time causing serious detriments to IANR's business. Helm contends that termination of the lease as to those two locomotives was mutually negotiated and agreed upon, as evidenced by the Amendment to the IANR Lease. The Amendment No. 1 left two locomotives, IANR 3607 and IANR 3609, subject to the IANR Lease.

It also is undisputed, or cannot reasonably be disputed, that IANR fell behind on the rent due under the IANR lease on the locomotives. However, IANR contends that this was so, in large part, because of the defective condition of the locomotives, the·unexpectedly high costs that IANR was.forced to bear to repair and maintain them, and IANR's ·lost earnings because the locomotives were not performing as well as expected or were out of service for repairs. Helm contends that the reasons IANR fell behind on rent payments are irrelevant under the terms of the "net lease" for the locomotives, but even if somehow relevant, the record establishes that the reasons IANR gave at the time for falling behind on rent payments was a general downturn in business owing to. the poor corn market in 1996·and 1997, leaving little for IANR to haul, not anything to do with the performance of the locomotives. Before exploring further the payment dispute involving the IANR locomotives, the court turns to.the facts necessary to put in context the parties' dispute concerning the MKCX locomotives, as the story of the MKCX locomotives began with very different circumstances, but soon became intertwined with that of the IANR locomotives.

### 2. The MKCX locomotives

The parties agree that their dispute also involves two other locomotives, designated MKCX 4302 and MKCX 4303, respectively, on which Helm held a lease with the Canada American Railroad Company (CDAC). CDAC had leased those two locomotives from MK Rail Corporation pursuant to ·a Locomotive Lease Agreement dated. January 26, 1995. *See id.* at 53–80 (Exhibit 15, the CDAC Lease). By its terms, the CDAC Lease, like the IANR Lease, was a "net lease," *id.* at 54(§ 4), and was actually for five locomotives, only two of which are at issue in this litigation. *See id.* at 67 (CDAC Lease Exhibit A). Unlike the IANR locomotives also at issue here, the MKCX locomotives subject to the CDAC Lease were all 3,000 horsepower, GP40 locomotives. *Id.* The original lease

term was 183 days beyond the date of acceptance at a rate of $285 per locomotive per day. *Id.* However, pursuant to Locomotive Lease Agreement Amendment No. 1, entered into as of October 12, 1995, the lease was extended for a term of five years commencing August 23, 1995, at a daily rental rate of $145 per unit. *Id.* at 71 (Locomotive Lease Agreement Amendment No. 1, §§ 1 & 4). MK Rail Corporation assigned the lease to Helm on May 9, 1996, during Helm's purchase of MK Rail Corporation, several years before CDAC provided the locomotives to IANR. *See id.* (Exhibit 16, the CDAC Lease Assignment and Assumption). IANR points out that there is no privity of contract between IANR and Helm with regard to CDAC's lease of the MKCX locomotives at issue here or the assignment of that lease to Helm by MK Rail Corporation, and Helm agrees that IANR was never a party to the CDAC Lease.

Instead, the two MKCX locomotives at issue here were provided to IANR by CDAC in May 2000, pursuant to a "power sharing agreement" between the two railroads. IANR contends that it is significant that the IANR Lease—the lease regarding the two IANR locomotives also at issue here—specifically notes that "Lessee has entered into a locomotive power sharing and reimbursement plan with CDAC (hereinafter called the **"Power Sharing Plan"**)," that, "as an inducement for Lessor to enter into this Lease, Lessee agrees to assign its payment receipts from the Power Sharing Plan to Lessor," *id.* at 2 (fourth and fifth "Whereas" clauses of the IANR Lease), and elsewhere acknowledges the existence of this power sharing agreement. *See, e.g., id.* at 4 (§ 4, ¶ D, which reiterates that the power sharing

agreement is further security for Helm, and ¶ E, which requires IANR to provide a copy of the power sharing agreement to Helm and not to amend that agreement without permission from Helm). IANR contends, on the basis of affidavits from its officers, that the power sharing agreement allowed the parties to lend each other locomotives that they had leased from third parties. However, the power sharing agreement itself has not been submitted as part of the summary judgment record in this case.[1] Helm contends that the references to the power sharing agreement in the IANR Lease do not specifically identify the MKCX locomotives at issue here, and that those references were intended as further inducement and security for Helm, such that the power sharing agreement cannot be raised as a defense to Helm's claims against IANR pertaining to the MKCX locomotives.

IANR contends that CDAC transferred the MKCX 4302 and MKCX 4303 locomotives to IANR pursuant to the power sharing agreement near the end of the extended term of the CDAC Lease, which expired in August 2000, in anticipation that CDAC would be required to return the locomotives to Helm's yard in St. Louis anyway at the end of the lease. IANR also contends that Helm was aware of the transfer of the locomotives from CDAC to IANR either at the time it occurred or very soon afterwards, and acquiesced in the transfer by entering into negotiations with IANR concerning IANR's interest in leasing one of the MKCX locomotives.

IANR contends further that, during the few months it used the two MKCX locomotives, the locomotives incurred no more than normal wear and tear and that any

---

1. IANR cites affidavits to this effect, but the power sharing agreement is not attached to any affidavit as an exhibit that the court can find, nor does it appear to be elsewhere in the record as a summary judgment exhibit or exhibit attached to a deposition.

excess wear and tear or need for repairs is properly attributable only to CDAC's use of the locomotives for several years and, in any event, is attributable only to CDAC as the lessee of the locomotives. Helm disputes these contentions. The parties agree that, during the time that IANR was in possession of the two MKCX locomotives, Helm invoiced CDAC for rental of those locomotives.

IANR contends that it had no long-term need for the MKCX 4303 locomotive, which was a "slug" or "B unit," *i.e.*, not equipped to carry a crew, but only to be used in conjunction with a "leader" locomotive, such as the MKCX 4302 locomotive, to provide additional traction power. However, IANR contends that it found MKCX 4302 to be a useful and reliable locomotive, and so entered into negotiations with Helm to lease that and other locomotives. At this point, the stories of the IANR and MKCX locomotives at issue here begin to intertwine.

### 3. The payment dispute

Helm contends that it began attempts to collect the past due rent on the IANR locomotives in the summer of 2000, but has been unable to resolve the matter without judicial intervention. IANR contends that the parties not only attempted to negotiate, but consummated an Amended Lease concerning both of the IANR locomotives still in its possession. IANR contends that the Amended Lease also did the following: (1) resolved any dispute concerning past due rent and repair costs on those locomotives; and (2) permitted IANR to lease the MKCX 4302 locomotive, which had previously been provided to IANR by CDAC, and three other locomotives. IANR contends, further, that Helm unilaterally breached that Amended Lease and reanimated the settled payment dispute. Helm agrees that negotiations concerning past due rent on the IANR locomotives and the possibility of IANR leasing the MKCX 4302 locomotive and other locomotives occurred over several months in the late summer and fall of 2000, but disputes that any agreement on those matters was ever reached. Thus, the documents memorializing the payment dispute and the negotiation process require some scrutiny.

By letter dated August 17, 2000, sent by overnight courier from Helm's General Counsel, Matthew Ogburn, to IANR's President, Daniel Sabin, Helm notified IANR that, pursuant to Section 12 of the IANR Lease, IANR owed Helm $96,140.00 as past due rent through and including July 31, 2000. *Id.* at 37 (Exhibit 5, Letter of August 17, 2000). The letter stated further that, "[i]f such past due rent is not paid to Helm during the next ten (10) days, a formal Event of Default under the Lease will exist, and Helm may exercise any and all remedies available to it to collect past due rent and to repossess its property." *Id.*

On September 14, 2000, Helm's Executive Vice President, William Peterson, sent IANR's President, Daniel Sabin, a hand-delivered letter notifying IANR that the default identified in the August 17, 2000, letter remained uncured, and invoking the remedy of terminating the lease for IANR 3607 through and including October 31, 2000, and for IANR 3609 through and including September 29, 2000. *Id.* at 38 (Exhibit 6, Letter of September 14, 2000). The specified dates were identified as "Return Dates," after which rent would cease to accrue if the locomotives were returned "in appropriate return condition pursuant to the terms and conditions of the Lease"; however, if the locomotives were not "in appropriate return condition," rent would continue to accrue until appropriate repairs were completed and/or the locomotives were delivered to the designated "Re-

turn Point" in Cedar Rapids, Iowa. *Id.* Helm demanded that the locomotives not be used in active service after the specified Return Dates, "except for movement to and from a repair facility and to the Return Point." *Id.* The September 14, 2000, letter also demanded delivery of the MKCX 4302 and MKCX 4303 locomotives in IANR's custody and control to the Return Point on or prior to September 29, 2000. *Id.* Finally, the letter invoked Section 4.B of the IANR Lease, notifying IANR that as of the date of the letter, "all past due rent shall accrue interest at the prime rate plus 3%." *Id.* at 39.

On September 15, 2000, Pete Collins of IANR sent William Peterson of Helm a response to a verbal proposal from Helm for IANR to resolve the payment dispute and also to allow IANR to lease 4 locomotives from Helm. *See id.* at 41 (September 15, 2000, letter). In that response, IANR "propose[d] and agree[d] to the following arrangement," which included a 20–month lease for MKCX 4302 and three GP–38 locomotives to be selected from Helm's fleet at a rate of $19,000 per month. *Id.* IANR's proposal also included the following provisions for resolution of disputes regarding outstanding rent and repairs:

● Return of units—The units will be repaired as agreed. Unit 4302 to remain and be included in the new lease. However, we request that the return schedule be delayed on units 4303 and 3609 until the new replacement units arrive on the Iowa Northern. Additionally, unit 3607 which needs the RTO that Helm agreed to supply for a price of $55,000 (payment included in monthly lease payment), we propose that for this price Iowa Northern will make all noted and agreed to repairs and Helm will install the RTO at their shop facility.

● Arrearages (amount to be determined) will be rolled into a note (12% interest).

Any amount outstanding after the lease has expired will be dealt with at that time.

*Id.*

On September 29, 2000, Helm responded with a letter from Phil Warner, its Vice President, to Pete Collins, which IANR contends is the consummated and enforceable amendment to the IANR lease and an agreement to resolve all matters pertaining to the disputes concerning the IANR and MKCX locomotives. That letter stated the following:

This letter will summarize Helm's current offer to supply locomotives to the Iowa Northern ("IANR"):

1) Total number of units will be four (4), including the MKCX 4302 which is currently on-hand and three (3) GP38 units from Metro East Industries ("MEI") now marked TM 857, 859, 860.

2) Term of the lease will be 20 months.

3) Lease rate will be $19,000 per month in aggregate. Included in this aggregate lease rate is the amortization of the $55,000 cost of the running take out engine ("RTO") Helm will supply for unit 3607. Lease document must be executed prior to units leaving MEI.

4) All four locomotives will carry a warranty on the catastrophic failure of the main engine for the term of the lease and catastrophic failure of the main generator for the first sixty days of the lease only.

5) IANR is responsible for all transportation charges on the return of units 3607, 3609, and 4303 to MEI in East St. Louis, IL, and for delivery of the three replacement units from MEI to IANR lines.

6) IANR [is] responsible for all repairs to units 3607, 3609, 4302 and 4303 as

agreed to in the letter agreement signed by you and faxed to me September 1, 2000 [N.B.: This document is not in the summary judgment record]. It is understood that IANR will perform these repairs prior to returning the units with the exception of the RTO for unit 3607.

7) All arrearages IANR owes Helm, including the $18,000 cost of installation of prime mover in 3607 will be rolled into a promissory note carrying an annual interest rate of 12%. Promissory note must be executed prior to units leaving MEI.

8) Should IANR be sold, IANR may terminate lease of locomotives early, only after all arrearages have been paid in full.

9) Prompt payment of both the $19,000 monthly lease rate and the promissory note payment are required. IANR will be put in default upon the first late payment of either of these obligations.

Pete, this proposal remains valid through the close of business on Friday, October 6, 2000. Please signify your acceptance of this proposal by signing in the space provided below and returning one copy to my attention.

*Id.* at 42 (September 29, 2000, letter).

Pete Collins signed the September 29, 2000, proposal indicating that it was "Agreed and Accepted," on October 6, 2000. However, he *also* made and initialed the following handwritten addition above item 1): "Subject to inspection and approval by Iowa Northern." *Id.* Helm asserts that Collins admitted in deposition that he did not consult with or obtain the agreement of anyone from Helm before making this addition, and that, as such, the addition constituted a counteroffer, which Helm never accepted. IANR contends that the parties had an agreement resolv-

ing all past disputes as of October 6, 2000, but that Helm then unilaterally breached the agreement after a change in ownership, because the new owners baulked at the deal.

In any event, the next correspondence in the summary judgment record is a letter from Pete Collins of IANR to Phil Warner of Helm concerning results of IANR's inspection of "three locomotives Helm has offered for lease to the Iowa Northern." Helm's Supplemental Appendix at 34 (Exhibit 7, Letter of October 10, 2000). The letter details various deficiencies with each of the locomotives "that need to be addressed before the units are accepted and forwarded to the IANR." *Id.* On October 31, 2000, Phil Warner, Vice President of Helm, sent the following letter to Pete Collins of IANR in response:

This letter serves as follow up to our phone conversation of Tuesday, October 25, 2000. As I explained, Helm has been purchased by a group of Helm employees and the new executives are those people I shared with you during our conversation.

Being as straightforward as possible, Helm would like Iowa Northern ("IANR") to find alternative locomotives to replace the two units under the Lease of Railroad Equipment dated March 28, 1995, as amended ("the Lease") and the two units which are currently on lease to the Canada American but in your possession. My letter to you of September 29, 2000, and executed by you on October 6, 2000, was subject to inspection and approval of the alternate locomotives by IANR. Helm is not agreeable to performing any of the repairs to the alternate units as stated in your letter to me of October 10, 2000. I assume that you are not interested in accepting those units under these conditions. Your writ-

ten confirmation of this would be appreciated.

As you know by letter dated August 17, 2000, to Daniel R. Sabin, IANR was notified of its default under the Lease for failure to pay rent. Since the past due rental amounts under the Lease remain unpaid, a formal Event of Default under the Lease exits. Nevertheless, Helm is agreeable to continuing the lease of the four units we have there now through November 30, 2000 in order to give you ample time to replace them; however, we expect that you will promptly pay us for their use. There is a chance that MKCX 4202[sic] and 4303 will need to be recalled earlier should they be sold. IANR will be responsible for the end-of-lease repairs on all four units as agreed to in the letter signed by you on September 1, 2000 [N.B.: Again, this document is not in the summary judgment record]. In addition, Helm will agree that payment of past due lease amounts currently in the amount of $84,460, as well as the cost of $68,500 (includes $50,000 for engine and $18,500 labor) for the running take out engine for 3607, may be paid over the period of one year with interest at the rate of 12%. A schedule of payments is attached.

Pete, please review this letter at your earliest convenience and contact me with any questions or comments. Upon your review, please indicate your receipt and acceptance of this letter by signing in the space provided below.

Helm's Appendix to First Motion for Summary Judgment at 43 (Exhibit 9, Letter of October 31, 2000). The letter was not signed as "Agreed and Accepted" by any representative of IANR.

Consequently, on November 13, 2000, Helm's Senior Vice President and Chief Financial Officer, Barbara W. Wilson, sent IANR's President, Daniel Sabin, the following letter by overnight courier:

On October 31, 2000 Helm Financial Corporation sent Mr. B.F. "Pete" Collins of the Iowa Northern Railway Company a proposal letter signed by Phil Warner. Due to the lack of response to that letter, this letter shall serve as the official withdrawal and termination of that proposal letter dated October 31, 2000.

By letter dated August 17, 2000, you were formally notified that the Iowa Northern Railway Company is in default under the Lease for failure to pay rent. Such default remains uncured.

Please be advised that your Lease with Helm Financial Corporation is hereby *terminated due to your failure to pay rent as required by said Lease.*

*Id.* at 46 (Exhibit 10, Letter of November 13, 2000) (emphasis in the original). However, Helm was apparently unable to obtain delivery of this letter as addressed, and instead sent a copy of it by overnight courier and by facsimile with another cover letter on November 14, 2000, to Daniel Sabin c/o the Bangor and Aroostock Railroad Company in Bangor, Maine. *See id.* at 47 (Exhibit 11). IANR apparently does not dispute eventually receiving a copy of the November 13, 2000, letter.

At some point during the fall of 2000, Helm agreed to sell the MKCX 4302 and MKCX 4303 locomotives to the Paducah & Louisville Railway ("PAL"). The President of PAL stated in deposition that he believed he agreed to buy those two locomotives in September or October 2000. Helm's Appendix in Support of Resistance to Iowa Northern's First and Second Motions for Partial Summary Judgment (Helm's Resistance Appendix) at 68–69 (Deposition of William Albritton). Therefore, on November 21, 2000, Phil Warner of Helm e-mailed Pete Collins of IANR

instructions concerning shipment of those two locomotives to an interchange point in Waterloo, Iowa. *See* Helm's Appendix to First Motion for Summary Judgment at 48 (Exhibit 12, November 21, 2000, e-mail). The e-mail directed IANR to ship the locomotives *"Dead and Drained* as soon as possible." *Id.* (emphasis in the original).

On December 8, 2000, Pete Collins sent Phil Warner a letter concerning Helm's inspection of all four locomotives at issue here between November 28 and December 1, 2000. *See id.* at 49 (Exhibit 13, Letter of December 8, 2000). The letter confirms that the two MKCX locomotives were interchanged at Waterloo, Iowa, as instructed by Helm, on the morning of November 30, 2000, but that "[t]he two IANR units are still on the Iowa Northern, dead and drained, being made ready to interchange, as instructed by Helm, to the UP at Cedar Rapids for movement to Paducah, KY." *Id.* Although, as explained above, it was the MKCX locomotives, not the IANR locomotives, that had been sold to PAL, the parties apparently agree that the IANR locomotives at issue were also to be sent to Paducah. The remainder of the December 8, 2000, letter stated the following:

> In view of past issues, we will require written conformation [sic] of our understanding of work left to be performed on these units. We did not receive any inspection reports from your inspector for the November 29th—December 1st inspection. We therefore must assume that there are no new or additional findings that was [sic] noted and agreed to from your August 17, 2000 inspection. We will not assume any responsibility for future work on these units, other than the level of work and not to exceed the cost of our previous understanding. Please advise. We expect to have the two [IANR] units ready for interchange to the UP no later than Wednesday,

December 13, 2000, but will not do so until we have your written concurrence on the work to be done following our release of the units.

> Additionally, if the Iowa Northern is going to be responsible for the freight cost of moving these units to Paducah, KY I want to know what the rate is going to be. Please provide me both rates, via UP/BN to PAL and the rate via IC/CN to PAL. If IANR is not nor [sic] will not be responsible for the freight rate then you may disregard this request.

*Id.* It is undisputed that the two MKCX locomotives were returned to Helm in December 2000. However, the IANR locomotives were not returned until January 2001.

Helm estimated that some $19,000 in repairs would be required to return the two MKCX locomotives to appropriate condition. However, it appears to be undisputed that PAL intended to retrofit the two MKCX locomotives, so that Helm did not actually perform those repairs, and instead sold the MKCX locomotives to PAL "AS–IS." Whether or not the price at which Helm sold the locomotives to the PAL reflected some "discount" because of their state of repair appears to be disputed.

In its motion for summary judgment, Helm originally claimed that it was entitled to unpaid rent from IANR for its use of the two MKCX locomotives, at a daily rate of $145 per locomotives, at an interest rate of 18% on unpaid rent. Thus, Helm sought a total of $62,640 in unpaid rent and $12,959.33 in interest on past due rent as of October 31, 2001, plus $19,709 in estimated repairs on the two MKCX locomotives. IANR denies that it is responsible for rent or repair costs or that it is responsible for any excess wear and tear on the MKCX locomotives. Rather, IANR

contends that Helm's claims concerning these locomotives are properly addressed to the CDAC, and that Helm is, indeed, pursuing such claims against the CDAC in litigation in state court in Maine. IANR now contends that Helm has settled its case with CDAC, which should extinguish its claim against IANR regarding the MKCX locomotives.

As mentioned above, IANR eventually returned the IANR 3607 and IANR 3609 locomotives to Helm in January 2001 pursuant to an agreed court order issued by this court in prior litigation. *See* Helm's Appendix to First Motion for Summary Judgment at 50 (Exhibit 14, Order of December 20, 2000, in Case No. C 00–3095–MWB). In its summary judgment motion, Helm originally claimed $103,020 in past due rent on these two locomotives, plus $35,030.56 in interest on past due rent accrued as of October 31, 2001, and continuing to accrue, plus estimated repair costs of $145,427, and inspection and transportation costs of $3,636 and $2,856.61, respectively. Helm also sought, pursuant to the IANR Lease, $49,678.34 in attorney fees incurred as of October 31, 2001, and continuing to accrue, for attempting to recover past due rent and repair costs. IANR denies that it is responsible for any of the amounts claimed by Helm.

### B. Procedural Background

#### 1. Helm's Complaint and IANR's original Answer

Helm filed its complaint against IANR in this matter on January 18, 2001. Although "Count I" of the complaint identifies the parties, alleges the bases for jurisdiction and venue, and makes general factual allegations, the causes of action that Helm asserts against IANR are set forth in Counts II through IV. Thus, Count II, identified as "Breach of Written Contract," alleges that IANR breached its lease with Helm for the IANR 3607 and IANR 3609 locomotives by, among other things, failing to pay rent and other obligations due Helm under the terms of the lease. Count III, identified as "Quantum Meruit," alleges that IANR has been unjustly, unfairly, and inequitably enriched by its use and possession of *all four* locomotives, causing losses to Helm in the form of lost rent, lost repair, transportation, and inspection costs, unpaid interest, and lost business opportunities and profits. Count IV, identified as "Conversion, Trover, and Trespass," alleges that IANR's possession and use of the MKCX 4302 and MKCX 4303 locomotives were in derogation of Helm's superior right, title, and interest in those locomotives.

IANR originally answered Helm's complaint on February 28, 2001, denying Helm's claims, and also asserted a counterclaim in three counts alleging claims for breach of lease, tortious interference with business, and punitive damages, respectively. Helm filed a reply to IANR's original counterclaims on March 8, 2001.

#### 2. Helm's first summary judgment motion

On November 19, 2001, Helm filed the first of the dispositive motions now before the court, seeking summary judgment on its own claims and IANR's counterclaims. IANR originally resisted Helm's motion for summary judgment on November 30, 2001, then filed an amended brief and amended appendix in support of its resistance on December 18, 2001. By order dated December 11, 2001, the court set the first dispositive motion for oral arguments on February 22, 2002. Helm filed its reply in further support of its motion for summary judgment on January 4, 2002.

#### 3. IANR's First Amended Answer, Affirmative Defenses, and Counterclaim

However, IANR was subsequently allowed to file an amended answer and

amended counterclaim on February 1, 2002. In its amended answer, IANR asserted, as the first of eight affirmative defenses, a defense of unconscionability of certain provisions of the March 28, 1995, lease involving the IANR 3607 and IANR 3609 locomotives. IANR also asserted eight counterclaims, including its original three counterclaims of breach by Helm of the lease for the locomotives (Count I); tortious interference with business (Count II); and a claim for punitive damages (Count III). The additional counterclaims are the following: breach of express warranties (Count IV); breach of implied warranties of fitness for a particular purpose (Count V); breach of implied warranty of merchantability (Count VI); breach of implied warranty of the capacity of the equipment (Count VII); breaches of covenants of good faith and fair dealing (Count VIII); and quantum meruit (Count IX).

### 4. IANR's motions for summary judgment and motions to strike

IANR then filed its own motions for partial summary judgment on February 19, 2002, which was the original deadline for dispositive motions, and just days before the date the court had originally set for oral arguments on Helm's first motion for summary judgment. IANR's first motion for partial summary judgment seeks judgment in IANR's favor on its affirmative defense asserting the unconscionability of certain provisions of the lease for the two IANR locomotives at issue in this case. IANR's second motion for partial summary judgment seeks summary judgment in its favor on issues pertaining to the MKCX locomotives at issue in this case.

The court concluded that it made little sense to hear oral arguments on the dispositive motions piecemeal. Therefore, by order dated February 21, 2002, the court rescheduled the oral arguments on Helm's first motion for summary judgment to April 16, 2002, and consolidated those arguments with oral arguments on IANR's cross-motions for partial summary judgment. Helm filed its reply to IANR's amended counterclaim on March 14, 2002, and its resistance to IANR's motions for partial summary judgment on March 15, 2002.

On March 28, 2002, IANR moved to strike affidavits of Francois Bernard and Philip J. Warner submitted by Helm in support of its resistance to IANR's motions for partial summary judgment. Helm resisted those motions on April 8, 2002. In addition, on April 1, 2002, Helm filed a supplemental brief in support of its own motion for summary judgment, to which IANR filed a response on April 5, 2002. With that, the briefing of the motions then pending appeared to be closed.

### 5. Helm's second motion for summary judgment and motions to strike

However, on April 15, 2002, the day before the scheduled oral arguments on the pending cross-motions for summary judgment, Helm filed yet another dispositive motion, its motion for summary judgment on IANR's first amended affirmative defenses and counterclaims. Helm's second motion for summary judgment was timely filed pursuant to a deadline for such a motion set in the order granting IANR leave to amend its answer and counterclaims. Helm's second dispositive motion meant that liability—at least—on all of the parties' claims and counterclaims in this litigation was before the court on one or more motions for summary judgment.

In light of Helm's second motion for summary judgment, the court concluded, once again, that it made little sense to address in piecemeal fashion the summary

judgment motions filed by both parties. Therefore, by order dated April 16, 2002, the court rescheduled the oral arguments on the earlier summary judgment motions and consolidated them with oral arguments on the latest motion for summary judgment on May 17, 2002. The court also set a briefing schedule on the latest motion for summary judgment, which the court cautioned the parties must be adhered to, in order to prevent jeopardizing the trial date of July 15, 2002, if any claims, defenses, or counterclaims remained for trial after disposition of the various summary judgment motions.

The parties adhered to that briefing schedule: IANR filed its resistance to Helm's April 15, 2002, motion for summary judgment on May 6, 2002, with a response to Helm's statement of facts in support of that motion, and an amended response to Helm's statement of facts in support of Helm's first motion for summary judgment, as well as a second supplemental appendix pertinent to its own motions for partial summary judgment and Helm's second motion for summary judgment

Helm filed a reply on May 13, 2002, along with motions to strike IANR's response to Helm's second motion for summary judgment and IANR's amended response to Helm's statement of facts in support of Helm's first motion for summary judgment. Also on May 13, 2002, IANR resisted Helm's motions to strike and, in further response to those motions, filed its own motions for leave to file a statement of additional facts in resistance to Helm's second motion for summary judgment and to file its amended response to Helm's original statement of facts.

#### 6. Oral arguments

At the oral arguments on May 17, 2002, plaintiff Helm was represented by Mark J. Herzberger of Moyer & Bergman, P.L.C., in Cedar Rapids, Iowa. Defendant IANR was represented by James C. Larew of the Larew Law Office in Iowa City, Iowa. Although the court imposed strict time limits on the parties' oral arguments, the parties' presentations were every bit as animated and comprehensive as their written arguments.

### II. WHAT RECORD CAN BE CONSIDERED?

Before the court can consider the merits of the various summary judgment motions, the court must first consider the preliminary matter of the parties' motions to strike portions of each other's responses to the various summary judgment motions. This is so, because the motions to strike go to what record the court can consider in its resolution of the parties' cross-motions for summary judgment.

#### A. IANR's Motions To Strike

On March 29, 2002, IANR filed separate motions to strike, in whole or in part, the affidavits of Francois Bernard, who is Helm's current Chief Mechanical Officer, and Philip J. Warner, Helm's Vice President, which Helm had offered in its appendix in support of its resistances to IANR's motions for partial summary judgment. As detailed more fully below, with reference to each of the challenged affidavits, IANR identifies two distinct grounds for striking all or portions of the affidavits: (1) lack of personal knowledge; and (2) contradiction of prior testimony. The court will consider the standards applicable to these challenges in turn.

#### 1. Applicable standards

##### a. Lack of personal knowledge

As to the first challenge, Rule 56(e) of the Federal Rules of Civil Procedure provides, in part, that, on summary judgment, "[s]upporting and opposing affi-

davits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e); *see also Erickson v. Farmland Indus., Inc.,* 271 F.3d 718, 728 (8th Cir.2001) (citing the rule). "In evaluating evidence related to possible summary judgment, a court may not consider affidavits that do not satisfy the requirements of Fed.R.Civ.P. 56(e)." *Aucutt v. Six Flags Over Mid–America, Inc.,* 85 F.3d 1311, 1317 (8th Cir.1996). In short, inadmissible material is not "properly available to defeat or support the [summary judgment] motion." *Firemen's Fund Ins. Co. v. Thien,* 8 F.3d 1307, 1310 (8th Cir.1993); *accord Duluth News–Tribune v. Mesabi Publ'g Co.,* 84 F.3d 1093, 1098 (8th Cir.1996) ("[I]n evaluating the evidence at the summary judgment stage, we consider only those responses that are supported by admissible evidence."). Moreover, "[a]ffidavits asserting personal knowledge must include enough factual support to show that the affiant possesses that knowledge." *El Deeb v. University of Minn.,* 60 F.3d 423, 428 (8th Cir.1995). An affirmation on "information and belief is insufficient." *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1367 (8th Cir.1983).

█ Where a statement in a summary judgment affidavit is hearsay, and fails to meet a hearsay objection—for example, the exception for a statement made about a matter within the scope of the declarant's employment, FED. R. EVID. 801(d)(2)(D)—the affidavit can be given no effect, because it fails to meet the "admissibility" and "personal knowledge" requirements. *Erickson,* 271 F.3d at 728. Although the court must review the record on summary judgment in the light most favorable to the non-moving party, courts "do not stretch this favorable presumption so far as to consider as evidence statements found only in inadmissible hearsay." *Mays v. Rhodes,* 255 F.3d 644, 648 (8th Cir.2001); *accord Cronquist v. City of Minneapolis,* 237 F.3d 920, 927 (8th Cir. 2001) (holding that affidavits that are based on hearsay cannot defeat a summary judgment motion).

On the other hand, the Eighth Circuit Court of Appeals has recognized the difference between the affiant's lack of personal knowledge of matters recounted in an affidavit as the basis for a decision, and the affiant's personal knowledge of the reasons for that decision. In *Aucutt v. Six Flags Over Mid–America, Inc.,* 85 F.3d 1311 (8th Cir.1996), an age-discrimination case, the court was confronted with the plaintiff's contention that an affidavit lacked "personal knowledge" as required by Rule 56(e) and that the district court, therefore, should not have credited the reasons given in the affidavit for the plaintiff's termination. *Aucutt,* 85 F.3d at 1317. More specifically, the affidavit at issue in *Aucutt* recounted an incident in which the plaintiff had disciplined young visitors to an amusement park for some rule infraction by making them do push-ups in the parking lot, but the affiant lacked personal knowledge of the push-up incident described. *Id.* However, the incident was identified in the affidavit as one of several examples of the plaintiff's failure to improve his hostile demeanor towards park patrons, which was the primary reason the employer gave for laying off the plaintiff in a reduction in force. *Id.* The employer asserted that the affidavit comported with the requirements of Rule 56(e), because it was based on the affiant's personal knowledge of the reasons for the decision to lay off the plaintiff, and the court agreed. *Id.* The court noted that the affiant was responsible for choosing three park security officers to be laid off as part of the reduction in force; that he

evaluated the personnel file of each employee under his supervision before he decided to lay off the plaintiff; and that he had repeatedly admonished the plaintiff to improve his demeanor towards park guests while performing his security duties, but that the plaintiff had failed to do so. *Id.* The court concluded as follows:

> Thus, [the affiant] had firsthand knowledge of the reasons why [the plaintiff] was selected for discharge. Fed. R.Civ.P. 56(e) does not require [the affiant] to have witnessed every incident supporting the termination decision, so long as he had personal knowledge that the decision was for reasons unrelated to age-based discrimination. *Cf. Gill v. Reorganized School Dist.,* 32 F.3d 376, 379 (8th Cir.1994) (school superintendent who discharged plaintiff teacher after receiving report that student had accused plaintiff of making racially derogatory remarks satisfactorily rebutted plaintiff's prima facie case with a legitimate reason for plaintiff's discharge; superintendent did not have to have observed incident in question, because crucial issue was "whether [the reported incident] was the real reason for [Gill's] termination and not a pretext for [race] discrimination").
>
> In light of the foregoing, we hold that the district court did not err in considering [the affiant's] affidavit in support of [the defendant's] motion for summary judgment.

*Aucutt,* 85 F.3d at 1318.

### b. Contradiction of prior testimony

As to contradiction of prior testimony, the Eighth Circuit Court of Appeals recently reiterated the following principles:

> It is well-settled that "[p]arties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment." *American Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.,* 114 F.3d 108, 111 (8th Cir. 1997). Consequently,
>
>> a party should not be allowed to create issues of credibility by contradicting his own earlier testimony. Ambiguities and even conflicts in a deponent's testimony are generally matters for the jury to sort out, but a district court may grant summary judgment where a party's sudden and unexplained revision of testimony creates an issue of fact where none existed before. Otherwise, any party could head off a summary judgment motion by supplanting previous depositions ad hoc with a new affidavit, and no case would ever be appropriate for summary judgment.
>
> *Wilson v. Westinghouse Elec. Corp.,* 838 F.2d 286, 289 (8th Cir.1988) (internal citations and quotation marks omitted).

*Bass v. City of Sioux Falls,* 232 F.3d 615, 619 (8th Cir.1999); *accord Dotson v. Delta Consolidated Indus., Inc.,* 251 F.3d 780, 781 (8th Cir.2001) ("We have held many times that a party may not create a question of material fact, and thus forestall summary judgment, by submitting an affidavit contradicting his own sworn statements in a deposition. *See, e.g., American Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.,* 114 F.3d 108, 111 (8th Cir. 1997), and *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1364–65 (8th Cir.1983)."); *Plymouth Foam Prods., Inc. v. City of Becker,* 120 F.3d 153, 155 n. 3 (8th Cir.1997) (to the extent that the affiant's affidavit conflicts with his earlier deposition testimony, his affidavit testimony should be disregarded); *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 402 (8th Cir.1995) (same). The Eighth Circuit Court of Appeals has explained that the rule that a party cannot create a "sham" issue of fact in an effort to defeat

summary judgment by filing an affidavit directly contradicting prior deposition testimony "is a sound one," because "if testimony under oath could be 'abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment.'" *Herring v. Canada Life Assur. Co.*, 207 F.3d 1026, 1030 (8th Cir.2000) (quoting *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1366 (8th Cir.1983)).

However, the Eighth Circuit Court of Appeals has also explained that, where the affidavit testimony seems consistent with the affiant's prior deposition testimony, or simply adds more detailed information, the court may properly consider the affidavit on summary judgment. *Bass*, 232 F.3d at 619. Similarly, the court has recognized "that there are 'narrow circumstances' in which a subsequent affidavit is appropriate, such as to explain certain aspects of the deposition testimony or where the prior testimony reflects confusion on the part of the witness." *Herring*, 207 F.3d at 1030–31 (citing *Camfield Tires, Inc.*, 719 F.2d at 1364–65). In such circumstances, "it would be for the jury to resolve the discrepancy in the deposition testimony and the affidavit." *Id.* at 1031.

### 2. Application of the standards

#### a. Mr. Bernard's affidavit

IANR specifically challenges the following averments in paragraph 6 of Mr. Bernard's affidavit:

> [I]t is my understanding and belief that the company that originally leased the [MKCX 4302 and MKCX 4303] locomotives to the Canadian American Railway Company (a.k.a. CDAC), MK Rail Corporation, considered both units to be leaders (i.e., intended to be occupied by a crew), and not slugs, or B units.

*See* IANR's First Motion to Strike Affidavit of Francois Bernard at 2 (quoting Affidavit of Francois Bernard of March 5, 2002, ¶ 6).

IANR contends that one of the issues on the parties' motions for summary judgment is whether Helm is attempting to recover repair costs that would make the MKCX 4303 locomotive a "leader," not merely a "slug" or "B unit," and thus, that the costs claimed are for "improvements" that would put that locomotive in a condition beyond any use or intended use by IANR. As to the affidavit of Mr. Bernard, IANR contends that the statement quoted above is an attempt by the affiant to establish personal knowledge of the condition of the MKCX locomotives at the start of the lease to CDAC so as to provide a basis for his estimate of the repairs referred to elsewhere in the affidavit and for which Helm seeks to recover here. However, IANR contends that the paragraph is based on hearsay of what an unidentified third party told Mr. Bernard, and fails to set forth any facts that indicate Mr. Bernard's personal knowledge of the condition of the locomotives at the time that IANR took possession of them. Moreover, IANR contends that the challenged portion of Mr. Bernard's affidavit is inherently inconsistent with his prior deposition statement that "'I believe Mr. Dunham said when he received them they were not lead capable, and I have no knowledge as to whether they were or were not.'" IANR's Brief in Support of Motion to Strike Affidavit of Francois Bernard at 3 (quoting Mr. Bernard's deposition, with transcription error corrected here) & Exhibit 4 (transcript of deposition). IANR contends that the conflict between Mr. Bernard's affidavit and his prior deposition testimony creates only a sham issue of fact that should not preclude summary judgment.

Helm states that Mr. Bernard's affidavit was submitted in support of Helm's

contention that the end-of-lease repairs for MKCX 4302 and MKCX 4303 were necessary for damage to the units beyond ordinary wear and tear. Helm contends, further, that the affidavit meets all requirements for consideration by the court. Helm points out that Mr. Bernard had been employed by Helm since 1996, and had been Helm's Chief Mechanical Officer of locomotives since 1999; that he was familiar with the condition of the MKCX 4303 locomotive when IANR surrendered it to Helm; that he prepared an end-of-lease repair estimate; that based on certain amenities in the cabin of that locomotive, he determined that the locomotive was a "leader," not a "B unit." Thus, far, Helm specifically contends that Mr. Bernard's affidavit was plainly based on personal knowledge. Helm contends further that, with regard to what repairs were necessary to correct damage beyond ordinary wear and tear, Mr. Bernard was familiar with the condition of the locomotive at the time it was surrendered by IANR, and was clearly qualified by his position with Helm to determine what constitutes ordinary wear and tear to a locomotive and what constitutes damage beyond such ordinary wear and tear, and that he made a determination regarding MKCX 4303 based on that knowledge and inspection.

The court finds that there does appear to be some inherent conflict between Mr. Bernard's averment that he "understood" that both of the MKCX locomotives at issue here had been considered "leaders" by MK Rail Corporation and his prior deposition testimony that he had been told by a CDAC official that the locomotives were *not* lead capable when CDAC received them, and, more importantly, that Mr. Bernard had "no knowledge as to whether they were or were not [lead capable]." It might be possible to twist and turn the two apparently conflicting statements in such a way as to make them

appear consistent—for example, by explaining a distinction between MK Rail Corporation "considering" the locomotives to be "leaders" and a CDAC official's statement that the locomotives were not in fact "lead capable" when CDAC received them, and by distinguishing between what Mr. Bernard had been told, either by MK Rail Corporation or CDAC, and what he *knew*, or in this case, *didn't know personally* about the lead capability of the locomotives. Thus, it might be possible to conclude that the affidavit testimony seems consistent with the affiant's prior deposition testimony, or simply adds more detailed information, such that it may properly be considered on summary judgment. *Bass*, 232 F.3d at 619. However, Helm has not attempted to explain the apparent contradiction between Mr. Bernard's deposition testimony that he knew nothing about the lead capability of the engines and his later affidavit averring that he had been told something quite different by MK Rail Corporation. Thus, Helm has not attempted to establish that the affidavit here fits the " 'narrow circumstances' in which a subsequent affidavit is appropriate," for example, "to explain certain aspects of the deposition testimony or where the prior testimony reflects confusion on the part of the witness." *Herring*, 207 F.3d at 1030–31 (citing *Camfield Tires, Inc.*, 719 F.2d at 1364–65). Even so, if this were IANR's only challenge to Mr. Bernard's affidavit, the court would be inclined to leave "for the jury to resolve the discrepancy in the deposition testimony and the affidavit." *Id.* at 1031.

However, IANR has also challenged the identified portion of Mr. Bernard's affidavit for lack of personal knowledge. The court concludes that Helm may have established "enough factual support to show that [Mr. Bernard] possesses [personal] knowledge," as required by Rule 56(e)—as

well as professional qualifications—to make admissible statements about a number of matters, *see El Deeb,* 60 F.3d at 428, including the following: the condition of the MKCX 4303 locomotive when IANR surrendered it to Helm; that certain amenities in the cabin of that locomotive suggested that it was a "leader," not a "B unit"; what constituted ordinary wear and tear in a locomotive; and what repairs were necessary to correct damage beyond ordinary wear and tear. However, Helm nowhere confronts IANR's central challenge, which is that Mr. Bernard had no personal knowledge of the condition of the MKCX 4303 locomotive (or, for that matter, the MKCX 4302 locomotive) *prior to or at the time it was leased to CDAC,* or *just prior to or at the time its was lent to IANR by CDAC.* FED. R. CIV. P. 56(e) (an affidavit "shall show affirmatively that the affiant is competent to testify to the matters stated therein"); *see also Erickson,* 271 F.3d at 728 (citing the rule). Information pertinent to those issues would include whether or not the MKCX 4303 locomotive was leased to CDAC in a condition to be a "leader," or only a "slug," and whether it was still (or ever) in the condition to be a "leader" when it was provided to IANR, information that, if personally known to Mr. Bernard, might show that he knew what damage in excess of ordinary wear and tear occurred during the time that either CDAC or IANR had possession of the locomotive. The affidavit contains no such averment of personal knowledge of these matters. An affirmation on "information and belief," which is all that Mr. Bernard's affidavit indicates about Mr. Bernard's supposed knowledge of the condition of the MKCX locomotives at the start of the lease with CDAC, "is insufficient." *Camfield Tires, Inc.,* 719 F.2d at 1367. The challenged statement is consequently hearsay from an unidentified third person for which Helm offers no exception.

*See Erickson,* 271 F.3d at 728 (hearsay for which there is no exception cannot be considered on summary judgment); *Mays,* 255 F.3d at 648 (although the court must review the record on summary judgment in the light most favorable to the non-moving party, courts "do not stretch this favorable presumption so far as to consider as evidence statements found only in inadmissible hearsay"); *Cronquist,* 237 F.3d at 927 (holding that affidavits that are based on hearsay cannot defeat a summary judgment motion).

Thus, the court cannot consider paragraph 6 of Mr. Bernard's affidavit. *See* FED. R. CIV. P. 56(e); *Erickson,* 271 F.3d at 728 (giving testimony containing such hearsay "no effect" on summary judgment); *Aucutt,* 85 F.3d at 1317 ("In evaluating evidence related to possible summary judgment, a court may not consider affidavits that do not satisfy the requirements of Fed.R.Civ.P. 56(e)."). To that extent, IANR's first motion to strike Mr. Bernard's affidavit will be granted.

#### b. Mr. Warner's affidavit

As to the affidavit of Philip J. Warner, IANR specifically challenges the averments concerning the need for and estimated cost of repairs to the MKCX locomotives. IANR contends that it was misled into believing that Mr. Warner was qualified to comment on behalf of Helm on various matters, because IANR was led to believe that Mr. Warner was an officer of Helm. IANR contends that it learned that Mr. Warner was not actually an officer of Helm only when a dispute arose as to the venue for his deposition. IANR contends, further, that Mr. Warner's affidavit concerning repair estimates to the MKCX locomotives is not based on personal knowledge, but is instead based on hearsay of a third person. IANR contends that Mr. Warner's depo-

sition testimony demonstrates that he lacked personal knowledge of the alleged damages for repairs to the MKCX locomotives that he describes in paragraph 7 of his affidavit, the condition of those locomotives at the start of the lease with CDAC, or how or when any alleged damage to the MKCX units occurred. IANR contends that there is no applicable exception to the hearsay rule for Mr. Warner's statements in his affidavit.

In response, Helm contends that IANR's motion regarding Mr. Warner's affidavit is unnecessary and a waste of the court's time, because Helm conceded in the course of briefing the summary judgment motions that the *amount* of repair costs for the MKCX locomotives to which it is entitled is a fact question. Nevertheless, Helm also contends that it never misled IANR about Mr. Warner's status as an officer of the company, because it never represented that he was an "officer" just by representing that he is a "vice president" of the company. The fact that IANR assumed that the title of "vice president" meant that Mr. Warner was an officer, Helm contends, is no fault of Helm's. That issue aside, Helm contends that Mr. Warner had personal knowledge of the repairs Helm claims that IANR is responsible and liable for. Helm contends that Mr. Warner's deposition indicates that he had a lengthy conference call with Francois Bernard, Gary Dunham, and Pete Collins after the MKCX locomotives were surrendered and end-of-lease inspections had been conducted, and that the parties discussed the inspections and potential repairs. Mr. Warner was also aware of Mr. Bernard's subsequent estimates concerning the costs of necessary repairs, even if he did not actually prepare the estimates.

The court disagrees with Helm's contention that IANR's challenge to Mr. Warner's affidavit is irrelevant to the disposition of the summary judgment motions in light of Helm's concession that there are genuine issues of material fact as to the *amount* of repair costs for the MKCX locomotives. This concession is not the same as a concession that the *extent of repairs for which IANR can be held responsible* is subject to genuine issues of material fact. However, the court ultimately rejects IANR's challenges to Mr. Warner's affidavit.

■ Although nothing in Mr. Warner's affidavit indicates that he was personally involved in determining the damages for repairs to the MKCX locomotives or that he knew anything about the condition of the MKCX locomotives at the beginning of the lease to CDAC, Mr. Warner's averments that "Helm estimated the cost of repairs necessary to return the locomotives to good condition," and that the cost "was $19,709.00" is based on his personal knowledge and is consistent with his deposition testimony. The statements are based on Mr. Warner's personal knowledge of the *reasons* for Helm's conclusion that repair costs would be $19,709, even if he had not conducted the inspection himself, or did not, himself, know the condition of the locomotives at the start of the lease with CDAC. *See Aucutt,* 85 F.3d at 1317 (distinguishing between personal knowledge of a specific incident contributing to a decision and personal knowledge of the basis for a decision). Moreover, Mr. Warner's affidavit is consistent with his deposition testimony that he participated in a conference call with Francois Bernard, Gary Dunham, and Pete Collins, after the MKCX locomotives were surrendered and inspected, at which the parties discussed the inspections and potential repairs, and that he was aware of Mr. Bernard's subsequent estimate of the repair costs. *See Bass,* 232 F.3d at 619 (the court may properly consider an affidavit that seems con-

sistent with the affiant's prior deposition testimony).

Thus, the court may consider Mr. Warner's affidavit and IANR's second motion to strike will be denied, even if Mr. Warner's affidavit adds little or nothing to the merits of Helm's determination of the cost of any repairs or the merits of Helm's contention that IANR is responsible for bearing any of those costs.

### B. Helm's Motions to Strike

Helm's May 13, 2002, motions to strike portions of IANR's resistances to Helm's motions for summary judgment do not challenge affidavits. Instead, Helm's first such motion is its Motion to Strike Defendant's Resistance to Helm's Motion for Summary Judgment on Defendant's First Amended Affirmative Defenses and Counterclaim. Thus, this motions apparently seeks to strike *in its entirety* IANR's resistance to Helm's second motion for summary judgment. Helm's second motion to strike is its Motion to Strike Defendant's Amended Response to Helm's Statement of Fact Submitted in Resistance to Helm's [First] Motion for Summary Judgment. Moreover, the grounds on which Helm's motions to strike are premised are very different from the grounds asserted in IANR's challenges to the affidavits.

### 1. Deficiencies of IANR's resistance to Helm's second summary judgment motion

Helm contends that IANR's resistance to Helm's second motion for summary judgment should be stricken for failure to comply with a local rule, N.D. IA. L.R. 56.1, which Helm contends *required* IANR to file a "Statement of Additional Material Facts" in resistance to Helm's second motion for summary judgment, but IANR did not do so. Helm argues, further, that IANR's failure to file a Statement of Additional Material Facts is just "one more of a long list of violations of the Local and Federal Rules of Civil Procedure" in the course of asserting and resisting the motions for summary judgment now before the court. In light of this history of rules violations and the specific deficiency of IANR's response to Helm's latest motion for summary judgment, Helm contends that the court should strike IANR's resistance to that motion in its entirety.

IANR, however, argues that the three other summary judgment motions already filed and resisted before Helm filed its second motion for summary judgment had already established a substantial record, including various statements of fact. IANR asserts that it understands the term "*additional* material facts," as set forth in N.D. IA. L.R. 56.1(b)(3), to mean facts that are not already made part of this record. In this instance, IANR argues that there are no such missing facts. IANR also argues that, if strict compliance with N.D. IA. L.R. 56.1(b)(3) is required, IANR has now attempted to cure any deficiency by requesting leave to submit a Statement of Additional Material Facts, which states that there are no additional material facts to set forth beyond what is identified in IANR's prior statements of fact and responses to Helm's statements of fact.

The local rule at issue, which prescribes the manner in which parties must move for and resist summary judgment in this district, provides that the moving party must serve and file a motion for summary judgment, a brief in support of the motion, a statement of material facts that the moving party contends are undisputed, and an appendix of supporting documents. *See* N.D. IA. L.R. 56.1(a). As to the obligations of the resisting party, which Helm specifically invokes here, the rule provides as follows:

b. **Resisting Party's Papers.** A party resisting a motion for summary

judgment must, within 21 days after service of the motion, serve and file contemporaneously all of the following:

1. A brief in conformity with LR 7.1(e) in which the resisting party responds to each of the grounds asserted in the motion for summary judgment;

2. A response to the [moving party's] statement of material facts [as required in subsection (a)(3) ] in which the resisting party expressly admits, denies, or qualifies each of the moving party's numbered statements of fact;

3. A statement of additional material facts that the resisting party contends preclude summary judgment; and

4. An appendix, as explained in section (e) of this rule.

A response to an individual statement of material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the resisting party's refusal to admit the statement, with citations to the appendix containing that part of the record. The failure to respond to an individual statement of material fact constitutes an admission of that fact.

Each individual statement of additional material fact must be concise, numbered separately, and supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions,. exhibits, and affidavits that support the statement, with citations to the appendix containing that part of the record.

N.D. IA. L.R. 56.1(b). Another subsection of the local rule also provides that the moving party, in reply, must expressly admit, deny, or qualify each of the resisting party's numbered statements of additional facts. N.D. IA. L.R. 56.1(d). Thus, the rule plainly contemplates, and expressly requires, *inter alia*, (1) a statement of material, purportedly undisputed, facts by the movant; (2) a response by the resisting party to the movant's statement of facts, identifying the basis for a genuine dispute, *as well as* a statement of *additional* material facts precluding summary judgment; and (3) a reply to the resisting party's statement of *additional* material facts. *See* N.D. IA. L.R. 56.1. The obvious goal of these requirements is to establish as plainly as possible which facts are actually in dispute and the basis in the record for any such disputes. Moreover, the reason for requiring a resisting party to provide both a response to the moving party's statement of facts and a statement of additional facts is just as plainly to determine whether facts that the resisting party asserts preclude summary judgment are undisputed or disputed.

Neither the goals nor the specific requirements of Rule 56.1 have been well satisfied in this case. The court previously cautioned the parties to this litigation to comply with the requirements of the rule, reminding them that "in response to an opposing party's statement of material facts, the resisting party *must* 'expressly admi[t], den[y], or qualif[y] each of the moving party's numbered statements of fact,'" and noting further that "[a] 'qualification' that is not responsive to the specific fact asserted will be deemed an admission of the fact asserted." Order of April 15, 2002 (citing N.D. IA. L.R. 56.1(b)(2), (b) (second unnumbered paragraph), & (d)) (emphasis in the order). This caution was prompted by the court's review of the parties' responses to statements of fact, and particularly IANR's responses, which did not expressly and directly address facts asserted by the other party, and instead

asserted various additional facts, apparently as "qualification" of the facts asserted by the other party. Indeed, determining what facts are genuinely *undisputed* in this case has been made remarkably difficult by the failure of the parties, and particularly of IANR, to admit that any fact is true, apparently because the fact as stated did not provide what IANR believed to be the "complete picture" of the facts of the case.[2]

■ Nevertheless, the court will not strike IANR's resistance to Helm's second motion for summary judgment on the ground that it does not strictly comply with N.D. IA. L.R. 56.1(b) owing to the absence of a Statement of Additional Material Facts. First, while the plain language of the rule does *require* a party resisting summary judgment to file a Statement of Additional Material Facts, the letter of the rule must give way to common sense at some point: If the resisting party has no additional facts to assert, there is little reason for that party to submit a Statement of Additional Material Facts. On the other hand, the better course for a party in that position is to submit a Statement of Additional Material Facts stating plainly that the resisting party does not believe that any additional facts are required to preclude summary judgment. IANR has now taken that "better course" by seeking leave to submit such a Statement of Additional Facts. Second, such a sanction would be overkill, that is, excessive punishment for a techni-

cal failure when both parties have fully briefed their arguments. Third, IANR has attempted to cure the defect in its resistance to Helm's second motion for summary judgment by submitting a belated Statement of Additional Material Facts, which states that IANR does not believe that there are any additional facts that must be submitted to preclude summary judgment, and a request for leave to file such a belated statement. Fourth, Helm has not shown, or even attempted to articulate, in what way it has been prejudiced by IANR's failure to submit a Statement of Additional Material Facts. Rather, Helm filed a reply, in which Helm attacked several of IANR's assertions of disputed or additional facts stated in IANR's response to Helm's statement of material facts, as well as a supplemental appendix, in further support of its second motion for summary judgment, and Helm was afforded the opportunity for oral arguments.

Therefore, Helm's motion to strike IANR's resistance to Helm's second motion for summary judgment will be denied and IANR's request for leave to file a belated Statement of Additional Material Facts in resistance to Helm's second motion for summary judgment will be granted.

### 2. *Improper amendment of prior statement of facts*

Helm has also moved to strike IANR's amended response to Helm's statement of

---

**2.** For example, it cannot reasonably be disputed that IANR never paid Helm any rent for use of the MKCX locomotives, and IANR could have admitted that fact at the outset without prejudicing any of its contentions that it did not owe any rent to Helm or that Helm's remedy for unpaid rent would only lie against CDAC, but IANR did not make such an admission. *See* IANR's Statement of Disputed Material Facts [in Response to Helm's First Motion for Summary Judgment] (De-

cember 5, 2001), ¶ 14. In IANR's proffered Amended Response to Helm's Statement of Facts Submitted in Resistance to Helm's [First] Motion for Summary Judgment, however, IANR does expressly "admi[t] that it has never paid HELM rent" for the MKCX locomotives. *See* IANR's Amended Response to Helm's Statement of Facts Submitted in Resistance to Helm's [First] Motion for Summary Judgment (May 6, 2002), ¶ 14.

facts in support of Helm's *first* motion for summary judgment. Helm argues that the amended response has been submitted well after the deadline for any resistance to Helm's first motion for summary judgment, without asking the court for leave to amend as required by Rule 15 of the Federal Rules of Civil Procedure, and without any identification of the new or added material in the amended response. Helm also points out that the amended response relies in part on affidavits signed well after IANR filed its original resistance to Helm's first motion for summary judgment.

IANR admits that the amended response incorporates information obtained in nearly six months of additional discovery and depositions, but argues that its primary purpose is to clarify those portions of Helm's statement of facts that have been admitted, denied, or qualified by IANR. IANR argues that it has offered the original and amended statements as exhibits to its motion for leave to amend, so that the two can be compared, and has identified the changes sought by the amendment. IANR also argues that Rule 15 is inapplicable to its amendment of submissions in resistance to summary judgment, as that rule applies to amendment and supplementation of *pleadings*, not *motions* or *resistances to motions*. IANR also points out that Helm has filed various "supplements" to its motions and resistances to motions for summary judgment without seeking leave of court to do so. However, to cure any mistake, IANR points out that it has also now sought leave of court to amend its response to Helm's statement of material facts in support of its first motion for summary judgment.

Helm's motion to strike IANR's amended response to Helm's statement of facts will also be denied, for some of the same reasons the court will deny Helm's other motion to strike. First, assuming without deciding that IANR could not amend its response to Helm's first motion for summary judgment at this point without leave of court, IANR has attempted to cure that defect by requesting leave to file the amendment. Second, Helm has not shown that it would be prejudiced by consideration of IANR's amended response. On May 16, 2002, Helm filed a reply in support of its motion to strike and a resistance to IANR's motion to amend its response to Helm's first statement of facts, asserting that it would be prejudiced by the belated amendment, because it did not have the benefit of the amended response while drafting its reply in support of summary judgment, and, owing to the lateness of the amendment, Helm has not had the opportunity to consider whether to amend its reply. Helm contends that, since the hearing on the cross-motions for summary judgment has already been postponed twice, it does not want to delay further the court's opportunity to hear the issues and enter a ruling by requesting more time to amend its reply. The court is unpersuaded by this assertion of "prejudice." Helm has had access to the evidence on which IANR's amended response relies, a reasonable opportunity to marshal the evidence in the record in favor of its motion for summary judgment, and the opportunity, in the course of oral arguments, to address any necessary response to IANR's amended response to Helm's statement of material facts. Indeed, under these circumstances, Helm's contention that it was prejudiced by IANR's amendment to its response to Helm's statement of facts in support of Helm's first motion for summary judgment is disingenuous at best.

In addition to these reasons, the court does not believe that it was necessarily impermissible for IANR to rely on subsequent discovery to modify its responses to Helm's statement of material facts. This

is so, in part, because a summary judgment ruling would be interlocutory, and consequently, the court would have had the power to revisit its ruling, had one already been issued, in light of subsequently discovered evidence, *see, e.g., Dishman v. American Gen. Assur. Co.,* 193 F.Supp.2d 1119, 1122–23 (N.D.Iowa 2002) (recognizing the court's discretion to reconsider an order either granting or denying summary judgment, because such an order is interlocutory). Also, permitting such supplementation before the court has ruled allows the summary judgment process to serve most completely its purpose "as an integral part of the Federal Rules as a whole" to help " 'to secure the just, speedy and inexpensive determination of every action,' " *Wabun–Inini v. Sessions,* 900 F.2d 1234, 1238 (8th Cir.1990) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), by identifying genuine, triable issues of fact. *See Celotex,* 477 U.S. at 327, 106 S.Ct. 2548. If a summary judgment ruling is not itself "fixed in stone," it does not seem appropriate to bar a party from supplementing or amending the summary judgment record prior to the court's ruling— except, perhaps, as a sanction for dilatory conduct, which the court finds is not present here—and to do so might preclude the court from determining what triable issues actually remain on the full record that would be submitted at trial.

Therefore, Helm's motion to strike IANR's amended response to Helm's statement of material facts in support of Helm's first motion for summary judgment will be denied and IANR's request for leave to file its amended response will be granted.

Having resolved the preliminary issues concerning what portions of the record the court may consider, the court turns to the merits of the parties' various summary judgment motions.

## III. STANDARDS FOR SUMMARY JUDGMENT

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir.), *cert. denied,* 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347, 2000 WL 84400 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). The essentials of these standards for present purposes are as follows.

### A. Requirements Of Rule 56

Rule 56 itself provides, in pertinent part, as follows:

**Rule 56. Summary Judgment**

(a) **For Claimant.** A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

**(b) For Defending Party.** A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

**(c) Motions and Proceedings Thereon**.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(a)-(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rouse v. Benson,* 193 F.3d 936, 939 (8th Cir.1999); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394.

### B. The Parties' Burdens

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston,* 133 F.3d at 1107; *Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). "When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Rather, the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.,* 122 F.3d 559, 562 (8th Cir.1997), *cert. denied,* 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348; *Quick,* 90 F.3d at 1377 (same).

The court will apply these standards in its disposition of the parties' cross-motions for summary judgment.

## IV. MERITS OF THE SUMMARY JUDGMENT MOTIONS

In Helm's November 19, 2001, motion for summary judgment, Helm seeks summary judgment, first, on its own claims, then on IANR's original three counterclaims. In IANR's first motion for partial summary judgment, filed February 19, 2002, IANR seeks summary judgment on its affirmative defense asserting the unconscionability of certain provisions of the IANR Lease on which Helm relies. In IANR's second motion for partial summary judgment, IANR seeks summary judgment on Helm's claims regarding the MKCX locomotives. Finally, in Helm's second motion for summary judgment, Helm seeks summary judgment on all of IANR's amended affirmative defenses and counterclaims. Thus, the parties' various motions for summary judgment put at issue liability—at least—on all of the claims, defenses, counterclaims, and issues in the case. In light of the overlap of claims, defenses, counterclaims, and issues among the motions for summary judgment, a more coherent picture of what, if any, issues remain for trial can best be obtained by considering the pending summary judgment motions claim-by-claim, rather than motion-by-motion. The first, and perhaps central, question in the court's consideration of the summary judgment motions is, consequently, who breached the IANR Lease?

### A. Who Breached The IANR Lease?

Helm asserts a breach-of-contract claim and IANR asserts a breach-of-contract counterclaim, both involving the IANR Lease. In addition to, or in the process of, resolving the motions for summary judgment on claims involving breach of the IANR Lease, the court will also necessarily decide whether summary judgment is appropriate on IANR's various affirmative defenses raised specifically to Helm's breach-of-contract claim, but not subsumed in IANR's breach-of-contract counterclaim.[3] Those affirmative defenses include IANR's first affirmative defense of unconscionability of certain provisions of the IANR Lease, and its fourth and sixth affirmative defenses of failure of consideration and frustration of purpose, respectively.

#### 1. The claim and counterclaim

In Count II of its Complaint, entitled Breach of Written Contract, Helm alleges that IANR has breached the IANR Lease, *inter alia*, by failing to pay rent and other obligations due Helm. Complaint, Count II, ¶ 23. Helm, therefore, prays for money damages for rent, repairs, maintenance, storage, inspection fees, and transportation costs, plus any and all applicable interest, costs, and reasonable attorney fees and expenses. *Id.* at Count II, Prayer, ¶ A. However, in its First Amended Answer, Affirmative Defenses, and Counterclaim, in Count I of its Counterclaim, entitled

---

**3.** The court reads IANR's breach-of-contract counterclaim to subsume IANR's seventh and eighth affirmative defenses of breach of contract and modification of contract, respectively. Therefore, these two affirmative defenses will not be considered separately. The court also reads IANR's counterclaims of breach of express warranties (Count IV), breach of implied warranties of fitness for a particular purpose (Count V), breach of implied warranty of merchantability (Count VI), breach of implied warranty of the capacity of the equipment (Count VII), and breaches of covenants of good faith and fair dealing (Count VIII) to subsume those portions of its affirmative defense of breach of contract based on breach of express and implied warranties, both written and oral. Therefore, the court will reserve consideration of breach of warranties for its analysis of the pertinent counterclaims. The court will also reserve for separate consideration IANR's fifth affirmative defense of failure to mitigate damages, as it goes to Helm's claims involving both the IANR and the MKCX locomotives.

Breach of Lease, IANR also alleges that Helm's conduct, as elsewhere alleged, was in breach of its contractual duties as set forth in the IANR Lease, the CDAC Lease, and the Amended Lease. The parties have each moved for summary judgment on these claims.

### a. Arguments of the parties

 Helm contends that, as to the lease for the IANR locomotives, there are no genuine issues of material fact under the governing law [4] regarding its entitlement to recover unpaid rent and interest on past due rent, repair costs, inspection

and transportation costs, and attorney fees to recover such amounts. Helm contends that the agreement governing its claims as to the IANR locomotives is the March 28, 1995, IANR Lease, as amended on December 11, 1997. Helm contends that no other agreement was ever consummated, because negotiations broke down when IANR inserted a handwritten term into the September 29, 2000, proffered agreement, thus making a counteroffer that Helm never accepted. Helm contends, further, that the IANR Lease creates a right to payment of rent due and interest on past due rent, and bars any reductions

---

4. Although almost every other issue in this case is hotly contested, IANR at first did not appear to dispute Helm's contentions that Helm's breach-of-contract claim against IANR involving the IANR locomotives is governed by California law, although not necessarily for the reasons advanced by Helm. However, in the briefing on Helm's second motion for summary judgment, IANR contended, for the first time, that the choice-of-law clause in the IANR Lease selecting California law was not necessarily the end of the matter, and that Iowa, instead, had the most significant relationship to the parties' contract dispute.

A federal court must apply the choice of law rules of the forum state—in this case, Iowa. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Iowa law employs the Second Restatement's "most significant relationship" test to determine which state's law will govern a contract's interpretation. *See, e.g., Veasley v. CRST Intern., Inc.,* 553 N.W.2d 896, 897 (Iowa 1996) (recognizing Iowa's adoption of the "most significant relationship" test); *Cameron v. Hardisty,* 407 N.W.2d 595, 597 (Iowa 1987) (same); *Cole v. State Auto. & Cas., Underwriters,* 296 N.W.2d 779, 781–82 (Iowa 1980) (same); *Berghammer v. Smith,* 185 N.W.2d 226, 231 (Iowa 1971) (same). Where the parties' contract contains no valid choice-of-law clause, the applicable factors are stated in RESTATEMENT (SECOND) OF CONTRACTS §§ 6 and 188, but if there is a valid choice-of-law clause in the contract, the factors in § 187 also apply. *See, e.g., L & L Builders Co. v. Mayer Associated Services, Inc.,*

46 F.Supp.2d 875, 882 (N.D.Iowa 1999); *Harlan Feeders, Inc. v. Grand Labs., Inc.,* 881 F.Supp. 1400, 1411 (N.D.Iowa 1995). Among other things, " '[Section] 187 permits the parties to agree on the law to be applied to the contract in most cases so long as it does not override the public policy of a state having a materially greater interest in the transaction.' " *Harlan Feeders,* 881 F.Supp. at 1412 (quoting *Joseph L. Wilmotte & Co. v. Rosenman Bros.,* 258 N.W.2d 317, 328 (Iowa 1977)). However, "[o]rdinarily, before any choice of law need be made, there must be a 'true conflict' between the laws of the possible jurisdictions on the pertinent issue." *L & L Builders Co.,* 46 F.Supp.2d at 881 (citing *Harlan Feeders,* 881 F.Supp. at 1404, in turn citing, *inter alia, Nesladek v. Ford Motor Co.,* 46 F.3d 734, 736 (8th Cir.1995)).

The court concludes that application of California law to Helm's contract claim is warranted based on these principles and factors identified in pertinent sections of the RESTATEMENT, including, but not necessarily limited to, the following: (1) there has been no showing that a "true conflict" exists between the laws of California and Iowa on the pertinent issues; (2) the contract provides that California law governs the construction of the Agreement, *see* Helm's Appendix to First Motion for Summary Judgment at 19 (IANR Lease, § 22); and (3) there has been no persuasive showing that Iowa necessarily has a materially greater interest in the transaction or that application of California law will override any public policy of Iowa, if Iowa does have a materially greater interest.

or setoffs for any claims that IANR might have had against Helm. Moreover, Helm contends that, once IANR accepted the IANR locomotives subject to the IANR Lease, under the terms of the Lease, IANR could not defend against a claim for rent under the contract on the ground that the locomotives were defective, damaged, or out of service for repairs. Helm also contends that the IANR Lease establishes IANR's obligation to pay for the costs and expenses of inspecting, repairing, and transporting the IANR locomotives, as well as IANR's obligation to pay accrued attorney fees to recover those costs, although Helm elsewhere concedes that the *amount* of repair costs, interest due on past due rent, and attorney fees may be subject to genuine issues of material fact. Helm also contends that there are no genuine issues of material fact that preclude summary judgment in its favor on IANR's counterclaim that Helm breached the lease, because the locomotives were leased "AS–IS," Helm disclaimed any other warranties, Helm delivered the locomotives in the condition required by the contract pursuant to FRA and AAR rules, and IANR inspected the locomotives and accepted them after Helm made repairs requested by IANR.

IANR, however, contends that there are genuine issues of material fact precluding summary judgment in Helm's favor on Helm's contract claim involving the IANR locomotives. First, IANR contends that there are genuine issues of material fact as to what constitutes the contract between the parties concerning the IANR locomotives—the March 28, 1995, agreement, additional oral promises, or the September 29, 2000, agreement, which IANR contends that Helm unilaterally breached—as well as whether Helm breached the contract at the outset by failing to provide GP–38 locomotives capable of delivering 2,000 horsepower of traction. IANR also contends that there are genuine issues of material fact as to whether IANR breached the March 28, 1995, IANR Lease, where Helm purportedly acknowledged that it had failed to perform the contract fully and the parties agreed to the terms of an amended lease that cured any past deficiencies on the part of both parties. IANR also contends that there are genuine issues of material fact as to whether Helm suffered any damage caused by any breach of the lease by IANR or what those damages are. IANR also disputes Helm's entitlement to or the amount of any repair, inspection, or transportation costs, or any attorney fees.

In reply, Helm argues that the IANR Lease was a negotiated document, not an adhesion contract, that it unambiguously required IANR to pay rent in the amount of $145 per day for each of the IANR locomotives at issue, and that it establishes that IANR is not entitled to any offset, abatement, or reduction of rents owed for any past, present, or future claims IANR may have against Helm. Furthermore, Helm argues that, under the terms of the lease, IANR's obligation to pay rent was not terminated or otherwise affected by any defect or damage to the locomotives or by any loss of use of the locomotives. Helm points out that IANR agreed to these terms and accepted the locomotives subject to the IANR Lease after inspecting them, demanding certain repairs, and inspecting the locomotives again to determine whether or not the repairs had been satisfactory. Although IANR argues that it was relieved of its obligation to pay rent, because the locomotives never performed satisfactorily, Helm argues that it is undisputed that Helm met its obligation to deliver the locomotives in compliance with FRA and AAR rules of interchange, IANR inspected the locomotives twice, and IANR accepted the locomotives "AS–IS." Finally,

Helm argues that the provisions of the IANR Lease providing for payment of rent and interest on unpaid rent are unambiguous.

In a supplemental brief, Helm argues that the court has already ordered IANR to do the repairs to the IANR locomotives that are at issue here, because, in prior litigation, the court specified in its order directing IANR to return the locomotives that the locomotives must comply with applicable AAR, FRA, and similar safety regulations, such that the units would be suitable for towing and transportation, but IANR did not do what the order required. IANR contends that the court order relied upon adds nothing to Helm's arguments, because it is undisputed that IANR made all necessary repairs to place the locomotives in FRA/AAR interchange condition before returning them to Helm, because the locomotives were, in fact, interchanged.

### b. What constitutes the IANR Lease?

In light of the parties' arguments, the first question the court must resolve on the respective breach-of-contract claims is, just what is the "Lease" for the IANR locomotives that the parties may or may not have breached? Helm contends that it is the original, March 28, 1995, agreement, as modified by written Amendment No. 1 on December 11, 1997, to terminate the lease early as to two of the locomotives, the one intended to have the "New Unit Number" IANR 3606, but never actually renumbered, and the one numbered IANR 3611. IANR, however, argues that the original lease was also modified by additional oral promises, and by an agreement on September 29, 2000, to resolve the disputes between the parties concerning the original lease (and to allow IANR to rent four other locomotives), but that Helm unilaterally breached that amended lease.

In the first instance, there is no dispute that the parties entered into a binding agreement for lease of four locomotives on March 28, 1995, and that the lease was subsequently amended, in writing, on December 11, 1997, to terminate the lease as to two of those locomotives. Thus, the question is, what other amendments became binding?

### i. Oral promises and amendments.
IANR contends that the written lease was amended by various oral promises—or that there are genuine issues of material fact concerning oral amendments—including a promise to "make things right," when IANR found that the locomotives were defective. Section 1625 of the California Civil Code provides that "execution of a contract in writing ... supersedes all negotiations or stipulations ... [that] preceded or accompanied the execution of the instruction." CAL. CIV. CODE § 1625. "That section is in effect a merger provision that makes the writing, rather than prior oral discussions or agreements, the controlling agreement." Tomlinson v. Qualcomm, Inc., 97 Cal.App.4th 934, 118 Cal.Rptr.2d 822, 831 n. 14 (2002); see also Alling v. Universal Mfg. Corp., 5 Cal. App.4th 1412, 1433, 7 Cal.Rptr.2d 718 (1992) ("An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement.") (internal quotations omitted); CAL. CODE CIV. PRO. § 1856(a), (b) & (g) (the parole evidence rule prohibits the introduction of extrinsic evidence to add to or contradict the terms of an integrated agreement, but it does not prohibit extrinsic evidence to explain the terms of the agreement or to explain an extrinsic ambiguity). However, "section [1625] does not appear to apply to modification of a prior express written agreement." Tomlinson, 118 Cal.Rptr.2d at 831 n. 14. California courts recognize that, "even where a con-

tract has been solemnized by a writing, an oral modification of that written contract may be proved by a preponderance of the evidence." *Weiner v. Fleischman,* 54 Cal.3d 476, 286 Cal.Rptr. 40, 816 P.2d 892, 899 (1991) (citing *Barrett v. Bank of Am.,* 183 Cal.App.3d 1362, 1370–71, 229 Cal. Rptr. 16 (1986)). On the other hand, a contract may specify the exclusive means by which it can be modified, "and therefore no other purported amendments (whether in written or oral form) are effective." *Tomlinson,* 118 Cal.Rptr.2d at 831. There appears to be "no California law suggesting a clause specifying an exclusive method for amending the agreement is unenforceable." *Id.* at 832 n. 15.

■ Here, the court concludes that any oral amendments asserted by IANR were ineffective, as a matter of law, in light of the express terms of the written lease entered into on March 28, 1995. That original lease included the following term:

> 19. *Effect and Modification of Lease.* This Lease exclusively and completely states the rights of Lessor and Lessee with respect to the leasing of the Units and supersedes all other agreements, oral or written, with respect thereto. No variation or modification of this Lease and no waiver of any of its provisions or conditions shall be valid unless in writing and signed by duly authorized signatories for Lessor and Lessee.

*See* Helm's Appendix to First Motion for Summary Judgment at 18 (Exhibit 1, Lease of Railroad Equipment, § 19). Thus, the March 18, 1995, agreement not only specified that it fully merged all prior negotiations into the written document, *see also* Cal. Civ. Code § 1625, it specified the *exclusive manner* in which the agreement could be modified or amended, *see Tomlinson,* 118 Cal.Rptr.2d at 831 & n. 14, specifically, "in writing and signed by duly authorized signatories for Lessor and Les-

see." Lease of Railroad Equipment, § 19. Any oral amendments were, therefore, ineffective. *Tomlinson,* 118 Cal.Rptr.2d at 831. Moreover, the parties demonstrated their ability to amend the agreement, pursuant to the "in writing" requirement, by executing the Amendment No. 1 on December 11, 1997, terminating the lease as to two of the locomotives. In short, IANR's contentions that Helm made oral promises, either before or after execution of the written Lease, that constituted part of the parties' agreement does not generate any genuine issues of material fact under governing law as to the contract controlling the parties' relationship. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

***ii. Written amendment.*** IANR also contends that the parties reached a *written* agreement to modify the March 18, 1995, lease on or about September 29, 2000, which would have resolved the disputes between the parties concerning the original lease (and also would have allowed IANR to rent four other locomotives), but that Helm unilaterally breached that amended agreement by repudiating and failing to perform it in October 2000. This argument fares no better.

■ As Helm contends, under California law, " 'terms proposed in an offer must be met exactly, precisely and unequivocally for its acceptance to result in the formation of a binding contract [citations]; and a qualified acceptance amounts to a new proposal or counteroffer putting an end to the original offer....' " *Panagotacos v. Bank of Am.,* 60 Cal.App.4th 851, 855–56, 70 Cal.Rptr.2d 595, 597 (1998) (quoting *Apablasa v. Merritt & Co.,* 176 Cal.App.2d 719, 726, 1 Cal.Rptr. 500 (1959)). As the court

recounted above, when Pete Collins signed the September 29, 2000, proposal from Helm, on October 6, 2000, indicating that Helm's proposal was "Agreed and Accepted," he *also* made and initialed a handwritten addition above item 1), which stated, "Subject to inspection and approval by Iowa Northern." Helm's Appendix to First Motion for Summary Judgment at 42 (September 29, 2000, letter). Moreover, Collins admitted in deposition that he did not consult with or obtain the agreement of anyone from Helm before making this addition. *Id.* at 86 (Deposition of Pete Collins at 84–85). Thus, IANR's attempt to reach an agreement under the terms of the September 29, 2000, letter from Helm constituted a counteroffer. *Panagotacos,* 60 Cal.App.4th at 855–56, 70 Cal.Rptr.2d 595. Moreover, that counteroffer was never accepted, notwithstanding Mr. Collins's contention in his deposition that Helm must have accepted it by permitting IANR's inspector to examine proffered locomotives, because Helm never signified any "exac[t], precis[e] and unequivoca[l]" acceptance of IANR's counteroffer, *see id.,* instead refusing to make any of the repairs IANR requested after inspecting the proffered locomotives. Helm's Appendix to First Motion for Summary Judgment at 43 (Exhibit 9, Letter of October 31, 2000).[5] IANR's attempt, in its resistance to Helm's second motion for summary judgment, to generate a genuine issue of material fact on this question by arguing that the term inserted by Mr. Collins did not vary from either Helm's or the industry's practice, and thus, did not constitute a counteroffer, fails, even assuming it is based on a correct legal premise, where IANR has presented no evidence demon-

strating either Helm's or the industry's purported practice in 2000. Thus, IANR failed to designate "specific facts showing that there is a genuine issue for trial" on this issue. FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka,* 122 F.3d at 562; *McLaughlin,* 50 F.3d at 511; *Beyerbach,* 49 F.3d at 1325.

In short, as a matter of law, the governing contract concerning the IANR locomotives was the March 18, 1995, Lease of Railroad Equipment, as modified by the written Amendment No. 1, dated December 11, 1997.

### c. Breach by IANR

Under California law, "the elements of the cause of action [for breach of contract] are the existence of the contract, performance by the plaintiff or excuse for nonperformance, breach by the defendant and damages." *First Commercial Mortgage Co. v. Reece,* 89 Cal.App.4th 731, 108 Cal.Rptr.2d 23, 33 (2001). For purposes of Helm's motion for summary judgment on its breach-of-contract claim, the question is whether IANR, as the party resisting that summary judgment motion, can go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial" on this claim. FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka,* 122 F.3d at 562; *McLaughlin,* 50 F.3d at 511; *Beyerbach,* 49 F.3d at 1325.

"It is, of course, basic hornbook law that the existence of a contract is a necessary element to an action based on

5. Furthermore, one of the terms of the September 29, 2000, "offer" from Helm was that a "Lease document must be executed prior to units leaving MEI," *see* Helm's Appendix to First Motion for Summary Judgment at 42 (September 29, 2000, letter, ¶ 3), which indicates that the parties contemplated execution of another, written lease to consummate their deal.

contract, regardless whether the plaintiff seeks specific performance or damages for breach of contract." *Roth v. Malson*, 67 Cal.App.4th 552, 557, 79 Cal.Rptr.2d 226 (1998). Moreover, "[u]nder California law, a contract will be enforced if it is sufficiently definite (and this is a question of law) for the court to ascertain the parties' obligations and to determine whether those obligations have been performed or breached." *Ersa Grae Corp. v. Fluor Corp.*, 1 Cal.App.4th 613, 623, 2 Cal. Rptr.2d 288 (1991).

█ Helm contends that, as a matter of law, the IANR Lease obligated IANR to pay rent of $145 per day on each of the IANR locomotives at issue here, interest on past due rent, repair costs, inspection and transportation costs, and attorney fees to recover such amounts. The court agrees that the IANR Lease does, in fact, state these obligations in terms that are sufficiently definite for the court to ascertain IANR's obligations and to determine whether those obligations have been performed or breached. *Id.* Specifically, the IANR Lease provided for a rental of $145 per unit per day, Helm's Appendix to First Motion for Summary Judgment at 3 (IANR Lease at § 4, ¶ A), and was, by its terms, a "net lease" providing, *inter alia,* that "Lessee shall not be entitled to any abatement of Rent, reduction thereof or set-off against Rent...." *Id.* (§ 4, ¶ C). The Lease also placed on IANR, among other things, the risk of any loss, damage, or destruction, *see id.* at 5(§ 7), the responsibility, "at its own cost and expense," of maintaining, servicing, and repairing the locomotives, *id.* at 7 (§ 9, ¶ C(i)), and the costs of insurance. *Id.* at 8 (§ 9, ¶ D). Moreover, the Lease provided that, in the event IANR defaulted in payment of any sum of money due to be paid under the Lease, IANR would be obligated to pay "interest on such unpaid sum from its due

date to date of payment by the Lessee at a rate equal to the rate of interest publicly announced by the Bank of Boston, Boston, MA, or its successor, as its prime rate, as such rate may change from time to time, plus three percent (3%)." *Id.* at 4 (§ 4, ¶ B). This provision also provides that "[a]ny costs incurred by Lessor in collecting *Rent or any other sum of money due under this Lease wrongfully withheld by Lessee,* including but not limited to, reasonable attorneys' fees, will be paid by Lessee." *Id.* (emphasis added); *see also id.* at 13 (§ 12, ¶ 12(A)(vii) (providing for recovery of attorney fees upon default by the Lessee)). Thus, IANR is obligated to pay interest, as specified, on unpaid rent and repair costs as well as Helm's costs and reasonable attorney fees to recover the unpaid sums. Also, upon default, the Lease obligates the Lessee to pay Helm's expenses, including transportation costs, which are expressly identified. *Id.* at 12–13 (§ 12, ¶ A(vii)). The court also concludes that the Lease permits Helm to recover inspection costs, which fall within the scope of "any damages and expenses," as the Lease plainly does not limit the items of damage to those expressly listed. *Id.* The Lease also provided that these obligations "shall survive the expiration or sooner termination of this Lease," *id.* at 3 (§ 3, ¶ D), so that the obligations to pay rent, etc., continued even after the Lease expired in August of 2000. Thus, the first element of Helm's breach-of-contract claim is established as a matter of law.

As to the second element of a breach-of-contract claim under California law, "[i]t is elementary [that] a plaintiff suing for breach of contract must prove it has performed all conditions on its part or that it was excused from performance." *Consolidated World Investments, Inc. v. Lido Preferred Ltd.*, 9 Cal.App.4th 373, 380, 11 Cal.Rptr.2d 524 (1992). Under section 2 of the IANR Lease, entitled "Acceptance and

Delivery of Units," Helm had the following obligations:

A. Lessor agrees to furnish the Units in compliance with the Federal Railroad Administration ("**FRA**") and Association of American Railroads ("**AAR**") rules of interchange in effect at the time of delivery. Lessee, at its expense, shall have the right to inspect and reject the Units subject to this Lease at the Delivery Point [elsewhere identified as the Union Pacific Railroad Company and Chicago and North Western Railway Company interchange point located in Cedar Rapids, Iowa]. Acceptance of the Units by Lessee shall be evidenced by a "**Certificate of Acceptance**" in the form set forth in Annex B attached hereto, the execution of which shall constitute conclusive evidence of acceptance of the Units herein identified.

B. In the event any Unit presented for acceptance to Lessee is not in FRA and AAR interchange condition, then upon written notice of the same by Lessee to Lessor, Lessor, at its option shall either promptly cause said Unit(s) to be repaired or replaced (at no expense to Lessee) or exclude such Unit(s) from this Lease.

Helm's Appendix to First Motion for Summary Judgment at 2 (IANR Lease at § 2). Helm was also obligated to deliver the "Units," at its expense, to the agreed "Delivery Point," which was the Union Pacific Railroad Company and Chicago and North Western Railway Company interchange point located in Cedar Rapids, Iowa. *Id.* at 3 (§ 2, ¶ C). There is no genuine issue of material fact that Helm performed these duties, although IANR contends that Helm breached other obligations under the IANR Lease, an issue addressed below with reference to IANR's counterclaim for breach of contract. The record is undisputed that Helm ultimately delivered the locomotives in compliance with FRA/AAR interchange rules,[6] that Helm allowed IANR to inspect the locomotives, and that Helm performed the requested repairs— which in some respects exceeded the requirements for compliance with FRA/AAR interchange rules—before IANR accepted delivery.

 Helm also notes that the IANR Lease provides that the "Units" were leased "AS–IS." Helm's Appendix to First Motion for Summary Judgment at 8 (IANR Lease § 9, ¶ A). IANR attempts to generate a genuine issue of material fact as to whether Helm satisfied this requirement by arguing that "AS–IS" meant the condition in which IANR found the locomotives when it inspected and hand-picked them in February 1995, not the much worse condition in which IANR found them upon delivery in the summer of 1995. In its briefing of Helm's second motion for summary judgment, Helm contends that the precise date to which the "AS–IS" disclaimer applies—February 1995, when IANR first inspected and handpicked the locomotives to be leased, March 1995, the date of the lease, or the summer of 1995, when the locomotives

---

**6.** IANR contends that there is a genuine issue of material fact as to whether Helm even delivered the locomotives in interchange condition under the AAR/FRA rules, because one of the railroads transporting the locomotives to Iowa refused to transport them on the basis that they were not in satisfactory condition under those rules. However, this dispute of facts, even if genuine, is not material. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (a dispute of fact is "material" only if it "might affect the outcome of the suit under the governing law"). It is undisputed that IANR ultimately accepted the locomotives, thus establishing that the locomotives were ultimately delivered in satisfactory condition.

were ultimately delivered—really doesn't matter here, because there are no genuine issues of material fact that IANR inspected the locomotives at delivery, that IANR requested certain repairs, that Helm performed those repairs to IANR's satisfaction, and that IANR then accepted the locomotives pursuant to the lease.

As the Ninth Circuit Court of Appeals recently explained,

> Under California law, the fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed at the time of contracting. Cal. Civ.Code § 1636; *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 68 Cal.App.4th 445, 474, 80 Cal.Rptr.2d 329 (1998). When a contract is reduced to writing, this intent "is to be ascertained from the writing alone, if possible." Cal. Civ.Code § 1639; *see also Brinton v. Bankers Pension Servs., Inc.,* 76 Cal.App.4th 550, 559, 90 Cal. Rptr.2d 469 (1999).

*U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.,* 281 F.3d 929, 934 (9th Cir.2002). Moreover, " 'a written contract must be read as a whole and every part interpreted with reference to the whole.' " *In re Crystal Properties, Ltd., L.P.,* 268 F.3d 743, 748 (9th Cir.2001) (quoting *Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1032 (9th Cir.1989), in turn quoting *Shakey's, Inc. v. Covalt,* 704 F.2d 426, 434 (9th Cir.1983)).

The court concludes, upon reading the contract as a whole, that "AS–IS" is not ambiguous, nor does the term otherwise require looking beyond "the writing alone." *See U.S. Cellular Inv. Co.,* 281 F.3d at 934; *In re Crystal Properties, Ltd., L.P.,* 268 F.3d at 748. Instead, "AS–IS" plainly means as the locomotives existed *upon acceptance of delivery by IANR.* Only at the point of acceptance did IANR's obligations under the Lease begin. *See,* *e.g.,* Helm's Appendix to First Motion for Summary Judgment at 3 (IANR Lease § 3, "Term of Lease"). Up until that point, the units subject to the Lease could be changed, upon IANR's rejection of a unit and Helm's decision to replace a unit at no expense to IANR, rather than repair it. *Id.* (§ 2, ¶ B). "AS–IS" is meaningless, if it refers to the condition of units that are not subject to the Lease at some point prior to commencement of the Lease term. Consequently, the term "AS–IS" can only refer to the condition of the locomotives actually and ultimately *subject* to the Lease. There is no genuine issue of material fact that IANR ultimately accepted the locomotives and it is at that point that the locomotives were leased "AS–IS."

Turning to the last elements of Helm's breach-of-contract claim, under California law, "[i]t is axiomatic that in order to prove a cause of action for breach of contract the plaintiff must prove a breach by the defendant and the amount of damages *caused* by the breach." *Golden Eagle Refinery Co., Inc. v. Associated Intern. Ins. Co.,* 85 Cal.App.4th 1300, 102 Cal.Rptr.2d 834, 843 (2001) (citing *Reichert v. General Ins. Co.,* 68 Cal.2d 822, 830, 69 Cal.Rptr. 321, 442 P.2d 377 (1968)) (emphasis in the original). "The unjustified failure of an obligor to perform a contract constitutes a breach of that contract." *Erich v. Granoff,* 109 Cal.App.3d 920, 929, 167 Cal. Rptr. 538, 543 (1980). Pursuant to statute, the measure of damages for a breach of contract under California law "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." CAL. CIV. CODE § 3300. Although Helm concedes that there are genuine issues of material fact as to the precise amount of any damages, and the court finds, further, that there are genuine

issues of material facts as to the precise repairs *required*—not just what those repairs would *cost*—there are no genuine issues of material fact that IANR did not pay all of the rent due under the contract or perform or pay for all of the repairs demanded by Helm at the end of the lease.

Therefore, with the exception of the extent and amount of damages, *unless* there are genuine issues of material fact on a defense that would bar Helm's recovery, Helm is entitled to judgment in its favor on IANR's liability on Helm's claim that IANR breached the lease for the IANR locomotives.

### d. Breach by Helm

In its amended counterclaim, IANR alleges that Helm's conduct, as elsewhere alleged, was in breach of its contractual duties as set forth in the IANR Lease, the CDAC Lease, and the Amended Lease. Helm is entitled to summary judgment on IANR's counterclaim that Helm breached the Amended Lease, by which IANR means the purported agreement on Helm's offer of September 29, 2000, because, as explained above, that agreement never ripened into a binding contract as a matter of law. Also, as a matter of law, IANR has no standing to assert Helm's breach of the CDAC Lease, because IANR elsewhere asserts, Helm agrees, and there are no genuine issues of material fact that IANR was never a party to that lease.

■ As to breach of the IANR Lease, as embodied in the March 28, 1995, agreement and the Amendment No. 1 dated December 11, 1997, IANR contends that Helm breached that agreement by delivering locomotives that were not in the condi-

tion they were in when inspected in February 1995, and instead were defective, because they were not capable of 2,000 horsepower of traction. IANR contends that the provision of locomotives capable of 2,000 horsepower of traction was the "essence" of the agreement. Presumably, this is a contention that IANR should be excused from any performance under the IANR Lease by Helm's prior breach or by failure of consideration.[7] IANR also contends that Helm breached the lease by depriving IANR of the locomotives as to which the IANR Lease was terminated, once IANR had repaired those locomotives to good operating condition, which resulted in a windfall for Helm and a detriment to IANR. Finally, IANR contends that Helm breached various implied warranties.

As explained above, the governing document for the lease of the IANR locomotives is the March 28, 1995, agreement, as amended by the Amendment No. 1 dated December 11, 1997. Moreover, there are no genuine issues of material fact that Helm delivered the locomotives in the condition dictated by the IANR Lease, which was as required by FRA/AAR interchange rules, that IANR was permitted to inspect the locomotives before accepting them, that Helm made the requested repairs before IANR accepted the locomotives, that the contract provided that the locomotives were then accepted "AS–IS," and that IANR subsequently executed a Certificate of Acceptance memorializing its acceptance of the locomotives pursuant to the Lease. Consequently, even if the locomotives never performed as well as IANR expected, or IANR had to spend much more on

---

7. Indeed, IANR's affirmative defense of failure of consideration, its fourth affirmative defense, is premised on its contention that Helm failed fully to perform and failed to provide consideration when it failed to deliver in a timely manner four GP–38 locomotives, each of them capable of providing 2,000 horsepower of traction power. *See* IANR's Amended Answer, Affirmative Defenses, and Counterclaim, Fourth Affirmative Defense.

repairing them and suffered more "downtime" because of such repairs than IANR anticipated, the locomotives were not "defective" under the plain meaning of the terms of the Lease, *see* CAL. CIV. CODE § 1639; *see also U.S. Cellular Inv. Co.,* 281 F.3d at 934, because IANR accepted the locomotives at the beginning of the lease term, conclusively establishing that they were ultimately delivered in satisfactory condition. *See* Helm's Appendix to First Motion for Summary Judgment at 2 (IANR Lease at § 2) ("Acceptance of the Units by Lessee shall be evidenced by a **'Certificate of Acceptance'** in the form set forth in Annex B attached hereto, the execution of which shall constitute conclusive evidence of acceptance of the Units herein identified.").

▆▆▆ IANR's challenge to the validity and conclusiveness of its acceptance— based on absence from the Certificate of Acceptance of the 2,000 horsepower description and the timing of the presentation and execution' of the Certificate—also fails to generate any genuine issues of material fact. First, the court concludes that IANR's contentions that delivery of locomotives capable of 2,000 horsepower of traction was the "essence" of the contract, and that Helm failed ever to perform that requirement of the contract, must fail as a matter of law in the face of the plain language of the contract, read as a whole. *See In re Crystal Properties, Ltd., L.P.,* 268 F.3d at 748. As explained in the court's recitation of pertinent facts of the case, apart from the reference to the horsepower of the locomotives in the "Equipment Description" in Annex A of the IANR Lease, the form Certificate of Acceptance (Annex B), and a Memoran-

dum of Lease (Annex E, Exhibit A), the IANR Lease makes no reference to the horsepower or traction capacity of the lo-comotives as a specific term of the parties' agreement, nor does it contain any express representation or warranty by Helm as to the traction capacity or other performance specifications of the locomotives. Instead, the body of the IANR Lease simply refers to the items subject to the lease as "Units." Moreover, the IANR Lease specifically disclaims any warranties "of any kind" by Helm as to the locomotives, which would conflict irreconcilably with an interpretation of the reference to horsepower of the locomotives in the annex describing units subject to the Lease as a "performance standard." Helm's Appendix to First Motion for Summary Judgment at 8 (Art. 9, ¶ A). Thus, in light of the "writing," standing alone, *see* CAL. CIV. CODE § 1639; *U.S. Cellular Inv. Co.,* 281 F.3d at 934, the merger clause in the contract, *see* CAL. CIV. CODE § 1625; *Tomlinson,* 118 Cal.Rptr.2d at 831 n. 14, and a reading of the written contract "as a whole," *see In re Crystal Properties, Ltd., L.P.,* 268 F.3d at 748, the reference to "Four (4), two-thousand (2,000) horsepower, GP38 locomotives," *see* Plaintiff's Appendix at 22 (IANR Lease, Annex A), was not a recitation of any sort of "performance standard," only a description identifying the type of locomotives involved. Helm's provision of locomotives with 2,000 horsepower of traction simply was not a requirement of the contract. Moreover, the record is devoid of any evidence that, in the course of performing the pre-acceptance inspection permitted by the Lease, IANR demanded that the locomotives be shown to be capable of 2,000 horsepower of traction.[8] Under

---

8. IANR's arguments that Helm should have made such a test when the locomotives came off the prior lease, and that Helm ordinarily performed such tests, are not supported by

the testimony of Francois Bernard upon which IANR relies. Instead, as Helm points out, Mr. Bernard referred to practices he instituted when he became Chief Mechanical

these circumstances, there is not the merest inference that rental of locomotives capable of 2,000 horsepower of traction was somehow the "essence" of the parties' agreement.

Second, because the horsepower of traction that the locomotives were capable of producing was not the "essence" of the parties' agreement or a material term of their contract, the absence of the reference to the horsepower of the locomotives from the Certificate of Acceptance that IANR ultimately executed also was not material. Finally, the dates of presentation and execution of the Certificate of Acceptance do not generate any genuine issues of material fact, because the Certificate of Acceptance recites the effective dates of IANR's acceptance of each of the locomotives, and it does not recite any reservations, conditions, or limitations on IANR's acceptance.

IANR's claim that Helm breached the IANR Lease by depriving IANR of the two IANR locomotives as to which the lease was terminated also fails as a matter of law. The parties executed a written amendment to the IANR Lease on December 11, 1997, specifically providing for termination of the lease as to those two locomotives. *See* Helm's Appendix to First Motion for Summary Judgment at 29–31. The Amendment itself recites that "Lessor and Lessee desire to terminate the Lease early for the Units bearing the reporting marks and number HLMX 2034 and IANR 3611 ("**Terminated Unit(s)**")," *id.* at 29 (Recital C); the Amendment is signed by a duly authorized official of IANR, *id.* at 30; and the record is devoid of evidence that IANR was somehow coerced into entering into that agreement.

Finally, IANR's contention that Helm breached the lease by breaching various

implied warranties also fails as a matter of law in the face of an express disclaimer of any such warranties in the IANR Lease, *see* Helm's Appendix to First Motion for Summary Judgment at 8 (IANR Lease, § 9, ¶ A), *unless* that disclaimer of warranties is shown to be unconscionable. Therefore, if there is no viable affirmative defense, Helm is entitled to summary judgment in its favor on IANR's counterclaim of breach of contract and IANR's contrary motion for summary judgment on that claim will be denied. In light of the foregoing analyses of Helm's breach-of-contract claim and IANR's breach-of-contract counterclaim, Helm is also entitled to summary judgment in its favor on IANR's fourth affirmative defense of failure of consideration, sixth affirmative defense of frustration of purpose, seventh affirmative defense of breach of contract, and eighth affirmative defense of modification of contract.

The court, therefore, turns to the question of whether summary judgment is appropriate in either parties' favor on IANR's affirmative defense of unconscionability to Helm's breach-of-contract claim.

### 2. *IANR's unconscionability defense*

#### a. *Arguments of the parties*

In its own first motion for partial summary judgment, IANR contends that the disclaimer of warranties and the provision providing that IANR must pay Helm's attorney fees in the event of litigation in the IANR Lease are unconscionable as a matter of law. IANR contends that unconscionability is a question of law and that both the procedural and substantive unconscionability requirements of an unconscionability defense are satisfied here as to

---

Officer for Helm in 1999, not practices prevailing in 1995. Again, nothing in the parties' contract required Helm to perform such tests

or to guarantee the performance or traction horsepower of the locomotives.

both provisions. IANR contends that it had no "viable alternatives" to accepting GP–38 locomotives from Helm, in view of a market shortage on such locomotives, and that IANR was not allowed to negotiate or change any of the terms of the Lease proffered by Helm, making the Lease a contract of adhesion. IANR also contends that the disclaimer of warranties provision is substantively unfair in that it only protects one party, Helm, leaving Helm as the only party with any legal redress, even though Helm was the party in exclusive control of the locomotives during the period from IANR's initial selection of the locomotives until their delivery in poor repair several months later. As to the attorney fees provision, which IANR identifies as § 12, ¶ A(vii) of the IANR Lease, IANR argues that the conditions in the commercial market, Helm's refusal to negotiate terms, and the fact that the provision is almost impossible to read in context also make that provision procedurally unconscionable. IANR also contends that the provision is not consistent with industry practice and is not reciprocal, allowing only Helm attorney fees, so that it is substantively unconscionable.

Helm responds to IANR's contentions by pointing out that IANR has not presented any evidence of any "market shortage" of GP–38 locomotives making Helm the only "viable" source of such locomotives. In contrast to Daniel Sabin's second affidavit, upon which IANR relies for these contentions, Helm points to the affidavit of James Magee, who was Helm's representative in negotiations with IANR to lease the locomotives in the first place, in which Mr. Magee avers that he recalls other sources of GP–38 locomotives at the time. Helm also contends that, even if there was such a market shortage of GP–38 locomotives, IANR was not forced to lease locomotives from Helm, as it could have leased different models of locomotives from another lessor or purchased its own locomotives. Helm also contends that there is no genuine issue of material fact that the lease was not a "take it or leave it" contract, because Daniel Sabin's second affidavit to that effect is directly contrary to his deposition testimony that there were "long and tedious" negotiations over the IANR Lease, during which the parties went back and forth on the terms as many as 15 times. Helm also argues that IANR's contentions about late delivery and condition of the locomotives have nothing to do with the purported unconscionability of terms of the contract. Helm also argues that there is no substantive unconscionability of the terms of the lease. Helm argues that the terms are not so one-sided *as to shock the conscience* or such that *no person in a reasonable state of mind would accept them*, because the disclaimer of warranties and attorney fees provisions are authorized by provisions of the California Commercial Code. Helm argues that the contract does not deny IANR all redress, because IANR had the right to inspect and reject or demand repair of the locomotives before accepting them pursuant to the Lease, and the lack of evidence of complaints about performance of the locomotives belies IANR's contentions that there was anything to complain about. Moreover, Helm contends that neither the disclaimer of warranties nor the attorney fees term were "hidden" from IANR. Finally, Helm argues that IANR has not identified any evidence that either provision was contrary to industry practice, because other leases Helm entered into lacking such terms were simply the product of individual negotiations.

### b. Applicable law

 Under California law, the question of whether a contract or clause is unconscionable is one of law. *U.S. Roof-*

*ing, Inc. v. Credit Alliance Corp.,* 228 Cal. App.3d 1431, 1448, 279 Cal.Rptr. 533, 543 (1991) (citing, *inter alia,* CAL. CIV. CODE § 1670.5, subd. (a), and *Central Bank v. Kaiperm Santa Clara Fed. Credit Union,* 191 Cal.App.3d 186, 205, 236 Cal.Rptr. 262 (1987)). As the California Court of Appeals has explained, in a case involving the purported unconscionability of a disclaimer of warranties,

> Unconscionability involves both procedural and substantive aspects. The procedural element focuses on the "oppression" arising from an inequality of bargaining power between the parties and the "surprise" of a clause hidden in a printed document. The substantive element is concerned with whether the terms are overly harsh or one-sided.

*U.S. Roofing, Inc.,* 228 Cal.App.3d at 1448, 279 Cal.Rptr. 533 (citations omitted); *see also Donovan v. RRL Corp.,* 26 Cal.4th 261, 1060A, 109 Cal.Rptr.2d 807, 27 P.3d 702, 723 (2001) ("An unconscionable contract ordinarily involves both a procedural and a substantive element: (1) oppression or surprise due to unequal bargaining power, and (2) overly harsh or one-sided results.") (citing *Armendariz v. Foundation Health Psychcare Services, Inc.,* 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669 (2000)); *Circuit City Stores, Inc. v. Adams,* 279 F.3d 889, 893 (9th Cir.2002) (stating the same standards under California law concerning an arbitration agreement), cert. denied, —— U.S. ——, 122 S.Ct. 2329, 153 L.Ed.2d 160 (2002) (No. 01–1460). That court also explained that "[a] determination of unconscionability, though a question of law, involves various factual considerations, including the business conditions under which the contract was formed, the relative bargaining power of the parties, their reasonable expectations, and the commercial reasonableness of the risk allocation as provided in the agreement." *Id.* (quoting *Central Bank v. Kaiperm Santa*

*Clara Fed. Credit Union,* 191 Cal.App.3d 186, 205, 236 Cal.Rptr. 262 (1987), in turn citing *A & M Produce Co. v. FMC Corp.,* 135 Cal.App.3d 473, 186 Cal.Rptr. 114 (1982)) (internal quotation marks omitted). Thus, as to "procedural" unconscionability, "oppression" consists of " 'an inequality of bargaining power resulting in no meaningful choice for the weaker party,' " while "surprise" " 'occurs when the supposedly agreed-upon terms are hidden in a document.' " *Navellier v. Sletten,* 262 F.3d 923, 940 (9th Cir.2001) (quoting *A & M Produce Co.,* 135 Cal.App.3d at 486, 186 Cal.Rptr. 114), *petition for cert. filed,* 70 U.S.L.W. 3698 (April 30, 2002) (No. 01–1615). "Substantive" unconscionability "refers to an overly harsh allocation of risks or costs which is not justified by the circumstances under which the contract was made," *i.e.,* terms so one-sided as to " 'shock the conscience.' " *Id.* (quoting *Stirlen v. Supercuts, Inc.,* 51 Cal.App.4th 1519, 1532, 60 Cal.Rptr.2d 138 (1997), for the "shock the conscience" standard). Although " 'both [procedural and substantive unconscionability] [must] be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability ... they need not be present in the same degree.' " *Soltani v. Western & Southern Life Ins. Co.,* 258 F.3d 1038, 1042 (9th Cir.2001) (quoting *Armendariz,* 99 Cal. Rptr.2d 745, 6 P.3d at 690). " 'Essentially a sliding scale is invoked: ... the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.' " *Id.* (again quoting *Armendariz,* 99 Cal.Rptr.2d 745, 6 P.3d at 690).

■ Under California law, a disclaimer of warranties is subject to the common-law doctrine of unconscionability. *See id.* Although the court in *U.S. Roofing* found

"nothing per se unconscionable in a financing lessor disclaiming all warranties in equipment selected solely by the lessee-buyer," *id.* at 1449, 279 Cal.Rptr. 533, that holding does not precisely fit the circumstances of this case. However, another California court explained, more generally, that "[w]arranty disclaimers ... are specifically authorized by the California Uniform Commercial Code (*see* CAL. U. COM. CODE, § 2316) and the Supreme Court has held 'no public policy opposes private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party.'" *Appalachian Ins. Co. v. McDonnell Douglas Corp.*, 214 Cal. App.3d 1, 26, 262 Cal.Rptr. 716, 730 (1989) (quoting *Tunkl v. Regents of University of California*, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441 (1963)).

### c. *Unconscionability of the challenged terms*

■ **i. *Procedural unconscionability.*** The court cannot conclude as a matter of law that either sufficient "oppression" or "surprise" is present here to render the challenged terms of the IANR Lease procedurally unconscionable. *See Donovan,* 109 Cal.Rptr.2d 807, 27 P.3d at 723; *Armendariz,* 99 Cal.Rptr.2d 745, 6 P.3d at 690; *U.S. Roofing,* 228 Cal.App.3d at 1448, 279 Cal.Rptr. 533; *Circuit City Stores,* 279 F.3d at 893; *Navellier,* 262 F.3d at 940. First, the record evidence presented by IANR in support of its contention that business conditions were such that IANR had no viable alternative but to lease locomotives from Helm falls far short of what this court would require to reach such a conclusion. *See U.S. Roofing, Inc.,* 228 Cal.App.3d at 1448, 279 Cal.Rptr. 533 (noting that "business conditions under which the contract was formed" go to the "oppressiveness" of the challenged terms). That evidence consists of little more than a

single paragraph in Daniel Sabin's Second Affidavit averring that

At the time that IANR began looking for four GP38 units, we found that the supplies of this type of locomotive were very limited. We had not contacted Helm originally, but we were contacted by Jim Magee to consider working with them. In fact, Helm Financial was the only supplier who indicated that it had GP38 units available for lease to IANR.

IANR's Appendix Re: First and Second Motions for Partial Summary Judgment at 82 (Second Affidavit of Daniel R. Sabin, ¶ 38). On the other hand, James Magee, for Helm, avers, even more concisely, that, "[t]o the best of my recollection, during 1994 and 1995, at the time of the Helm/Iowa Northern negotiations, there were other sources of GP–38 locomotives available to Iowa Northern besides Helm." Helm's Appendix in Support of Its Resistances to IANR's First Motion for Partial Summary Judgment at 73 (Affidavit of James Magee at ¶ 6). Neither party's evidence is persuasive. Neither has presented any reliable evidence of lessors or sellers of locomotives, let alone, GP–38 locomotives, active in 1994 and 1995, or what the availability of such locomotives from such providers might have been in 1994 and 1995. Thus, the court looks for more instructive evidence.

Second, the record simply will not support any conclusion that the parties were of such unequal bargaining power that the challenged portions of the IANR Lease were procedurally unconscionable. *See Donovan,* 109 Cal.Rptr.2d 807, 27 P.3d at 723; *Armendariz,* 99 Cal.Rptr.2d 745, 6 P.3d at 690; *U.S. Roofing,* 228 Cal.App.3d at 1448, 279 Cal.Rptr. 533; *Circuit City Stores,* 279 F.3d at 893; *Navellier,* 262 F.3d at 940. Notwithstanding IANR's attempts to portray itself as the smaller and weaker party taken advantage of by a

large and savvy lessor of railroad locomotives and rolling stock, it cannot reasonably be disputed that IANR's principals were sophisticated and experienced in the business of running a railroad. For example, some were involved in other railroad ventures, including the CDAC and the Bangor & Aroostock Railroad. Also, the record cannot reasonably be disputed that the parties spent several months, from at least the fourth quarter of 1994 to March 1995, negotiating the terms of IANR's lease of the four IANR locomotives. Daniel Sabin himself described the negotiations as involving "very, very long and tedious discussions," Helm's Appendix in Support of Its Resistances to IANR's First Motion for Partial Summary Judgment at 54 (Deposition of Daniel Sabin at 23), with the parties going "through 15 different similar documents ... to come up with what the terms would be." *Id.* at 55 (Deposition of Daniel Sabin at 34). Daniel Sabin's contrary statement in his later affidavit to the effect that the contract was ultimately presented to IANR as non-negotiable will not generate a genuine issue of material fact on this issue. *See Dotson,* 251 F.3d at 781; *Bass,* 232 F.3d at 619.

Nor will the record sustain any conclusion that IANR was "surprised" by the now challenged terms. *See Donovan,* 109 Cal.Rptr.2d 807, 27 P.3d at 723; *Armendariz,* 99 Cal.Rptr.2d 745, 6 P.3d at 690; *U.S. Roofing,* 228 Cal.App.3d at 1448, 279 Cal.Rptr. 533; *Circuit City Stores,* 279 F.3d at 893; *Navellier,* 262 F.3d at 940. In Article 9, which is entitled "Warranty; Compliance with Laws and Rules; Maintenance; Insurance; Indemnification and Reports," the IANR Lease contains the following "Warranty" provision:

> A. *Warranty.* Lessor warrants that Lessor has the right to lease the Units. Lessor hereby assigns to Lessee for the Term of this Lease the benefit to which Lessor is entitled of all warranties and indemnities of the manufacturer, reconditioner, repairer or maintainer of the Units. Otherwise, except for the aforesaid, Lessor leases the Units AS–IS, AND LESSOR MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND RESPECTING THE UNITS WHETHER STATUTORY, WRITTEN, ORAL OR IMPLIED, AND LESSOR HAS NOT MADE AND DOES NOT HEREBY MAKE, NOR SHALL IT BE DEEMED BY VIRTUE OF HAVING LEASED THE UNITS PURSUANT TO THIS LEASE TO HAVE MADE, ANY REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, DESIGN OR CONDITION OF, OR AS TO THE QUALITY OF WORKMANSHIP IN THE UNITS ALL OF WHICH ARE EXPRESSLY DISCLAIMED AND LESSOR SHALL NOT BE LIABLE, IN CONTRACT, TORT OR OTHERWISE, ON ACCOUNT OF ANY MANUFACTURER'S DEFECT, WHETHER HIDDEN, LATENT OR OTHERWISE DISCOVERABLE OR NONDISCOVERABLE RESPECTING ANY UNITS.

Helm's Appendix to First Motion for Summary Judgment at 8 (Art. 9, ¶ A). In the whole of the IANR Lease, this is the only language in all capital letters. Thus, the provision is plainly conspicuous, not hidden. *See, e.g., Navellier,* 262 F.3d at 940 ("surprise" " 'occurs when the supposedly agreed-upon terms are hidden in a document' ") (quoting *A & M Produce Co.,* 135 Cal.App.3d at 486, 186 Cal.Rptr. 114). Although not made as conspicuous by capitalization, the "attorney fees" provisions nevertheless appear in logical places in the Lease in the company of listings of other remedies and rights of recovery given

Helm under the Lease, in § 4 on "Rentals," in a paragraph detailing what Helm is entitled to recover if IANR defaulted "in the payment of any sum of money," *see* Helm's Appendix to First Motion for Summary Judgment at 4 (§ 4, ¶ B), and in § 12 on "Default," in one of the paragraphs detailing Helm's options in the event of a default. *See id.* at 14 (§ 12, ¶ A(vii)). Although not necessarily models of clarity, the attorney fees provisions are not so incomprehensible as to leave IANR unwarned that Helm could seeks attorney fees under the circumstances presented here.

***ii. Substantive unconscionability.*** In the absence of any significant showing of procedural unconscionability, IANR's showing of substantive unconscionability to invalidate the challenged provisions of the IANR Lease must necessarily be very substantial. *See, e.g., Soltani,* 258 F.3d at 1042 (citing *Armendariz,* 99 Cal.Rptr.2d 745, 6 P.3d at 690). IANR has not made a sufficient showing for the court to hold as a matter of law that either of the challenged provisions is substantively unconscionable.

First, the disclaimer of warranties is authorized by California law. *See, e.g., Appalachian Ins. Co.,* 214 Cal.App.3d at 26, 262 Cal.Rptr. 716. Moreover, such a provision in the present Lease is not "an overly harsh allocation of risks or costs which is not justified by the circumstances under which the contract was made," such that it " 'shock[s] the conscience.' " *Navellier,* 262 F.3d at 940 (quoting *Stirlen,* 51 Cal.App.4th at 1532, 60 Cal.Rptr.2d 138). Helm was not the manufacturer of the locomotives and had not been responsible for either their prior use or maintenance. Moreover, IANR's legitimate concerns with the condition of the locomotives were not wholly unprotected under the Lease, as IANR had an opportunity to inspect the locomotives when first delivered by Helm, IANR could request repairs before accepting them, and the "Warranties" provision, quoted above, transferred to IANR "all warranties and indemnities of the manufacturer, reconditioner, repairer or maintainer of the Units." Nor were the provisions for attorney fees either "unjustified" or "shocking to the conscience," where Helm, as the Lessor, might reasonably be placed in the position of attempting to recover, through the courts, either money owed for rent and repairs or its property, the locomotives, from a defaulting lessee. Neither provision shifted to IANR's shoulders, in an involuntary transaction, lacking consideration, risks that the law would otherwise have placed upon Helm. *See Appalachian Ins. Co.,* 214 Cal.App.3d at 26, 262 Cal.Rptr. 716.

The court holds that IANR's affirmative defense of unconscionability fails as a matter of law. As explained above, that conclusion paves the way for the entry of summary judgment in Helm's favor on Count II of Helm's Complaint, Helm's claim of breach of the IANR Lease; Count I of IANR's Amended Counterclaim, IANR's counterclaim of breach of contract; and IANR's first, fourth, sixth, seventh, and eighth affirmative defenses, as well as the first affirmative defense of unconscionability.

**3. Failure to mitigate damages defense**

Although IANR asserts its fifth affirmative defense of failure to mitigate damages as against Helm's claims regarding both the IANR and MKCX locomotives, the court will address the defense at this point only as to Helm's claim regarding the IANR locomotives. In that defense, IANR alleges that Helm failed to mitigate its damages by failing to assume control over, take possession of, and either lease

or sell the IANR locomotives (and the MKCX locomotives) upon any alleged breach of the Helm–IANR Lease (or the Helm–CDAC Lease) or upon the termination of either lease. IANR's First Amended Answer, Affirmative Defenses, and Counterclaim, Fifth Affirmative Defense. Helm contends that the defense is absurd, because it amounts to an assertion that Helm should have saved IANR from itself, instead of attempting to work with IANR when IANR ran into trouble paying rent on the IANR locomotives. Helm contends that IANR steadfastly refused to return the IANR locomotives until Helm obtained a court order for their return, thus undercutting any basis for IANR's failure-to-mitigate defense. IANR, however, contends that Helm did not act altruistically to work with IANR, but instead, persistently hedged its bets, attempting to leave other parties responsible for the costs and consequences of its leasing arrangements, even though Helm had the contractual right to demand the return of the IANR locomotives upon a perceived breach of the IANR Lease. IANR also contends that Helm improperly led IANR to believe that the parties would reach an agreement to resolve their dispute, actually reached such an agreement, then breached it, and only then sought return of the locomotives.

■ Under California law, "A plaintiff who suffers damage as a result of either a breach of contract or a tort has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided." *Shaffer v. Debbas,* 17 Cal.App.4th 33, 41, 21 Cal.Rptr.2d 110 (1993); *accord Valle de Oro Bank v. Gamboa,* 26 Cal.App.4th 1686, 1691, 32 Cal.Rptr.2d 329, 331 (1994). Thus,

> A plaintiff may not recover for damages avoidable through ordinary care and reasonable exertion. (*Mayes v. Sturdy Northern Sates, Inc.* (1979) 91 Cal. App.3d 69, 85, 154 Cal.Rptr. 43.) The duty to mitigate damages does not require an injured party to do what is unreasonable or impracticable. (*Valencia v. Shell Oil Co.* (1944) 23 Cal.2d 840, 846, 147 P.2d 558.) "The rule of mitigation of damages has no application where its effect would be to require the innocent party to sacrifice and surrender important and valuable rights." (*Seaboard Music Co. v. Germano, supra,* 24 Cal.App.3d at p. 623, 101 Cal. Rptr. 255.)

*Valle de Oro Bank,* 26 Cal.App.4th at 1691, 32 Cal.Rptr.2d at 331–32.

■ Some time ago, the California Court of Appeals explained that, on a motion for summary judgment, evidence necessary to sustain the defense for trial requires evidence that "at least raise[s] a factual question of whether the plaintiff made any effort whatsoever to mitigate or whether the effort made was reasonable under the circumstances." *Sebastian Int'l, Inc. v. Peck,* 195 Cal.App.3d 803, 810, 240 Cal.Rptr. 911, 915 (1987). The court does not believe that IANR has produced any such evidence to defeat Helm's motion for summary judgment on IANR's failure to mitigate damages defense as to claims for rent and repair costs on the IANR locomotives. Helm's attempts to negotiate solutions to IANR's past due rent problems were, themselves, *some* effort, and a reasonable one at that, to mitigate damages, including damages that might arise from attempting to recover the locomotives from IANR, should IANR prove unwilling to surrender them, as was ultimately the case. What IANR asks for, under the circumstances, is plainly not "ordinary care and reasonable exertion," but that Helm should have done "what is unreasonable or impracticable." *Valle de Oro*

*Bank,* 26 Cal.App.4th at 1691, 32 Cal. Rptr.2d at 331–32. Nor has IANR pointed to any evidence that it was unreasonable, under the circumstances, for Helm to attempt to negotiate an amendment to the IANR Lease to resolve the issue of past due rent, rather than simply demand return of the locomotives, where IANR argues, instead, that it is entitled to summary judgment on various defenses and counterclaims premised on its contention that it was *unreasonable* for Helm to demand the return of two of the IANR locomotives when IANR was behind on rent under the IANR Lease. An injured party may be required to take reasonable steps to save itself from damage, but it is not required to take unreasonable steps to save the other party from itself, which is what recognizing IANR's failure-to-mitigate defense would do under the circumstances of this case.

Helm is entitled to summary judgment on IANR's fifth affirmative defense of failure to mitigate damages, at least as it applies to Helm's claim for rent and repair costs on the IANR locomotives.

## B. IANR's Breach Of Warranty Counterclaims

IANR's "breach of warranty" counterclaims, premised on the lease of the IANR locomotives, consist of the following: breach of express warranties (Count IV), breach of implied warranties of fitness for a particular purpose (Count V), breach of implied warranty of merchantability (Count VI), and breach of implied warranty of the capacity of the equipment (Count VII). As explained above, these counterclaims also subsume IANR's seventh affirmative defense of breach of contract to the extent it is based on breach of express and implied warranties, both written and oral.

The analysis of these counterclaims is necessarily brief in light of the court's conclusion, above, that the disclaimer of warranties in the IANR Lease is not unconscionable. Each of these warranties is expressly disclaimed, usually in precisely the same terms IANR now characterizes the warranties. *See* Helm's Appendix to First Motion for Summary Judgment at 8 (Art. 9, ¶ A).[9] The disclaimer is not unconscionable, nor is that term rendered ineffective or unenforceable by any other circumstance. Therefore, Helm, not IANR, is entitled to summary judgment on all of these counterclaims.

## C. Breach Of Covenant Of Good Faith And Fair Dealing

Count VIII of IANR's Counterclaim asserts a claim for breach of covenant of good faith and fair dealing. As pleaded, this claim asserts that Helm breached the covenant in the following particulars: "Helm ... promised that the locomotives offered to IANR in February 1995, as described in the Lease of Locomotive Equipment, dated March 28, 1995, as capable of producing 2000 horsepower of traction power, would be the same ones, and in the same condition, as those that would be delivered immediately thereafter," but that the units delivered four months later were in disrepair, in an altered condition, and unable to produce 2,000 horsepower of traction power; that Helm never provided an explanation for nor mechanical histories of the locomotives so as to account for the changes in condition; and that Helm

---

9. The exception to mirror-language disclaimer of the asserted warranties is the purported warranty of "capacity of the equipment." However, such a warranty is plainly disclaimed by language disclaiming "REPRESENTATIONS OR WARRANTIES OF ANY KIND RESPECTING THE UNITS WHETHER STATUTORY, WRITTEN, ORAL OR IMPLIED," and disclaiming any warranty regarding the "CONDITION OF ... THE UNITS." Helm's Appendix to First Motion for Summary Judgment at 8 (Art. 9, ¶ A).

promised to correct the problems created by its failure to deliver the locomotives in the same condition as when IANR had contracted for them, but did not fulfill that promise. IANR's First Amended Answer, Affirmative Defenses, and Counterclaim, Counterclaim Count VIII, ¶¶ 80–83. Helm seeks summary judgment on Count VIII of IANR's Counterclaim, as well.

### 1. Arguments of the parties

Helm's argument for summary judgment on IANR's counterclaim of breach of covenant of good faith and fair dealing is, in essence, that its performance complied with the express terms and conditions of the IANR Lease, and therefore, cannot be deemed to be in bad faith or unfair. In response, IANR asserts a litany of purported misconduct by Helm that IANR contends constituted neither good faith nor fair dealing, although some of the instances of breach of covenant asserted by IANR in its resistance were not actually alleged in the counterclaim, as recited just above. Nevertheless, IANR's allegations of bad faith in its response to Helm's motion for summary judgment consist of the following: failure by Helm to deliver locomotives capable of 2,000 horsepower of traction in the condition that the locomotives were in when the lease was executed; failure to perform extra-contractual promises; Helm's failure to test and verify the condition of the locomotives at the end of the prior lease; Helm's actions in initially sending a repair crew to address IANR's concerns about exceptional problems with the locomotives, then calling off that repair crew; Helm's alteration of the Certificate of Acceptance by removing the 2,000 horsepower performance standard; Helm's pressuring IANR to relinquish the two locomotives as to which the Lease was eventually terminated, after IANR had repaired them, so that Helm could take advantage of a better market opportunity for those units; and Helm's agreement to modify the Lease in September of 2000, followed by breach of that amended agreement. In reply, Helm reiterates that the contract sets forth the parties' respective obligations and that there is no genuine issue of material fact that Helm performed its side of those obligations.

### 2. Governing law

▉ Neither party has bothered to cite the legal standards applicable to such a claim under California law or the law of any other jurisdiction. The court, however, concludes that California law is also applicable to this contract claim. Under California law, a covenant of good faith and fair dealing is implied in every contract, imposing on each party to the contract a duty of good faith and fair dealing in the performance and enforcement of that contract. *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373, 388 (1988) (citing RESTATEMENT (SECOND) OF CONTRACTS § 205); *accord Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.,* 2 Cal.4th 342, 6 Cal. Rptr.2d 467, 826 P.2d 710, 726–28 (1992) (In Bank) (noting that this is so, unless the contract expressly states otherwise). The covenant is implied in law in order to assure that a contracting party "refrain[s] from doing anything to injure the right of the other to receive the benefits of the agreement." *Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809, 169 Cal.Rptr. 691, 620 P.2d 141, 145 (1979), *appeal dismissed, cert. denied,* 445 U.S. 912, 100 S.Ct. 1271, 63 L.Ed.2d 597 (1980). In other words, the covenant "is aimed at making effective the agreement's promises." *Foley,* 254 Cal.Rptr. 211, 765 P.2d at 389. It accomplishes this goal by requiring each party to do all things reasonably contemplated by the contract's terms to accomplish the goals of the contract, and to refrain from

doing anything that would destroy or injure another party's right to receive the fruits of the contract. *Kendall v. Ernest Pestana, Inc.*, 40 Cal.3d 488, 220 Cal.Rptr. 818, 709 P.2d 837, 844 (1985) (In Bank); *Ocean Servs. Corp. v. Ventura Port Dist.*, 15 Cal.App.4th 1762, 19 Cal.Rptr.2d 750, 760–61 (1993). Thus, "[t]he scope of the duty of good faith and fair dealing depends upon the purposes of the particular contract." *Kransco v. American Empire Surplus Lines Ins. Co.*, 23 Cal.4th 390, 97 Cal.Rptr.2d 151, 2 P.3d 1, 8 (2000). However, the implied covenant cannot be invoked where it would vary the express terms of the parties' contract. *Carma Developers (Cal.), Inc.*, 6 Cal.Rptr.2d 467, 826 P.2d at 728; *PMC, Inc. v. Porthole Yachts, Ltd.*, 65 Cal.App.4th 882, 890–891, 76 Cal. Rptr.2d 832 (1998).

### 3. The record in light of governing law

Several of the instances of alleged breach of the covenant of good faith and fair dealing that IANR asserts simply mirror IANR's allegations of breach of contract, all of which were rejected above. For example, this claim reiterates IANR's failed contention that the contract required Helm to deliver locomotives capable of meeting a "performance standard" of producing 2,000 horsepower of traction. However, because the contract did not expressly impose such an obligation, the implied covenant cannot be invoked to impose it, *Carma Developers (Cal.), Inc.*, 6 Cal.Rptr.2d 467, 826 P.2d at 728, nor is such an obligation reasonably contemplated by the contract's terms to accomplish the goals of the contract, where the court concluded above that there was no showing that delivery of locomotives capable of delivering 2,000 horsepower of traction was somehow the "essence" of the contract. *See Kendall*, 220 Cal.Rptr. 818, 709 P.2d at

844; *Ocean Servs. Corp.*, 19 Cal.Rptr.2d at 760–61.

Similarly, invoking the covenant to impose upon Helm an obligation to deliver *the same* locomotives that IANR inspected in February 1995 in the same condition would improperly vary the terms of the IANR Lease, as this court has interpreted the "AS–IS" and merger provisions of the Lease. *Carma Developers (Cal.), Inc.*, 6 Cal.Rptr.2d 467, 826 P.2d at 728. Indeed, the IANR Lease expressly gave *Helm* the right to replace any delivered unit, rather than repair it, if IANR found the unit was unsatisfactory as delivered. Helm's Appendix to First Motion for Summary Judgment at 3 (IANR Lease § 2, ¶ B). Therefore, implying an obligation under the covenant to provide only *the same* locomotives would vary, even contradict, an express term of the contract.

The court also rejected above IANR's assertions that purported oral promises "to make things right" became terms of the contract, and imposing such a promise via the covenant of good faith and fair dealing would plainly change the express terms of the contract, which imposed upon IANR the burdens of maintenance after IANR inspected and accepted delivery of the locomotives. Similarly, where no written amendment or modification ever became binding, an obligation to perform such an unconsummated agreement cannot be imposed by way of the covenant of good faith and fair dealing. The court also rejected above IANR's contention that the variance in the form of the Certificate of Acceptance was material, so that Helm's alleged alteration of the Certificate of Acceptance was not conduct that destroyed or injured IANR's right to receive the fruits of the contract. *See Kendall*, 220 Cal.Rptr. 818, 709 P.2d at 844; *Ocean Servs. Corp.*, 19 Cal.Rptr.2d at 760–61. Finally, the court concluded above that, as

a matter of law, the parties agreed to the return of two of the locomotives subject to the IANR Lease in a written amendment, so that the return of those two locomotives did not destroy or injure IANR's right to receive the fruits of the contract. *Id.*

Similarly unavailing, as a matter of law, are alleged breaches of covenant that differ from IANR's allegations of breach of contract. First, the IANR Lease nowhere imposed upon Helm an obligation to provide an explanation for the condition of the locomotives upon delivery, to provide the mechanical histories of the locomotives, or to test and verify the condition of the locomotives at the end of the prior lease, so that IANR improperly seeks to vary the terms of the contract via the covenant of good faith and fair dealing. *See Carma Developers (Cal.), Inc.,* 6 Cal.Rptr.2d 467, 826 P.2d at 728. Nor is it clear that these obligations were reasonably contemplated by the contract's terms to accomplish the goals of the contract, or how Helm's failure to perform these supposed obligations destroyed or injured IANR's right to receive the fruits of the contract. *See Kendall,* 220 Cal.Rptr. 818, 709 P.2d at 844; *Ocean Servs. Corp.,* 19 Cal.Rptr.2d at 760–61. Again, under the contract, IANR was to bear the duties of repair and maintenance, and IANR had, and was allowed to exercise, the right to inspect the locomotives and demand repairs to its satisfaction before the locomotives were accepted under the Lease, that is, before the Lease imposed upon IANR the responsibility to maintain and repair the locomotives. Because IANR's inspection and refusal rights protected IANR's right to receive the fruits of the contract, the contract did not reasonably contemplate that Helm would be required to explain the condition of the locomotives upon delivery, to provide mechanical histories, or to test and verify the condition of the locomotives at the end of the prior lease, and Helm's failure to do so

did not, as a matter of law, destroy or injure IANR's right to receive the fruits of the contract. *See id.; Ocean Servs. Corp.,* 19 Cal.Rptr.2d at 760–61.

The court also finds nothing in the contract requiring delivery "immediately," and also concludes that there are no genuine issues of material fact that IANR agreed to begin the delivery of the locomotives in May 1995. Moreover, IANR has cited no "time is of the essence" clause in the contract, nor from the record is there any apparent urgency about the precise date of delivery where the parties took several months to negotiate the transaction in the first place. Thus, there is nothing that destroyed or injured IANR's right to the fruits of the contract in Helm's timing of the delivery of the locomotives, which actually began in June 1995. Certainly, IANR has not designated any "specific facts showing that there is a genuine issue for trial" on a contention that IANR was somehow injured by tardy delivery of the locomotives. FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka,* 122 F.3d at 562; *McLaughlin,* 50 F.3d at 511; *Beyerbach,* 49 F.3d at 1325.

Finally, even assuming that there are genuine issues of material fact as to whether Helm initially provided a repair crew to address IANR's purportedly "exceptional" problems with the locomotives, then withdrew the crew—and assuming, further, that IANR's breach of covenant claim can be based on such allegations, which are not part of the claim as pleaded—IANR has not generated a genuine issue of material fact that there was a breach of the covenant of good faith and fair dealing in this incident. Again, the contract expressly imposed upon IANR the obligations and expenses of repair and maintenance of the locomotives once IANR had accepted delivery of them. This contention, therefore, also improperly at-

tempts to impose by way of the covenant of good faith and fair dealing terms and conditions plainly at variance with the express terms of the IANR Lease. *See Carma Developers (Cal.), Inc.,* 6 Cal.Rptr.2d 467, 826 P.2d at 728.

Helm is entitled to summary judgment in its favor on IANR's counterclaim for breach of the covenant of good faith and fair dealing.

### D. Counterclaim For Quantum Meruit

The last of IANR's counterclaims that has at issue only the locomotives subject to the IANR Lease is IANR's counterclaim for quantum meruit in Count IX of its First Amended Counterclaim. *See* IANR's First Amended Answer, Affirmative Defenses, and Counterclaim, Count IX. In this counterclaim, IANR alleges that Helm took possession of the HLMX 2034 (identified in the Counterclaim as "IANR 2034") and IANR 3611 locomotives after they had been substantially improved by IANR, and then sold or leased them to another or other railroads with the express intent and purpose of enriching itself to IANR's detriment. *See id.* at ¶ 86. Although the claim is captioned "quantum meruit," the essence of the allegations is that Helm was "unjustly enriched" by taking possession of the locomotives after they had been repaired at IANR's expense. Helm, however, contends that it is entitled to summary judgment in its favor on this counterclaim, as well.

#### 1. Arguments of the parties

Helm argues that it is entitled to summary judgment on this counterclaim, because the parties mutually agreed to the return of the HLMX 2034 and IANR 3611 locomotives in the Amendment No. 1 to the IANR Lease, executed on December 11, 1997. Second, Helm contends that the Bangor & Aroostock Railroad, not IANR, actually made and paid for repairs to the

two locomotives, so that IANR suffered no detriment.

IANR, however, responds that the boilerplate, self-serving contract suggesting that the parties agreed to the termination of the lease on these two locomotives is belied by the sworn affidavits of Daniel Sabin and Gary Dunham, which aver that Helm threatened to take back all of the locomotives it had leased to IANR, on the ground that IANR was behind on its rent payments, if IANR did not agree to return of the two repaired units. IANR also contends that, although the Bangor & Aroostock Railroad made and initially paid for repairs to the two locomotives, those repairs were credited against IANR under the power-sharing agreement between the Bangor & Aroostock Railroad and IANR, so that IANR did ultimately suffer the detriment of Helm's unjust enrichment. IANR also contends that it was deprived of the two locomotives for the remaining months of what was supposed to be a sixty-month lease just at the moment when those locomotives were finally capable of providing 2,000 horsepower of traction. Finally, IANR contends that it paid all of the rent it owed Helm on these two locomotives.

In reply, Helm argues that the Amendment No. 1 to the IANR Lease is clear that both parties agreed to terminate the Lease as to the two locomotives. Helm also argues that the record is devoid of evidence of any credit against IANR under the power-sharing agreement between IANR and the Bangor & Aroostock Railroad in support of IANR's contention that IANR somehow ultimately bore the expense of the repairs to the locomotives. Thus, Helm reiterates that IANR has failed to generate any genuine issues of material fact that it suffered any harm.

### 2. The governing law

The parties have not asserted that the outcome of IANR's counterclaim for quantum meruit or unjust enrichment depends upon whether the claim is analyzed under California or Iowa law, and the court does not find that it does. *See L & L Builders Co.*, 46 F.Supp.2d at 881 ("Ordinarily, before any choice of law need be made, there must be a 'true conflict' between the laws of the possible jurisdictions on the pertinent issue.") (citing *Harlan Feeders*, 881 F.Supp. at 1404, in turn citing, *inter alia, Nesladek v. Ford Motor Co.*, 46 F.3d 734, 736 (8th Cir.1995)). As the California Court of Appeals has explained, "In general, a person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Enterprise Leasing Corp. v. Shugart Corp.*, 231 Cal.App.3d 737, 748, 282 Cal.Rptr. 620, 626 (1991); *accord Lectrodryer v. SeoulBank*, 77 Cal.App.4th 723, 726, 91 Cal.Rptr.2d 881 (2000) (the elements for a claim of unjust enrichment are "receipt of a benefit and unjust retention of the benefit at the expense of another"). A "benefit" means any type of advantage, and such a benefit can be conferred when one adds to another's property or saves the other from expense or loss; it is not essential that the party seeking restitution paid money directly to the recipient. *County of Solano v. Vallejo Redevelopment Agency*, 75 Cal.App.4th 1262, 1278, 90 Cal.Rptr.2d 41 (1999). "However, the 'mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor.'" *Marina Tenants Assn. v. Deauville Marina Development Co.*, 181 Cal.App.3d 122, 134, 226 Cal.Rptr. 321, 328 (1986) (quoting Restatement of Restitution § 1, cmt. c.). Rather, the person receiving the benefit must make restitution only if, as between the two parties, circumstances make it unjust for the person to retain it. *First Nation-*

*wide Savings v. Perry*, 11 Cal.App.4th 1657, 1663, 15 Cal.Rptr.2d 173 (1992). Therefore, " '[i]t must ordinarily appear that the benefits were conferred by mistake, fraud, coercion or request; otherwise, though there is enrichment, it is not unjust.'" *Enterprise Leasing Corp.*, 231 Cal.App.3d at 748, 282 Cal.Rptr. at 626 (quoting *Nibbi Brothers, Inc. v. Home Federal Sav. & Loan Assn.*, 205 Cal. App.3d 1415, 1422, 253 Cal.Rptr. 289 (1988), but omitting emphasis in *Nibbi* ). Iowa law does not appear to be to the contrary. *See, e.g., State, Dept. of Human Services ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 154–55 (Iowa 2001) (stating, "The doctrine of unjust enrichment is based on the principle that a party should not be permitted to be unjustly enriched at the expense of another or receive property or benefits without paying just compensation," citing *Credit Bureau Enters., Inc. v. Pelo*, 608 N.W.2d 20, 25 (Iowa 2000), and stating that the elements of such a claim are the following: "(1) defendant was enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiff; and (3) it is unjust to allow the defendant to retain the benefit under the circumstances," again citing *Pelo*, 608 N.W.2d at 25).

### 3. The record in light of governing law

Although the "unjust" aspect of Helm's "enrichment" in taking possession of the locomotives just after IANR had purportedly incurred considerable expense for repairing them may not be entirely clear from the pleading of IANR's counterclaim, it is clear from IANR's briefing of the summary judgment motion regarding this claim that IANR asserts that Helm "coerced," that is "pressured and threatened," IANR to return the locomotives. The nature of the coercion is articulated as

a threat to take possession of *all four* locomotives subject to the lease, on the basis of past-due rent, if IANR did not surrender the two locomotives in question in this counterclaim.

Even assuming that there are no genuine issues of material fact as to the truth of IANR's assertions of the facts giving rise to the supposed "coercion" here, there was no "coercion" as a matter of law. Although Daniel Sabin avers, in his second affidavit, that IANR paid every penny of the rent due on the two locomotives returned to IANR, he nowhere asserts that IANR was *not* behind on rent due under the IANR Lease at the time, nor has IANR identified any other portion of the record placing that matter in dispute at the time of the Amendment No. 1 to the IANR Lease. *See* FED. R. CIV. P. 56(e) (the party resisting summary judgment must designate "specific facts showing that there is a genuine issue for trial"); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka*, 122 F.3d at 562; *McLaughlin*, 50 F.3d at 511; *Beyerbach*, 49 F.3d at 1325. It is undisputed that the IANR Lease would have permitted Helm to declare a default on the basis of non-payment of rent, to terminate the Lease as to *all* of the locomotives on the basis of that default, and then recover possession of *all* of the locomotives. The court concludes that, as a matter of law, a party has not engaged in "coercion" sufficient to sustain a claim of unjust enrichment where that party purportedly threatened only to invoke rights given to that party under the terms of a contract between the parties, any more than a party has "coerced" another by threatening to institute a civil action against the other as long as there was probable cause to believe in the existence of that cause of action. *Cf.* RESTATEMENT OF RESTITUTION § 1 ("Unjust Enrichment") & § 71 ("Threats of Civil Action" as "coercion" on unjust enrichment claim).

Helm is entitled to summary judgment in its favor on IANR's counterclaim for quantum meruit or unjust enrichment.

### E. Who Pays For Rent And Repairs To The MKCX Locomotives?

#### 1. Helm's claim and IANR's defenses

The court now turns to the other two locomotives at issue in this litigation, designated MKCX 4302 and MKCX 4303, respectively, on which Helm also held the lease to the Canada American Railroad Company (CDAC). These two locomotives, however, were provided to IANR in May 2000 by the CDAC and ultimately returned to Helm by IANR in December 2000. Helm seeks to recover rent from IANR for the time that IANR used the locomotives, as well as end-of-lease repair costs, on a theory identified in Helm's Complaint as "quantum meruit," based on Helm's contention that IANR was unjustly enriched by use and possession of the MKCX locomotives to Helm's detriment. *See* Helm's Complaint, Count III. As affirmative defenses, IANR asserts that Helm is judicially estopped to assert a claim against IANR for rent or repair costs on the MKCX locomotives on the basis of claims made by Helm against CDAC in litigation in Maine, IANR's First Amended Answer, Affirmative Defenses, and Counterclaim, Second Affirmative Defense; that there is no privity of contract between Helm and IANR regarding the MKCX locomotives, *see id.*, Third Affirmative Defense; that Helm failed to mitigate its damages as to the MKCX locomotives, *see id.*, Fifth Affirmative Defense; and that any dispute regarding rent for the MKCX locomotives was resolved by the amendment to the IANR Lease in September 2000, which would also have provided that IANR could rent one of the MKCX locomotives, but that Helm breached that amended lease. *See id.*, Eighth Affirma-

tive Defense. Both parties seek summary judgment in their favor on Helm's claims and IANR's defenses regarding the MKCX locomotives.

### 2. Arguments of the parties

Helm argues that it is undisputed that IANR possessed and used the MKCX locomotives in its business from May to December 2000, but has not paid Helm any rent or repair costs for those locomotives. Therefore, Helm contends that IANR was unjustly enriched by its use of the locomotives and equity demands that IANR recompense Helm for that use. In its reply brief in support of its first motion for summary judgment, Helm clarifies that it seeks to recover against IANR under the equitable doctrine of unjust enrichment.[10] Helm concedes, however, that the amounts of rent and repair costs that it is entitled to recover from IANR are subject to genuine issues of material fact.

IANR's principal argument against Helm's claim regarding the MKCX locomotives is that IANR used and possessed the MKCX locomotives with the full knowledge, consent, and permission of the lawful lessee, CDAC, and recompensed CDAC for that use pursuant to a power-sharing agreement between the two railroads. IANR also contends that Helm was fully aware of IANR's use and possession of the MKCX locomotives. Thus, IANR contends that Helm's claim for rent and costs of repairs properly lies against CDAC, not IANR. Indeed, IANR points out that

Helm is pursuing such a remedy against CDAC in litigation in Maine. Also, as to the elements of an unjust enrichment claim, in its own motion for summary judgment regarding the MKCX locomotives, IANR contends that there is nothing in the record to suggest that Helm believed it was conferring a benefit upon IANR or that IANR appreciated that it was receiving a benefit from Helm in connection with these locomotives. Rather, IANR contends that its arrangement for use of the MKCX locomotives was with CDAC, and throughout the time that the locomotives were in IANR's possession, Helm continued to bill CDAC monthly rental fees. Toward the end of the period that these locomotives were in IANR's possession, IANR contends that IANR and Helm were negotiating, and eventually entered into, a lease regarding at least one of the MKCX locomotives, which Helm breached. IANR also denies that it is responsible for any damage to the MKCX locomotives in excess of normal wear and tear during the few months it used those locomotives, or that Helm has established any factual basis for any excess wear and tear. IANR argues that Helm's claim for repair costs properly lies against CDAC, the user of the locomotives for nearly five years preceding IANR's use.

### 3. The governing law

Although Helm framed its arguments for summary judgment regarding the

---

**10.** In light of this clarification, there is no need to address IANR's assertion that it is unclear whether Helm is asserting an implied contract claim for quantum meruit or an equitable claim of unjust enrichment. *But see generally Iowa Waste Systems, Inc. v. Buchanan County,* 617 N.W.2d 23 (Iowa Ct.App. 2000) (distinguishing between quantum meruit and unjust enrichment theories). Nor would it have been necessary, even in the absence of this clarification, to consider IANR's contentions that Helm is not entitled to recover rent or repair costs for the MKCX locomotives under a breach-of-contract theory, because Helm simply never asserted a breach-of-contract claim regarding these two locomotives. *See* Helm's Complaint, Count III. Finally, IANR's affirmative defense asserting no privity of contract is inapposite where no contract claim regarding the MKCX locomotives is asserted against IANR.

MKCX locomotives in terms of both Iowa and California law, IANR specifically contends that Iowa law should apply to this dispute under Iowa's choice-of-law rules. Although IANR has made no showing that there is any true conflict of law between California and Iowa on an unjust enrichment claim, *see L & L Builders Co.*, 46 F.Supp.2d at 881 ("Ordinarily, before any choice of law need be made, there must be a 'true conflict' between the laws of the possible jurisdictions on the pertinent issue.") (citing *Harlan Feeders*, 881 F.Supp. at 1404, in turn citing, *inter alia, Nesladek*, 46 F.3d at 736), and the court suggested above, in reference to IANR's unjust enrichment counterclaim regarding two of the IANR locomotives, that there is no apparent substantive difference, the court concludes that Iowa law applies to Helm's unjust enrichment claim regarding the MKCX locomotives. This is so, in light of the circumstances of this case and the pertinent factors in Iowa's choice-of-law test based on which forum has the most significant relationship, *see, e.g., Veasley v. CRST Intern., Inc.*, 553 N.W.2d 896, 897 (Iowa 1996) (recognizing Iowa's

adoption of the "most significant relationship" test, as embodied in RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 145 & 6),[11] and Helm's concession that Iowa law may apply.

As the Iowa Supreme Court recently explained,

> The doctrine of unjust enrichment is based on the principle that a party should not be permitted to be unjustly enriched at the expense of another or receive property or benefits without paying just compensation. *Credit Bureau Enters., Inc. v. Pelo*, 608 N.W.2d 20, 25 (Iowa 2000). Although it is referred to as a quasi-contract theory, it is equitable in nature, not contractual. *See Iowa Waste Sys., Inc. v. Buchanan County*, 617 N.W.2d 23, 29 (Iowa Ct. App.2000). It is contractual only in the sense that it is based on an obligation that the law creates to prevent unjust enrichment. *See id.* at 29–30.

> The doctrine of unjust enrichment serves as a basis for restitution. *Smith*, 325 N.W.2d at 94. It may arise from contracts, torts, or other predicate

---

**11.** In *Veasley,* the Iowa Supreme Court explained the test as follows:

> The most significant relationship test is that which is stated as follows in the Restatement (Second) Conflict of Laws:
>
> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
>
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicile, residence, nationality, place of incorporation, and place of business of the parties, and

> (d) the place where the relationship, if any, between the parties is centered.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.
>
> *Restatement (Second) Conflict of Laws* § 145 (1971).

*Veasley,* 553 N.W.2d at 897–98. The parties do not plainly contest, and the court finds, without the need for further elaboration, that these factors weigh in favor of applying the law of Iowa to Helm's claim to recover rent and repair costs for the MKCX locomotives, not least because the MKCX locomotives were used in Iowa, so that Iowa is where any relationship between Helm and IANR regarding those locomotives was centered and the place where any conduct causing injury to Helm occurred, as well as the place of business of IANR. *See id.* (pertinent factors).

wrongs, or it may also serve as independent grounds for restitution in the absence of mistake, wrongdoing, or breach of contract. See 1 *Dobbs*, § 4.1(1), at 553.

Recovery based on unjust enrichment can be distilled into three basic elements of recovery. They are: (1) defendant was enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiff; and (3) it is unjust to allow the defendant to retain the benefit under the circumstances. See *Credit Bureau Enters., Inc.*, 608 N.W.2d at 25; *West Branch State Bank v. Gates*, 477 N.W.2d 848, 851–52 (Iowa 1991).

*State, Dept. of Human Services ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 154–55 (Iowa 2001) (footnotes omitted) (*Palmer*). The court in *Palmer* explained that lack of a remedy at law had sometimes been characterized as an element of an "unjust enrichment" claim, but explained, "The adequacy of a legal remedy is a general limitation on the exercise of equity jurisdiction and is properly considered when restitution is sought in equity, but no independent principle exists that restricts restitution to cases where alternative remedies are inadequate." *Palmer*, 637 N.W.2d at 154 n. 2. In addition, in *Palmer*, the Iowa Supreme Court clarified the "critical inquiry" on the second element of such a claim, as follows:

> We recognize unjust enrichment is a broad principle with few limitations. We have never limited this principle to require the benefits to be conferred directly by the plaintiff. See *Iconco v. Jensen Constr. Co.*, 622 F.2d 1291, 1301–02 (8th Cir.1980) (plaintiff not required to show he directly conferred benefit on defendant under Iowa law). Instead, benefits can be direct or indirect, and can involve benefits conferred by third parties. See I *Palmer*, § 1.7, at 40–41,

44. The critical inquiry is that the benefit received be at the expense of the plaintiff. See *Guldberg v. Greenfield*, 259 Iowa 873, 878, 146 N.W.2d 298, 301 (1966).

*Palmer*, 637 N.W.2d at 155.

With these principles of the governing law in mind, the court turns to consideration of the parties' cross-motions for summary judgment on Helm's unjust enrichment claim.

### 4. The record in light of governing law

■ There is no genuine issue of material fact as to the first element of Helm's unjust enrichment claim, whether "[IANR] was enriched by the receipt of a benefit." *Palmer*, 637 N.W.2d at 154–55. IANR does not dispute that it had the use and possession of the MKCX locomotives from May 2000 to December 2000, which was plainly a "benefit" enjoyed by IANR. See *id.* at 154 (identifying the basis for a claim as, *inter alia*, receiving property). Thus, this first element of Helm's claim is established as a matter of law.

The second element of Helm's claim is that "the enrichment was at the expense of [Helm]." *Id.* at 155. In light of *Palmer*, IANR's contentions that it received the MKCX locomotives from CDAC, not Helm, do not stand as any bar to Helm's claim of unjust enrichment. The question is not from whom IANR received the locomotives, because the provision of the benefit upon which an unjust enrichment claim is based "can be direct or indirect, and can involve benefits conferred by [a] third part[y]," in this case, CDAC. See *Palmer*, 637 N.W.2d at 155. Instead, "[t]he critical inquiry is that the benefit received be at the expense of the plaintiff." *Id.* There is no genuine dispute that the benefit of use and possession of the MKCX locomotives by IANR was at Helm's expense, where

Helm was the owner and lessor of the locomotives, because MK Rail Corporation assigned the lease to Helm on May 9, 1996, during Helm's purchase of MK Rail Corporation, several years before CDAC provided the locomotives to IANR, *see* Helm's Appendix to First Motion for Summary Judgment, Exhibit 15 (CDAC Lease) & Exhibit 16 (CDAC Lease Assignment and Assumption), but Helm was not paid rent or repair costs for the period IANR was in possession of the locomotives. Thus, the second element of Helm's claim of unjust enrichment is also established as a matter of law.

The "fighting issue," then, is the third element of Helm's claim, which is whether "it is unjust to allow [IANR] to retain the benefit under the circumstances," *i.e.*, whether it is unjust to allow IANR to enjoy the use and possession of the MKCX locomotives for several months without compensating Helm. *Palmer*, 637 N.W.2d at 155. IANR contends that there is no such injustice, because IANR was using the locomotives with the permission of the lawful lessee, CDAC; IANR compensated CDAC for use of the locomotives, under the terms of the power-sharing agreement between the two railroads; and Helm was aware of IANR's use and possession of the locomotives at or shortly after IANR received the locomotives, acquiesced in IANR's use and possession, but continued to bill CDAC monthly rent for the entire time that IANR possessed the locomotives. Helm, however, contends that the power-sharing agreement between IANR and CDAC is irrelevant and it is undisputed that IANR did not pay Helm either rent or repair costs for its use of the MKCX locomotives.

The court agrees that it is undisputed that IANR never paid *Helm* for rent or repairs to the MKCX locomotives. For example, in IANR's Amended Response to Helm's Statement of Facts Submitted in Resistance to Helm's [First] Motion for Summary Judgment, IANR expressly "admit[ted] that it has never paid HELM rent" for the MKCX locomotives. *See* IANR's Amended Response to Helm's Statement of Facts Submitted in Resistance to Helm's [First] Motion for Summary Judgment (May 6, 2002), ¶ 14. However, IANR asserts, in its own Statement of Material Facts in support of its own motion for partial summary judgment regarding the MKCX locomotives, that it compensated CDAC for use of the locomotives via the power-sharing agreement between those two parties, because CDAC owed IANR locomotive power. Statement of Material Facts Re: [IANR's] Second Motion For Partial Summary Judgment Re: Locomotives MKCX 4302 and MKCX 4303 at ¶ 10. IANR also asserts the following:

> 25. At all times during IANR's use and possession of the MKCX 4302 and MKCX 4303, pursuant to the CDAC–IANR power sharing agreement—and with Helm's full knowledge of that fact—Helm had appropriately invoiced CDAC for them, pursuant to the MK Rail Lease, as assigned to Helm. Helm had never invoiced or billed IANR for use of these units. [Plaintiff's Second Supplemental Response to IANR's Request for Production Nos. 13 and 14, Pages S46785–S46792, App. 259–266]

Statement of Material Facts Re: [IANR's] Second Motion For Partial Summary Judgment Re: Locomotives MKCX 4302 and MKCX 4303 at ¶ 25. The reference to IANR's Appendix for supporting evidence does, indeed, identify invoices sent by Helm to CDAC for rent on the MKCX locomotives from May 2000 through November 2000. IANR's Appendix Re: First and Second Motions for Partial Summary Judgment at 259–66. The parties

agree that the MKCX locomotives were returned to Helm in December 2000.

Helm's "responses" to these two factual allegations are not fully responsive to the factual assertions made therein. Rather, Helm responded to IANR's statement that IANR used the MKCX locomotives pursuant to the power-sharing agreement with CDAC, because CDAC owed IANR power, by asserting that, although the power-sharing agreement between IANR and CDAC is referenced in the IANR Lease, the IANR Lease nowhere references the MKCX locomotives, and that the power-sharing agreement was an inducement for Helm to enter into the IANR Lease, so that it cannot be used as an excuse for IANR not to pay rent and expenses for its use of the MKCX locomotives. *See* Helm's Response to Statement of Material Facts: Re [IANR's] Second Motion for Partial Summary Judgment Re: Locomotives MKCX 4302 and MKCX 4303 at ¶ 10. Thus, this "response" does not deny or point to any record evidence genuinely putting at issue whether IANR fully compensated CDAC for use of the MKCX locomotives. As to IANR's allegation that Helm invoiced CDAC for rent on the MKCX locomotives for the entire time the locomotives were in IANR's possession, Helm responded only as follows:

> 25. Helm admits it did not bill Iowa Northern for its use of the locomotives. Helm had no contract with Iowa Northern for the MKCX units. In light of the above-referenced provisions in the Iowa Northern Lease Agreement concerning the power sharing agreement, the power sharing agreement cannot be used as an excuse by Iowa Northern to not pay rents and expenses arising out of its use of the locomotives.

*Id.* at ¶ 25. Thus, this response does not deny or "qualify" IANR's factual statement that Helm *billed CDAC* for rent on the locomotives during the time that IANR possessed them. Neither of Helm's responses designates any "specific facts showing that there is a genuine issue for trial" on the questions of whether IANR compensated CDAC for use of the MKCX locomotives (or offset that use against power owed to it by CDAC, which amounts to the same thing) or whether Helm billed CDAC for rent on the locomotives. FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka,* 122 F.3d at 562; *McLaughlin,* 50 F.3d at 511; *Beyerbach,* 49 F.3d at 1325. Therefore, under the circumstances presented by the undisputed facts, as a matter of law, IANR was not "unjustly enriched" by its use of the MKCX locomotives, even if Helm was not compensated directly by IANR, because IANR compensated CDAC for use of the locomotives by offsetting that use against power CDAC owed IANR under their power-sharing agreement.

Moreover, to the extent that Helm was *never* compensated for use of the MKCX locomotives during the period that the locomotives were in IANR's possession, Helm's proper remedy is against its lessee, CDAC. Although "no independent principle exists that restricts restitution to cases where alternative remedies are inadequate," the Iowa Supreme Court explained in *Palmer* that "[t]he adequacy of a legal remedy is a general limitation on the exercise of equity jurisdiction and is properly considered when restitution is sought in equity." *Palmer,* 637 N.W.2d at 154 n. 2. Helm has expressly clarified that its action to recover rent and repair costs for the MKCX locomotives from IANR is under the equitable doctrine of unjust enrichment. *See, e.g.,* Helm's Reply to Defendant's Brief and Amended Brief in Support of Resistance to [Helm's First] Motion for Summary Judgment at 10 & n. 4. Thus, the "general limitation" is applicable here, and the availability of an action at law by

Helm to recover rent and repair costs from CDAC defeats Helm's equitable claim of unjust enrichment against IANR. Indeed, Helm has brought such a law action against CDAC in litigation in Maine. Helm specifically asserts that it will not seek a double recovery in the two actions and apparently has settled its claims against CDAC. However, neither circumstance can revive Helm's unjust enrichment action against IANR, even if Helm's settlement with CDAC did not provide Helm with any recovery for the period that IANR used and possessed the MKCX locomotives, because Helm bore the risk that its unjust enrichment claim against IANR would fail.

IANR is entitled to summary judgment on Helm's claim for unjust enrichment based on IANR's use and possession of the MKCX locomotives. Also, because Helm's claim fails as a matter of law, the court need not reach the question of whether either party is entitled to summary judgment on any of IANR's affirmative defenses to that claim.

### F. IANR's Counterclaim For Tortious Interference With Business

Finally, the court must consider IANR's second counterclaim of tortious interference with business. *See* IANR's First Amended Answer, Affirmative Defenses, and Counterclaim, Counterclaim Count II. It appears from the pleading of the counterclaim that it is premised on Helm's conduct with respect to both the IANR and MKCX locomotives. *See id.* at ¶ 52 (incorporating by reference allegations pertaining to both the IANR and MKCX locomotives). Moreover, IANR argues in its resistance to Helm's motion for summary judgment on this counterclaim that there are genuine issues of material fact as to whether Helm tortiously interfered with IANR's existing contracts and business expectancies by failing to supply locomotives

under the IANR Lease that were capable of supplying 2,000 horsepower of traction and by unilaterally shutting down IANR's locomotive power in late 2000, *i.e.*, by demanding return of both the IANR and MKCX locomotives. Helm has also moved for summary judgment on this counterclaim.

### 1. Arguments of the parties

Helm argues that it is entitled to summary judgment on this counterclaim under either California or Iowa law, because Helm contends that it did not intentionally or improperly interfere with any contract or business expectancy of IANR by exercising its rights under the IANR Lease, and in so doing, offering IANR thirty days to find replacement locomotives before the IANR locomotives were to be returned to Helm's possession. Similarly, Helm contends that IANR had no possessory right to the MKCX locomotives, so that Helm could not have acted improperly in demanding that IANR return those locomotives to Helm. Helm also contends that the record is devoid of any evidence that it acted with the intent to injure IANR, rather than to protect its own legitimate business interests.

IANR, however, contends that it has generated genuine issues of material fact that, notwithstanding Helm's knowledge of the importance of supplying 2,000 horsepower GP–38 locomotives in order for IANR to secure shipping business from several of its clients, Helm failed to supply locomotives capable of supplying 2,000 horsepower of traction, with resulting damage to IANR. IANR also contends that it has generated genuine issues of material fact that Helm's actions in unilaterally shutting down IANR's locomotive power in late 2000 interfered with IANR's contractual relationships with shippers,

whose existence was known to Helm, and that IANR suffered damage as a result.

In reply, Helm reiterates that IANR has not generated any genuine issues of material fact that Helm acted intentionally to harm IANR or that its conduct was improper.

### 2. *The governing law*

 Helm relies on both Iowa and California law as stating essentially identical elements of IANR's tortious interference claim, while IANR relies exclusively on Iowa law. The court need not make a choice of law, because it finds no true conflict in the law of California and Iowa on this counterclaim. *See L & L Builders Co.,* 46 F.Supp.2d at 881 ("Ordinarily, before any choice of law need be made, there must be a 'true conflict' between the laws of the possible jurisdictions on the pertinent issue.") (citing *Harlan Feeders,* 881 F.Supp. at 1404, in turn citing, *inter alia, Nesladek,* 46 F.3d at 736). The elements of a claim of tortious interference with existing contracts, under both Iowa and California law, are the following: (1) the plaintiff had a valid contractual relationship with a third party; (2) the defendant knew of that relationship; (3) the defendant intentionally interfered with that relationship; (4) the defendant's action caused the third party to breach its contractual relationship with the plaintiff or disrupted the contractual relationship between the third party and the plaintiff by making performance more burdensome or expensive; and (5) the amount of damages. *See, e.g., Grimm v. U.S. West Communications, Inc.,* 644 N.W.2d 8, 11–12 (Iowa 2002); *Revere Transducers, Inc. v. Deere & Co.,* 595 N.W.2d 751, 763 (Iowa 1999); *accord PMC, Inc. v. Saban Entertainment, Inc.,* 45 Cal.App.4th 579, 595, 601, 52 Cal.Rptr.2d 877, 886 (1996). The elements of the tort of interference with a prospec-

tive business advantage or contractual relationship, under both Iowa and California law, are the following: (1) the plaintiff had a prospective contractual or business relationship; (2) the defendant knew of the prospective relationship; (3) the defendant intentionally and improperly interfered with the relationship; (4) the defendant's interference caused the relationship to fail to materialize; and (5) the amount of resulting damages. *See, e.g., Blumenthal Inv. Trusts v. City of West Des Moines,* 636 N.W.2d 255, 269 (Iowa 2001); *accord Westside Center Associates v. Safeway Stores 23, Inc.,* 42 Cal.App.4th 507, 521–522, 49 Cal.Rptr.2d 793 (1996). Thus, both claims have as an element the impropriety or wrongfulness of the defendant's conduct. That impropriety or wrongfulness must be "by some legal measure other than the fact of interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 11 Cal.4th 376, 45 Cal.Rptr.2d 436, 902 P.2d 740, 751 (1995); *accord Compiano v. Hawkeye Bank & Trust,* 588 N.W.2d 462, 464 (Iowa 1999) (a defendant's conduct is improper only if it is undertaken with "the sole or predominant purpose to injure or financially destroy" another, and is not "improper" if it is a necessary consequence of actions taken for a different purpose); RESTATEMENT (SECOND) OF TORTS § 766B cmt. d & § 767.

### 3. *The record in light of governing law*

 Although IANR may have generated genuine issues of material fact on other elements of its tortious interference claim, either as to interference with existing or prospective contractual or business relationships, it has not generated any genuine issues of material fact that the alleged "interference" by Helm was, in some legal sense, "wrongful" apart from the interference. *See Della Penna,* 45 Cal. Rptr.2d 436, 902 P.2d at 751; *Compiano,*

588 N.W.2d at 464; RESTATEMENT (SECOND) OF TORTS § 766B cmt. d. & § 767. IANR asserts only that there are genuine issues of material fact as to Helm's knowledge of IANR's need for 2,000 horsepower locomotives and its failure to provide them, but not that Helm failed to supply locomotives supplying the required horsepower *to harm IANR.* Indeed, the court has reiterated that providing locomotives capable of providing 2,000 horsepower of traction was not a term or the "essence" of the IANR Lease, so that it cannot be "wrongful," in any legal sense, for Helm not to have provided such locomotives. Similarly, IANR has alleged that, as to Helm's demands for return of the locomotives in late 2000, Helm unilaterally shut down IANR's locomotive power, thus interfering with IANR's contractual relationships with shippers, whose existence was known to Helm, and that IANR suffered damage as a result, but nowhere asserts any genuine issue of material fact that Helm acted "wrongfully," in some legal sense, by doing so. In short, Helm has pointed to the portions of the record establishing its legal right to demand return of the IANR and MKCX locomotives in late 2000, but IANR has not met its burden to designate "specific facts showing that there is a genuine issue for trial" on the "wrongfulness" of Helm's demands for return of those locomotives. FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka,* 122 F.3d at 562; *McLaughlin,* 50 F.3d at 511; *Beyerbach,* 49 F.3d at 1325.

Helm is entitled to summary judgment in its favor on IANR's counterclaim of interference with existing or prospective contractual or business relationships.

## V. CONCLUSION

Helm has established that it is entitled to summary judgment on IANR's *liability* for unpaid rent and repair costs on the IANR locomotives and IANR's affirmative defenses to the contrary, including IANR's affirmative defense of the unconscionability of certain provisions of the IANR Lease. However, neither party is entitled to summary judgment on the question of the repairs in question or the amount of unpaid rent, repair costs, attorney fees, or interest. Helm has also established that it is entitled to summary judgment on all of IANR's counterclaims. For its part, IANR has established that it is entitled to summary judgment on Helm's claim for unjust enrichment seeking unpaid rent and repair costs for the MKCX locomotives. Thus, only the "damages" portion of Helm's claim for breach of the IANR Lease remains for trial.

THEREFORE,

1. Helm's November 19, 2001, motion for summary judgment is **granted** as to liability of IANR on Count II of Helm's Complaint alleging breach of the IANR Lease and as to IANR's counterclaims of breach of lease (Counterclaim Count I), tortious interference with business (Counterclaim Count II), and punitive damages (Counterclaim Count III) in their entirety. However, this motion for summary judgment is **denied** as to damages on Helm's breach-of-contract claim (Complaint Count II).

2. IANR's first motion for partial summary judgment, filed February 19, 2002, seeking summary judgment on IANR's first affirmative defense of unconscionability of certain provisions of the IANR Lease, is **denied** in its entirety.

3. IANR's second motion for partial summary judgment, also filed February 19, 2002, seeking summary judgment on Count III of Helm's Complaint, captioned quantum meruit and asserting that IANR was unjustly enriched regarding the MKCX locomotives at issue in this case, is **granted** in its entirety.

4. Helm's second motion for summary judgment, on April 15, 2002, seeking summary judgment on IANR's remaining affirmative defenses and counterclaims is

a. **granted** as to IANR's first affirmative defense of unconscionability; fourth affirmative defense of failure of consideration; fifth affirmative defense of failure to mitigate damages, as to Count II of Helm's Complaint asserting breach of the IANR Lease; sixth affirmative defense of frustration of purpose, seventh affirmative defense of breach of contract; and eighth affirmative defense of modification of contract;

**AND**

c. **granted** as to IANR's counterclaims for breach of express warranties (Counterclaim Count IV); breach of implied warranties of fitness for a particular purpose (Counterclaim Count V); breach of implied warranty of merchantability (Counterclaim Count VI); breach of implied warranty of the capacity of the equipment (Counterclaim Count VII); breaches of covenants of good faith and fair dealing (Counterclaim Count VIII); and quantum meruit (Counterclaim Count IX);

**BUT**

c. **denied as moot** as to IANR's second affirmative defense of judicial estoppel; third affirmative defense of no privity of contract regarding the MKCX locomotives; and fifth affirmative defense of failure to mitigate damages as to Count III of Helm's Complaint seeking quantum meruit or unjust enrichment regarding the MKCX locomotives.

5. IANR's March 29, 2002, motion to strike, in whole or in part, the affidavit of Francois Bernard is **granted** as to paragraph 6 of Mr. Bernard's affidavit, and the court has not considered that paragraph in its disposition of the parties' cross-motions

for summary judgment, but the motion to strike is otherwise **denied**.

6. IANR's March 29, 2002, motion to strike, in whole or in part, the affidavit of Philip J. Warner is **denied** in its entirety.

7. a. Helm's May 13, 2002, motion to strike IANR's resistance to Helm's motion for summary judgment on IANR's first amended affirmative defenses and counterclaim is **denied**; and

b. IANR's May 13, 2002, request for leave to file a belated statement of additional material facts in resistance to Helm's second motion for summary judgment is **granted**.

8. a. Helm's May 13, 2002, motion to strike IANR's amended response to Helm's statement of fact submitted in resistance to Helm's first motion for summary judgment is **denied**; and

b. IANR's request for leave to file its amended response is **granted**.

**IT IS SO ORDERED.**

## MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFF'S MOTION TO CORRECT MISTAKE IN ORDER AND PLAINTIFF'S MOTION TO ALTER OR AMEND JUDGMENT

This matter comes before the court pursuant to plaintiff Helm's June 6, 2002, "Motion to Correct Mistake in Order," and Helm's June 7, 2002, "Motion to Alter or Amend Judgment." Both motions challenge portions of this court's May 31, 2002, Memorandum Opinion and Order Regarding the Parties' Cross-motions for Summary Judgment. The first motion challenges the court's denial of that part of Helm's motions for summary judgment seeking unpaid rent on the IANR locomotives at issue in this litigation, while the second motion challenges this court's granting of IANR's motion for summary

judgment on Helm's claim of unjust enrichment concerning the MKXC locomotives also at issue in this litigation.

As this court recently explained in *EEOC v. American Home Products Corp.*, 165 F.Supp.2d 886 (N.D.Iowa 2001), although the Federal Rules of Civil Procedure do not seem to provide any basis for a motion to reconsider this court's *granting* of partial summary judgment, that means that this court actually has more, rather than less, discretion to alter or amend such an interlocutory order than is provided by either Rule 59(e) or Rule 60(b) of the Federal Rules of Civil Procedure. *See American Home Prods. Corp.*, 165 F.Supp.2d at 892. This court has also held that courts retain the power to reconsider and revise an order *denying* summary judgment, which is also interlocutory in nature, up until the time a final judgment is entered. *See Longstreth v. Copple*, 189 F.R.D. 401, 403 (N.D.Iowa 1999). Therefore, the court has the authority to correct, reconsider, alter, or amend the challenged portions of its May 31, 2002, Memorandum Opinion and Order Regarding the Parties' Cross-motions for Summary Judgment, should the court decide that it is appropriate or necessary to do so. Under the circumstances presented here, the court finds it unnecessary to wait for IANR's resistance to Helm's motions to correct, alter, or amend, if any, before ruling on them.

In its "Motion to Correct Mistake in Order," Helm contends that the court apparently "overlooked" the fact that there is no genuine issue of material fact that IANR owes Helm $103,020.00 in unpaid rent on the IANR locomotives, nor is there any genuine issue of material fact on the amount of interest on unpaid rent, as calculated pursuant to the terms of the IANR Lease ($24,576.58 as of May 31, 2002, plus interest accruing from June 1, 2002, forward until paid). Helm contends that it conceded only that there were genuine issues of material fact as to the amount of repair costs, transportation and inspection expenses, and legal fees involving these locomotives to which it was entitled.

The court finds that, in its summary judgment ruling, it repeatedly recognized that IANR disputed whether any unpaid rent for the IANR locomotives was due, for various reasons, but neither the ruling nor the record properly indicates that IANR ever disputed the *amount* of unpaid rent. Moreover, at page 967 of its summary judgment ruling, the court noted that, as to the IANR locomotives "Helm ... concedes that the *amount* of repair costs, interest due on past due rent, and attorney fees may be subject to genuine issues of material fact." Memorandum Opinion and Order Regarding the Parties' Cross-motions for Summary Judgment, May 31, 2002, at 967 (emphasis in the original). It was as to *the MKCX locomotives* that the court later found, on page 92 of its ruling, that "Helm concedes ... that the amounts of rent and repair costs that it is entitled to recover from IANR are subject to genuine issues of material fact." *Id.* at 990. Thus, Helm is correct that there are no genuine issues of material fact as to the amount of unpaid rent on the IANR locomotives.

Therefore, the summary judgment ruling should, indeed, be "corrected" to state that Helm is entitled to summary judgment regarding the IANR locomotives not just as to IANR's liability for unpaid rent and interest thereon, but also as to damages for unpaid rent in the amount of $103,020.00. However, the court does not agree that it must necessarily enter summary judgment for interest on unpaid rent on the IANR locomotives through June 1, 2002, even assuming that there is no genuine issue of material fact as to how that interest would be calculated under the

terms of the IANR Lease. Rather, because the court already concluded that IANR is liable to Helm for interest on unpaid rent on the IANR locomotives under the terms of the IANR Lease, but that interest continues to accrue, and the rate varies over time, the amount of interest on unpaid rent does not need to be determined until *final* judgment is entered. Thus, Helm's June 6, 2002, "Motion to Correct Mistake in Order" will be granted in part and denied in part.

In Helm's June 7, 2002, "Motion to Alter or Amend Judgment," Helm contends that the court improperly concluded that IANR was not "unjustly enriched" by use of the MKCX locomotives, which were on loan to IANR from CDAC, but were subject to a lease to CDAC held by Helm, even if IANR did not pay Helm any rent for its use of those locomotives, because IANR had somehow established that it had "compensated" the proper lessee, CDAC, for its use of the MKCX locomotives. Helm contends that the evidence submitted by IANR in support of its claim that it had paid or compensated CDAC for its use of the MKCX locomotives does not support that claim. This is so, Helm contends, because IANR never submitted the power-sharing agreement between CDAC and IANR to the summary judgment record and, Helm contends, the affidavits offered instead support only a conclusion that CDAC owed IANR power under the power-sharing agreement, and transferred the MKCX locomotives to IANR to satisfy that "debt," but not how or when CDAC incurred such a "debt." In short, Helm contends that the affidavits do not establish that IANR paid or otherwise compensated CDAC for use of the locomotives. In a footnote in its brief in support of this motion, Helm also contends that the court improperly concluded that Helm had an adequate legal remedy against CDAC, the proper lessee of the MKCX locomotives,

again relying on language from an opinion of the Iowa Supreme Court stating that "no independent principle exists that restricts restitution to cases where alternative remedies are inadequate." These contentions are without merit.

First, Helm now contends that it is impossible to determine whether IANR compensated CDAC for use of the MKCX locomotives without the power-sharing agreement between those two railroads being part of the summary judgment record, but at the time the court was considering the summary judgment motions, Helm contended that the power-sharing agreement was "irrelevant." Helm can't have it both ways. Next, the court adequately addressed Helm's present sufficiency-of-the-evidence arguments on pages 98–101 of its summary judgment ruling. The court found the record evidence submitted by IANR was sufficient to demonstrate that IANR used the MKCX locomotives pursuant to the power-sharing agreement between CDAC and IANR, under which CDAC owed IANR locomotive power, and that IANR had thus "compensated" CDAC for use of the MKCX locomotives, and that Helm knew of IANR's use of the MKCX locomotives, but continued to invoice CDAC for rent for the entire time that IANR was using those locomotives. The court also detailed Helm's failure to genuinely dispute these factual averments. Therefore, the court reaffirms its conclusion that, under the circumstances presented by the undisputed facts, as a matter of law, IANR was not "unjustly enriched" by its use of the MKCX locomotives, even if Helm was not compensated directly by IANR, because IANR compensated CDAC for use of the locomotives by offsetting that use against power CDAC owed IANR under their power-sharing agreement.

Moreover, Helm misrepresents or simply fails to understand the court's conclu-

sions concerning the impact of an adequate remedy at law—in this case, an action at law by Helm against CDAC—as a jurisdictional bar to Helm's unjust enrichment claim against IANR concerning the MKCX locomotives. This court expressly recognized that, in *Iowa Dept. of Human Services ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142 (Iowa 2001), the Iowa Supreme Court stated that "no independent principle exists that restricts restitution to cases where alternative remedies are inadequate." *Palmer*, 637 N.W.2d at 154 n. 2. However, as this court also explained, in *Palmer*, the Iowa Supreme Court continued by stating that "[t]he adequacy of a legal remedy is a general limitation on the exercise of equity jurisdiction and is properly considered when restitution is sought *in equity.*" *Palmer*, 637 N.W.2d at 154 n. 2 (emphasis added). This court then found that Helm had expressly clarified that its action to recover rent and repair costs for the MKCX locomotives from IANR is under the *equitable doctrine of unjust enrichment. See, e.g.,* Helm's Reply to Defendant's Brief and Amended Brief in Support of Resistance to [Helm's First] Motion for Summary Judgment at 10 & n. 4. Thus, the "general limitation" identified in *Palmer* is applicable here, and the availability of an action at law by Helm to recover rent and repair costs for the MKCX locomotives from CDAC defeats Helm's equitable claim of unjust enrichment against IANR concerning those same locomotives. The court also now reaffirms this alternative—and entirely sufficient—basis for granting IANR's motion for summary judgment on Helm's unjust enrichment claim concerning the MKCX locomotives.

THEREFORE,

1. Helm's June 6, 2002, "Motion to Correct Mistake in Order" is **granted** to the extent that the court's May 31, 2002,

summary judgment ruling is amended to state that Helm is entitled to summary judgment to the further extent that IANR is liable for damages for unpaid rent on the IANR locomotives in the amount of $103,020.00. Helm's June 6, 2002, "Motion to Correct Mistake in Order" is otherwise **denied**.

2. Helm's June 7, 2002, "Motion to Alter or Amend Judgment" is **denied in its entirety**.

**IT IS SO ORDERED**.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION TO ALTER OR AMEND JUDGMENT

This matter comes before the court pursuant to defendant IANR's June 12, 2002, "Motion to Alter or Amend Judgment." IANR's motion, like Helm's prior motions to correct and to alter and amend judgment, challenges portions of this court's May 31, 2002, Memorandum Opinion and Order Regarding the Parties' Cross-motions for Summary Judgment. IANR contends that the court erred as a matter of law and fact in granting summary judgment on the parties' various claims, defenses, and counterclaims concerning breach of the IANR Lease.

As this court recently explained in *EEOC v. American Home Products Corp.*, 165 F.Supp.2d 886 (N.D.Iowa 2001), although the Federal Rules of Civil Procedure do not seem to provide any basis for a motion to reconsider this court's *granting* of partial summary judgment, that means that this court actually has more, rather than less, discretion to alter or amend such an interlocutory order than is provided by either Rule 59(e) or Rule 60(b) of the Federal Rules of Civil Procedure. *See American Home Prods. Corp.*, 165 F.Supp.2d at 892. This court has also held that courts retain the power to reconsider

and revise an order *denying* summary judgment, which is also interlocutory in nature, up until the time a final judgment is entered. *See Longstreth v. Copple,* 189 F.R.D. 401, 403 (N.D.Iowa 1999). Therefore, the court has the authority to alter or amend the portions of its May 31, 2002, Memorandum Opinion and Order Regarding the Parties' Cross-motions for Summary Judgment, in light of IANR's challenges, should the court decide that it is appropriate or necessary to do so. As with the court's disposition of Helm's prior motions to correct, alter, or amend the same summary judgment ruling, under the circumstances presented here, the court finds it unnecessary to wait for the opposing party's resistance before ruling on the present motion to alter or amend the May 31, 2002, ruling.

In its motion to alter or amend, IANR contends that the court erred as a matter of law and fact in concluding that the parties did not reach an agreement on the terms of an amended lease in the form of Helm's September 29, 2000, offer and IANR's October 6, 2000, response—an agreement that IANR contends Helm subsequently breached. Specifically, IANR contends that there are at least genuine issues of material fact, under the proper legal standard, that its addition of terms to Helm's September 29, 2000, offer did not constitute a "counteroffer" that Helm never accepted. IANR also contends that the court mistakenly relied on IANR's purported failure to generate genuine issues of material fact regarding Helm's or the industry's practice to allow inspections prior to leasing locomotives *in 1995,* when the pertinent time frame of the disputed lease amendment was *September to October of 2000.* IANR contends that these errors require reinstatement of its counterclaim for breach of contract regarding the IANR Lease, as well as trial on Helm's breach-of-contract claim regarding the IANR loco-

motives and at least some of IANR's defenses to that claim.

The court acknowledges that there is, indeed, a typographical error on page 970 of the slip opinion of its ruling on the parties' cross-motions for summary judgment. Because of that typographical error, the court misidentified the time period for which IANR failed to generate a genuine issue of material fact as to Helm's and the industry's practice on inspections of locomotives prior to leasing. The error should be corrected as follows, with strike-outs showing deletions and bold text showing corrections:

[Editor's Note: Correction incorporated in print publication.]

Memorandum Opinion and Order Regarding the Parties' Cross-motions for Summary Judgment, May 31, 2002, at 970. However, IANR disputes this conclusion, as a matter of law and fact, even as corrected, as well as certain other conclusions regarding the breach-of-contract claims, defenses, and counterclaims involving the IANR Lease.

IANR contends that the court erred, as a matter of law, by holding that the applicable standard for counteroffers under California law is the following: " '[T]erms proposed in an offer must be met exactly, precisely and unequivocally for its acceptance to result in the formation of a binding contract [citations]; and a qualified acceptance amounts to a new proposal or counteroffer putting an end to the original offer....' " *Panagotacos v. Bank of Am.,* 60 Cal.App.4th 851, 855–56, 70 Cal.Rptr.2d 595, 597 (1998) (quoting *Apablasa v. Merritt & Co.,* 176 Cal.App.2d 719, 726, 1 Cal.Rptr. 500 (1959)). IANR contends, instead, that the governing standard under California law is found in § 2207 of the California Commercial Code. There are several reasons why IANR's assertion of

this provision now as the applicable legal standard does not change the court's conclusions in the summary judgment ruling regarding claims involving the IANR Lease.

First, although Helm expressly cited and relied on the *Panagotacos* decision as stating the applicable standard under California law for determining whether the addition of terms to an offer constitutes a counteroffer, IANR never disputed that standard with a citation to any other authority, statutory or decisional, prior to its motion to alter or amend the summary judgment ruling. Certainly, nowhere in its briefing of the various cross-motions for summary judgment has the court found any reference by IANR to § 2207. The court was not required to accept IANR's unsupported assertion that some other legal standard should apply and IANR's failure to cite any authority for any different legal standard constitutes a waiver of its present contentions.

Moreover, under the standard as stated in *Panagotacos*, which IANR never properly disputed, this court correctly concluded that Pete Collins's handwritten addition to Helm's September 29, 2000, proposal, which stated, "Subject to inspection and approval by Iowa Northern," Helm's Appendix to First Motion for Summary Judgment at 42 (September 29, 2000, letter), constituted a counteroffer, because Collins's response did not constitute an "exac[t], precis[e] and unequivoca[l]" acceptance of Helm's offer. *Panagotacos*, 60 Cal.App.4th at 855–56, 70 Cal.Rptr.2d 595. As the court pointed out in its summary judgment ruling, Collins admitted in deposition that he did not consult with or obtain the agreement of anyone from Helm before making this addition. Helm's Appendix to First Motion for Summary Judgment at 86 (Deposition of Pete Collins at 84–85). IANR's counteroffer was never accepted, notwithstanding Mr. Collins's contention in his deposition that Helm must have accepted it by permitting IANR's inspector to examine proffered locomotives, because Helm never signified any "exac[t], precis[e] and unequivoca[l]" acceptance of IANR's counteroffer, *see Panagotacos*, 60 Cal.App.4th at 855–56, 70 Cal.Rptr.2d 595, instead refusing to make any of the repairs IANR requested after inspecting the proffered locomotives. Helm's Appendix to First Motion for Summary Judgment at 43 (Exhibit 9, Letter of October 31, 2000).

Second, even if § 2207 states the applicable standard, IANR failed to generate genuine issues of material fact that a binding agreement was reached to amend the IANR Lease in October 2000 on the basis of its submissions either prior to the court's summary judgment ruling or in its present motion to alter or amend that ruling. The statutory provision on which IANR now relies provides as follows:

**§ 2207. Additional terms in acceptance or confirmation**

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) The offer expressly limits acceptance to the terms of the offer;

(b) They materially alter it; or

(c) Notification of objection to them has already been given or is given within

a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this code.

CAL. COM. CODE § 2207. "Section 2207 replaces the common law 'mirror image' rule which required an acceptance to 'mirror' the offer, i.e., to reiterate all terms and conditions exactly," replacing it with a rule that "the common law counteroffer becomes an acceptance if it contains a 'definite and seasonable expression of acceptance' and, between merchants, the additional terms of the 'counteroffer' become a part of the contract." *Transwestern Pipeline Co. v. Monsanto Co.*, 46 Cal. App.4th 502, 514, 53 Cal.Rptr.2d 887, 893 (1996); *see also Steiner v. Mobil Oil Corp.*, 20 Cal.3d 90, 141 Cal.Rptr. 157, 569 P.2d 751, 757 (1977) ("Section 2207 rejects the 'mirror image' rule," replacing it with "inquir[y] as to whether the parties intended to complete an agreement"). However, "[t]he foregoing rule does not apply if the offeree expressly conditions its acceptance on the offeror's assent to the offeree's additional terms." *Transwestern Pipeline Co.*, 46 Cal.App.4th at 514, 53 Cal.Rptr.2d at 893 (citing § 2207(1)). Also, the statute itself states that the terms added by the offeree do not become part of the contract if any of three conditions is present: (1) "[t]he offer expressly limits acceptance to the terms of the offer," CAL. COM. CODE § 2207(2)(a); (2) the additional terms "materially alter" the offer, *id.* at § 2207(2)(b); or "[n]otification of objection to [the addi-

tional terms] has already been given or is given within a reasonable time after notice of them is received." *Id.* at 2207(2)(c).

Although Helm's September 29, 2000, offer plainly states that "[t]his letter will summarize Helm's current offer to supply locomotives to the Iowa Northern," *see* Helm's Appendix to First Motion for Summary Judgment at 42 (September 29, 2000, letter), which is a fairly emphatic suggestion that these terms, and no others, are acceptable to Helm, the court stops short of concluding, as a matter law, that Helm's offer expressly limited acceptance to the terms of the offer. *See* CAL. COM. CODE § 2207(2)(a). However, the court does conclude, as a matter of law, that IANR's acceptance was "expressly made conditional on assent to the additional or different terms." *See id.* at § 2207(1); *Transwestern Pipeline Co.*, 46 Cal.App.4th at 514, 53 Cal.Rptr.2d at 893 (citing § 2207(1)). Mr. Collins's handwritten addition expressly made IANR's acceptance "[s]ubject to inspection and approval by Iowa Northern." Helm's Appendix to First Motion for Summary Judgment at 42 (September 29, 2000, letter). As the California Court of Appeals has explained, "All that section 2207, subdivision (1) requires [to make acceptance conditional on assent to the offeree's additional terms] is a clear expression 'in a manner sufficient to notify the offeror that the offeree is unwilling to proceed with the transaction unless the additional or different terms are included in the contract.'" *PMC, Inc. v. Porthole Yachts, Ltd.*, 65 Cal.App.4th 882, 888, 76 Cal.Rptr.2d 832, 835 (1998). Making IANR's acceptance "subject to" the additional conditions of inspection and approval of the locomotives is, as a matter of law, "a clear expression 'in a manner sufficient to notify [Helm] that [IANR] is unwilling to proceed with the transaction unless the additional or different terms are included in the con-

tract.'" *Id.* Moreover, Helm pointed to record evidence that the right to inspect and approve the new locomotives was an important issue to IANR, *see* Helm's Statement of Material Facts in Support of Helm's Second Motion for Summary Judgment, ¶ 12, and IANR admitted that fact. *See* IANR's Response to Helm's Statement of Material Facts (Docket # 134, May 6, 2002). Helm never assented to the additional or different terms included by Mr. Collins, either in written form or by conduct, as explained more fully below.

Also, the court concludes, again as a matter of law, that the additional terms added to Helm's offer by Mr. Collins *did* "materially alter" Helm's offer. *See* CAL. COM. CODE § 2207(2)(b). Again, IANR has not properly generated a genuine issue of material fact that the right of inspection and approval of the locomotives was not "important" to IANR. Instead, IANR asserts that the additional terms did not materially alter Helm's offer, or that it has at least generated a genuine issue of material fact that the additional terms did not materially alter the offer, because it has pointed to record evidence that Helm's and the industry's practice recognized the right of a leasing party to inspect a locomotive prior to leasing or purchasing. In support of this contention in its motion to alter or amend, IANR points only to certain deposition testimony of Phil Warner, a vice president of Helm, consisting of the following exchange:

Q. You agree with me that inspecting locomotives by a potential lessee is a customary practice within the locomotive industry, you would expect that a railroad would want to inspect locomotives before leasing them?

A. I would say that in my experience in working with Helm in leasing and selling locomotives that perspective [sic] lessees and/or perspective [sic] buyers prefer to inspect the locomotives prior to leasing them or buying them.

IANR's Second Supplemental Appendix Re: First and Second Motions for Partial Summary Judgment and Helm's Motions for Summary Judgment Re: Amended Pleadings, 342 (Deposition of Phil Warner at p. 89, *ll.* 1–10). Although IANR may have asked the precise question concerning customary practice within the locomotive industry on inspections by lessees, IANR did not receive the kind of unequivocal affirmative response from Helm that could possibly be construed as an admission concerning industry practice. Rather, a statement by a representative of Helm that "pr[o]spective lessees ... *prefer* to inspect the locomotives prior to leasing them," *id.* (emphasis added), utterly fails to generate any genuine issue of material fact that it is either Helm's or the industry's practice *actually to permit* either inspection or approval of units offered pursuant to a lease.

Although IANR also repeatedly asserted prior to the court's summary judgment ruling that Helm's and the industry's practice was to permit inspection and approval, the court cannot find that IANR designated any record evidence generating genuine issues of material fact that it was Helm's practice to do so *in 2000*, that IANR knew or believed that it was Helm's practice to do so *in 2000*, or that it was the "industry practice" to do so *in 2000*.[1] For example, while disputing Helm's contention that Mr. Collins's additions constituted a counteroffer, IANR asserted "IANR's right to inspect, its right to expect that locomotives would meet minimal industry practices, and its right to expect that if the offered

1. *See supra,* page 1002 (correcting the time frame for which IANR failed to generate a genuine issue of material fact on Helm's or the industry's practice in this regard).

locomotives were deficient IANR would have the opportunity to look at others in Helm's inventory were in conformity with the negotiations, with Helm practices and with industry custom," such that "[t]he right to inspect required neither express description in the Amended Lease Agreement nor additional consideration." IANR's Response to Helm's Statement of Material Facts (Docket # 134, May 6, 2002), ¶ 12. However, IANR fails to cite with these assertions any portion of the record supporting them. *See id.* IANR's citation to deposition testimony of Francois Bernard, Helm's Chief Mechanical Officer, that he ordinarily required certain inspections and repairs prior to offering locomotives for lease, *see id.*, does not support a claim that *lessees* were ordinarily allowed to inspect or approve locomotives prior to accepting them pursuant to a lease as a matter of either Helm's or the industry's practice. Therefore, the court reaffirms its conclusion that IANR failed to designate specific facts showing that there is a genuine issue for trial on this issue. *See* Memorandum Opinion and Order Regarding the Parties' Cross-motions for Summary Judgment, May 31, 2002, slip op. at —— (as amended herein).

There are yet more grounds for rejecting IANR's attempts to alter or amend the summary judgment ruling concerning breach of the IANR Lease on the basis of its belated assertion that Cal. Com. Code § 2207 states the governing law. IANR asserts that the conduct of the parties indicates that there was agreement to the terms of the amended lease, including Mr. Collins's addition, because Helm permitted IANR to inspect the locomotives offered under the lease. The court acknowledges

that, under California law, "even if the offeree's acceptance is expressly made conditional on the offeror's assent to the offeree's additional terms, and no such assent is given, the existence of a contract and its terms may nevertheless be inferred if the parties' conduct recognizes the existence of a contract." *Transwestern Pipeline Co.,* 46 Cal.App.4th at 514, 53 Cal.Rptr.2d at 893 (citing § 2207(3)).[2] However, the court concludes that IANR has failed to generate any genuine issues of material fact that there was such a "contract inferred from conduct" here incorporating the additional terms added by Mr. Collins, because there was no conduct by Helm "recogniz[ing] the existence of a contract" including the "inspection and approval" terms. *See id.* Instead, Helm expressly objected to and rejected such terms by refusing to agree to the repairs demanded by IANR after IANR inspected the offered locomotives. In other words, while the additional terms required both "inspection and approval," and Helm may have permitted the "inspection," it never assented, in words or by conduct, to the "approval" part of IANR's additional term. Similarly, Helm's rejection on October 31, 2000, of the "approval" part of IANR's additional term, stated in IANR's October 6, 2000, response to Helm's offer, prevented the additional term from becoming part of the contract pursuant to § 2207(2)(c), because it constituted Helm's "[n]otification of objection to [the additional term] . . . given within a reasonable time after notice of [the additional term] [wa]s received."

In short, IANR's belated assertion that § 2207 of the California Commercial Code governs whether the terms it added to

---

**2.** The court notes that the statute provides that "[c]onduct by both parties which recognizes the existence of a contract is sufficient to establish a *contract for sale* although the writings of the parties do not otherwise establish a contract." Cal. Com. Code § 2207(3) (emphasis added). However, the court will assume, for the sake of argument, that this provision providing for "contract by conduct" also applies to a lease.

Helm's September 29, 2000, offer constituted a "counteroffer" does not change the disposition in the court's summary judgment ruling of any of the parties' claims, defenses, or counterclaims involving breach of the IANR Lease.

THEREFORE, IANR's June 12, 2002, "Motion to Alter or Amend Judgment" is **granted** to the extent that the court has corrected a typographical error on page 970 of the slip opinion of the May 31, 2002, Memorandum Opinion and Order Regarding the Parties' Cross-motions for Summary Judgment, as stated herein, but IANR's motion is otherwise **denied**.

IT IS SO ORDERED.